JONES DAY
Jane Rue Wittstein
Thomas E. Lynch
Andrew Butler
250 Vesey Street
New York, NY 10281
Tel: (212) 326-3939
Fax: (212) 755-7306
Email: jruewittstein@jonesday.com
Email: telynch@jonesday.com
Email: abutler@jonesday.com

*Attorneys for Reorganized Debtors*
 *NIU Holdings LLC and NII Holdings, Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

|  |  |
|---|---|
| In the matter of: | Chapter 11 |
| NIU Holdings LLC, | Case No. 15-10155 (SCC) |
| Reorganized Debtor. |  |

------------------------------------------------------- x

|  |  |
|---|---|
| NIU Holdings LLC, |  |
| Plaintiff, |  |
| v. | Adv. Proc. No. 19-01099 |
| AT&T Mobility Holdings, B.V.; New Cingular Wireless Services, Inc.; Nextel International (Uruguay) LLC; and Comunicaciones Nextel de México S.A. de C.V., |  |
| Defendants. |  |

------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF NIU HOLDINGS LLC
## AND NII HOLDINGS, INC. FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ............................................................................................................ 4

    A.    The Parties.............................................................................. 4

    B.    NIU and NII Sold Their Telecommunications Business in Mexico to New Cingular in 2015 as Part of Their Bankruptcies. ........................ 4

    C.    NIU Agreed to Indemnify New Cingular for Certain Potential Taxes and Damages; NII Agreed to Guarantee NIU's Obligations..................... 5

    D.    Ten Percent of the $1.875 Billion Sale Price Was Placed in Escrow to Be Distributed in Accordance with the Parties' Written Escrow Agreement. .......... 6

    E.    April 30, 2017 Was the Agreed "Final Release Date" Under the Escrow Agreement. By That Date, AT&T Needed to Assert All Claims Against the Escrow Account. After the Final Release Date, NIU Was Entitled to Receive All Excess Funds................................................ 7

    F.    On April 27, 2017, AT&T Submitted an Escrow Claim Notice to Assert Claims for Specific Amounts in the Escrow Account.......................... 8

    G.    AT&T Immediately Agreed to Release to NIU All Funds That Exceeded the Amount of All Claims Identified in Its April 2017 Claim Notice. ............11

    H.    On May 18, 2017, AT&T Reduced Its Claim Against the Escrow Account and Promptly Agreed to Release to NIU Escrow Funds Exceeding the Corrected Total of Its Claims..........................................11

    I.    NIU Timely Objected to AT&T's April 27, 2017 Escrow Claim Notice............12

    J.    The Parties Reached an Agreement Regarding a Portion of the Disputed Claim Amounts on July 18, 2017, and AT&T Agreed to Release $3.8 Million More from the Escrow Account to NIU. ..............................12

    K.    Of the $109,941,971 in Disputed Claim Amounts Held in the Escrow Account as of July 2017, $72,320,671 Related to the 2010 and 2011 Com Nextel Audits...............................................................13

    L.    Com Nextel's 2010 and 2011 Tax Audits Have Been Finally Resolved with Payments Totaling $3,994,720 ($68.3 Million Less Than the $72.3 Million AT&T Reserved for Those Two Audits as Claims Against the Escrow Account)......................................................14

    M.    Despite Final Resolutions of the 2010 and 2011 Com Nextel Tax Audits, AT&T Refuses to Execute a Joint Release Notice for the Excess Funds Held in the Escrow Account. .........................................15

N.  NIU's Adversary Complaint ............................................................................16

O.  Defendants' Counterclaims ...........................................................................16

P.  Jurisdiction and Venue .................................................................................17

LEGAL ARGUMENT...........................................................................................17

A.  NIU Is Entitled to Summary Judgment on Its Breach of Contract and Declaratory Judgment Claims Because There Are No Material Disputed Facts............................................................................................................17

B.  NIU Is Entitled to the $65,800,288 From the Escrow Account Because the 2010 and 2011 Tax Audits for Com Nextel Are Now Resolved. ..................18

　　1.  In April 2017, AT&T Reserved Funds in the Escrow Account for the 2010 and 2011 Com Nextel Tax Audits in Accordance with the Escrow Agreement...............................................................................18

　　2.  The 2010 and 2011 Com Nextel Tax Audits For Which AT&T Reserved Escrow Account Funds Have Been Finally Resolved. NIU Is Entitled to Receive the Funds in the Escrow Account That Exceed Still Pending Disputed Claim Amounts for Which AT&T Delivered a Claim Notice Before the Final Release Date.......................20

　　3.  AT&T's Refusal to Execute a Joint Release Notice to Disburse to NIU the Excess $65,800,288 in the Escrow Account That Exceeds Still Pending Disputed Claim Amounts Is a Breach of the Escrow Agreement...........................................................................................20

C.  AT&T's Refusals to Execute a Joint Release Notice Are Unjustified. ..............22

　　1.  AT&T's Argument That Its Tax Claim Notice Identified a Single, Aggregate Claim and All Disputes Must Be Resolved Before Any Disbursement Is Made to NIU Contradicts the Parties' Agreements. ........................................................................................22

　　2.  AT&T's Prior Agreements to Disburse Escrow Funds That Exceeded Its Claims Are Inconsistent with Its New, Litigation-Driven Interpretation.............................................................24

　　3.  In May 2017, AT&T Said It Would Disburse $35 Million From the Escrow Account Upon Resolution of the 2010 Com Nextel Tax Audit Consistent with the Plain Language of the Escrow Agreement. In 2018, AT&T Reversed Course and Introduced a New, Litigation-Driven Interpretation.................................................24

D.  NIU Is Entitled to 9% Interest from the Date of AT&T's Breach. .....................25

E.    Defendants' Counterclaims Are Both Factually and Legally Deficient. .............27

    1.    AT&T Has No Current Basis to Demand Indemnification from NIU......................................................................................................28

    2.    Because NIU Has Not Defaulted on Any Obligation to AT&T, AT&T Has No Current Basis to Enforce Its Guarantee Against NII. ......................................................................................................29

    3.    Defendants Cannot Create Claims by Characterizing Them as Seeking Declaratory Judgment or Equitable Relief................................29

        a.    Defendants Are Not Entitled to a Declaratory Judgment.............30

        b.    Defendants Are Not Entitled to Equitable Relief. .......................31

CONCLUSION....................................................................................................34

# TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 106 S.Ct. 2505 (1986) ................................................................17

*Beacon Theatres, Inc. v. Westover,*
359 U.S. 500, 79 S.Ct. 948 (1959) ....................................................................32

*Bison Capital Corp. v. ATP Oil & Gas Corp.,*
884 F. Supp. 2d 57 (S.D.N.Y. 2012) .................................................................26

*Brown v. Sandimo Materials,*
250 F.3d 120 (2d Cir. 2001) ..............................................................................32

*Cohen v. Loeb Partners Corp.,*
No. 90 CIV. 5175 (KMW), 1992 WL 84535 (S.D.N.Y. Apr. 13, 1992) ............30

*Dow Jones & Co. v. Harrods, Ltd.,*
237 F. Supp. 2d 394 (S.D.N.Y. 2002) ...............................................................30

*First Investors Corp. v. Liberty Mut. Ins. Co.,*
152 F.3d 162 (2d Cir. 1998) ..............................................................................17

*Golden v. Zwickler,*
394 U.S. 103, 89 S.Ct. 956 (1969) ....................................................................30

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
527 U.S. 308, 119 S.Ct. 1961 (1999) ................................................................33

*Harsco Corp. v. Segui,*
91 F.3d 337 (2d Cir. 1996) ................................................................................17

*Kumiva Grp., LLC v. Garda USA Inc.,*
146 A.D.3d 504, 45 N.Y.S.3d 410 (N.Y. App. Div. 2017) ................................27

*McNally Wellman Co., a Div. of Boliden Allis v. New York State Elec. & Gas*
*Corp.,* 63 F.3d 1188 (2d Cir. 1995) ..................................................................26

*Md. Cas. Co. v. Pac. Coal & Oil Co.,*
312 U.S. 270, 61 S.Ct. 510 (1941) ....................................................................30

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374, 112 S.Ct. 2031 (1992) ...................................................................32

*Morlee Sales Corp. v. Manufacturers Trust Co.*,
    9 N.Y.2d 16, 210 N.Y.S.2d 516, 172 N.E.2d 280 (1961) ...................................18

*N.Y. Times Co. v. Gonzales*,
    459 F.3d 160 (2d Cir. 2006) .......................................................................30, 31

*NML Capital v. Republic of Argentina*,
    17 N.Y.3d 250, 952 N.E.2d 482 (2011) ............................................................26

*Ocean Transp., Inc. v. Am. Phil. Fiber Indus.*,
    743 F.2d 85 (2d Cir. 1984) ...............................................................................25

*Old Colony Trust Co. v. Omaha*,
    230 U.S. 100, 33 S.Ct. 967 (1913) ...................................................................25

*Omni Quartz, Ltd. v. CVS Corp.*,
    287 F.3d 61 (2d Cir. 2002) ...............................................................................17

*Spirit Realty, L.P. v. GH & H Mableton, LLC*,
    227 F. Supp. 3d 291 (S.D.N.Y. 2017) ..............................................................30

*Swan Media Grp., Inc. v. Staub*,
    841 F. Supp. 2d 804 (S.D.N.Y. 2012) ..............................................................17

*TAP Manutencao e Engenharia Brasil S.A. v. Int'l Aerospace Grp., Corp*,
    127 F. Supp. 3d 202 (S.D.N.Y. 2015) ..............................................................21

*U.S. Underwriters Ins. Co. v. Orion Plumbing & Heating Corp.*,
    321 F. Supp. 3d 313 (E.D.N.Y. 2018) ..............................................................30

*Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*,
    577 F. App'x 58 (2d Cir. 2014) ........................................................................26

**S**TATUTES

11 U.S.C. § 105 ................................................................................................................. 5, 33

11 U.S.C. § 350 .................................................................................................................... 4

11 U.S.C. § 363 .................................................................................................................... 5

28 U.S.C. § 157(b)(2) ......................................................................................................... 17

28 U.S.C. § 1334 ................................................................................................................ 17

28 U.S.C. § 1408 ................................................................................................................ 17

28 U.S.C. § 1409 ................................................................................................................ 17

28 U.S.C. § 2201 ................................................................................................................ 30

N.Y. C.P.L.R. 5001(b) ....................................................................................................... 26

N.Y. C.P.L.R. 5004 ............................................................................................................ 26

**O**THER **A**UTHORITIES

Federal Rules of Bankruptcy Procedure Rule 3022 ............................................................. 4

Federal Rules of Bankruptcy Procedure Rule 7001(7) ...................................................... 33

Federal Rules of Bankruptcy Procedure Rule 7056 ............................................................ 1

Federal Rules of Civil Procedure Rule 56(c) ..................................................................... 17

Federal Rules of Civil Procedure Rule 65 .......................................................................... 33

Local Bankruptcy Rule 7056-1 ............................................................................................ 1

## PRELIMINARY STATEMENT

NIU Holdings LLC ("NIU") and NII Holdings, Inc. ("NII") submit this memorandum in support of their motion for summary judgment[1] requesting that the Court: (1) enter judgment for NIU, including a declaration that NIU is entitled to $65,800,288 currently being withheld in an escrow account and (2) dismiss Defendants' counterclaims against both NIU and NII. [2]

NIU is pursuing this adversary proceeding because Defendants unjustifiably refuse to issue a Joint Release Notice affirming NIU's right to $65.8 million in an escrow account governed by an unambiguous Escrow Agreement. In furtherance of Defendants' effort to deny NIU its rights and to delay NIU's access to its money, Defendants have asserted meritless counterclaims against NIU and NII that ignore indisputable facts while reinterpreting contracts in ways that are contradicted by their plain language.[3] There are no disputed material facts, and NIU and NII are each entitled to a judgment in their favor on all claims.

The Escrow Agreement at the center of this dispute was part of NIU and NII's $1.875 billion sale of a telecommunications business in Mexico to Defendant New Cingular in April 2015.[4] In the Purchase Agreement documenting that sale, the parties agreed that ten percent of the purchase price, *i.e.,* $187.5 million, would fund an Escrow Account to be

---

[1]   NIU and NII bring this motion in accordance with Bankruptcy Rule 7056 and Local Bankruptcy Rule 7056-1. They also submit with this memorandum a Statement of Material Facts consistent with Local Bankruptcy Rule 7056-1(b). Citations to the "7056-1(b) Statement" throughout this memorandum refer to that document, which references and incorporates the evidence NIU and NII present in support of this motion. (*See generally* 7056-1(b) Statement.)

[2]   The four Defendants are: AT&T Mobility Holdings B.V. ("AT&T"), New Cingular Wireless Services, Inc. ("New Cingular"), Nextel International (Uruguay) LLC ("Nextel Uruguay"), and Comunicaciones Nextel de México S.A. de C.V. ("Com Nextel").

[3]   Defendants label their claims against NIU and NII as "counterclaims" even though NIU is the only plaintiff. (*See generally* Defendants' Amended Answer, Affirmative Defenses, and Counterclaims to the Complaint for Declaratory Judgment and Breach of Contract Filed by NIU Holdings LLC, dated June 10, 2019 (ECF No. 14).) While NII is in the position of a third-party defendant responding to what should be denominated third-party claims, for ease of reference, NIU and NII adopt Defendants' general characterization of their claims as "counterclaims."

[4]   This Court approved that transaction on March 23, 2015 as part of NIU's reorganization. (*See* 7056-1(b) Statement, ¶ 10.)

administered by Citibank N.A. and distributed in accordance with a written Escrow Agreement. The $65,800,288 that Defendants refuse to release from the Escrow Account is, therefore, part of the remaining consideration NIU has a right to receive for the 2015 sale of its assets.

Under the Escrow Agreement, AT&T was permitted to make "Claims" against the Escrow Account on and before the April 30, 2017 "Final Release Date." After the Final Release Date, NIU was entitled to receive all funds in the Escrow Account that were not the subject of Claims that AT&T asserted before that deadline.

On April 27, 2017, three days before the Final Release Date, AT&T delivered to NIU and the Escrow Agent an Escrow Claim Notice identifying Claims with values totaling $117.9 million. The next day, on April 28, 2017, AT&T responded to NIU's request for more detail by providing NIU with amounts, by tax year and entity, setting forth the alleged basis for the Claims in its Escrow Claim Notice.

In the weeks that followed its delivery of its Escrow Claim Notice, AT&T promptly agreed that NIU was entitled to receive the $45.6 million difference between the total amount then in the Escrow Account and the $117.9 million aggregate amount of the Claims set forth in AT&T's April 27, 2017 Escrow Claim Notice. In May and July 2017, AT&T agreed that NIU was entitled to receive approximately $8 million more from the Escrow Account after AT&T recognized errors among individual matters underlying its April 27, 2017 Escrow Claim Notice.

Since 2017, two significant matters that comprised $75.7 million of the $117.9 million in total Claims that AT&T identified in its April 27, 2017 Escrow Claim Notice—*i.e.*, the Com Nextel tax audits for the years 2010 and 2011—have been finally resolved. No cash payment was owed to the Mexican tax authorities to close the audit related to Com Nextel's 2010 amended tax return; a payment of $3.995 million was required to close the audit related to

Com Nextel's 2011 amended tax return, which the parties agreed in July 2018 to pay out of the Escrow Account. As a result of the 2010 and 2011 Com Nextel tax audits being concluded, NIU is entitled to more than $65.8 million in the Escrow Account.[5]

Notwithstanding AT&T's acknowledgment in May 2017 that excess funds it reserved for the Claims it made on April 27, 2017 should be disbursed to NIU as individual disputed matters are resolved (as is required by the Escrow Agreement), AT&T now refuses to execute the joint instructions necessary to release the money to which NIU is entitled. Instead, AT&T unjustifiably asserts that it can revamp the Claims it submitted in its April 27, 2017 Escrow Claim Notice and can reallocate Escrow Account funds admittedly no longer needed for the now-resolved 2010 and 2011 Com Nextel tax audits to different claims, notwithstanding the absence of any such right in the parties' contracts. AT&T's refusal to sign the required Joint Release Notice is a breach of the parties' Escrow Agreement.

AT&T has no legal justification for its conduct. Instead, AT&T's actions are transparent efforts to tie-up more than $65.8 million of remaining consideration for a 2015 transaction to which NIU is contractually entitled while Defendants try to invent contractual rights based on speculative claims for potential future liabilities. In furtherance of what can only be viewed as an intentional program of delay, Defendants have now filed counterclaims claiming: (1) purported rights to indemnities from NIU, even though Defendants have yet to incur any unpaid indemnifiable loss under the parties' Purchase Agreement and (2) relief under a guarantee

---

[5]     As described below, the $65.8 million to which NIU is entitled under the Escrow Agreement differs from the $68.3 million that NIU demanded in its Adversary Complaint primarily as a result of a $2.7 million disbursement from the Escrow Account to which the parties agreed in June 2019 to fund a settlement of Com Nextel's 2012 tax audit. (*See* 7056-1(b) Statement, ¶¶ 60, 79.) That agreed disbursement reduced the amount of funds in the Escrow Account exceeding the remaining Disputed Claim Amounts, thus changing the calculation of the amount owed to NIU under Section 3(e)(iii)(2) of the Escrow Agreement. (*See* 7056-1(b) Statement, ¶ 80.) NIU has updated and corrected its calculations to account for this recent development, which is part of the undisputed facts that provide the basis for this motion.

from NII, even though the conditions precedent to even making a demand against the guarantee have yet to occur (and may never occur).

The material facts of this case are undisputed and, for the reasons set forth in this memorandum, NIU and NII are entitled to summary judgment.

## FACTS

### A.    The Parties

Plaintiff/Counterclaim Defendant NIU is a party to both the Purchase Agreement and the Escrow Agreement relevant to this action. (7056-1(b) Statement, ¶¶ 1, 2.) Third-Party Defendant NII is a party to the Purchase Agreement. (7056-1(b) Statement, ¶ 1.)

Defendants/Counterclaim Plaintiffs/Third-Party Plaintiffs New Cingular, Nextel Uruguay, and Com Nextel are all parties to the relevant Purchase Agreement. (7056-1(b) Statement, ¶ 1.) Defendant/Counterclaim Plaintiff/Third-Party Plaintiff New Cingular is also a party to the Escrow Agreement. (7056-1(b) Statement, ¶ 2.)

Defendant/Counterclaim Plaintiff/Third-Party Plaintiff AT&T was not a signatory to the Purchase Agreement or to the Escrow Agreement. (7056-1(b) Statement, ¶ 4.) However, AT&T is a permitted assignee of New Cingular's rights and interests under both of those agreements. (7056-1(b) Statement, ¶ 4.)

### B.    NIU and NII Sold Their Telecommunications Business in Mexico to New Cingular in 2015 as Part of Their Bankruptcies.

NII and several of its affiliates filed for chapter 11 bankruptcy protection in and after September 2014.[6] (7056-1(b) Statement, ¶ 5.) As part of their reorganizations, NIU and NII

---

[6]    NIU filed its bankruptcy petition on January 25, 2015, and its proceedings were jointly administered as part of the chapter 11 cases of NII and its then-affiliated debtors. (7056-1(b) Statement, ¶¶ 6-7.) On October 18, 2016, the Court entered the Final Decree Pursuant to Section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022 Closing the Debtors' Jointly Administered Chapter 11 Cases. (7056-1(b) Statement, ¶ 12.) On February 11, 2019, NIU Holdings filed a motion to reopen its bankruptcy case in order to commence this adversary

sold their telecommunications operations in Mexico to New Cingular. (7056-1(b) Statement, ¶¶ 8-10.) Specifically, NIU transferred all of NIU's and NII's Mexican business assets to New Cingular pursuant to the Purchase Agreement, dated January 26, 2015. (7056-1(b) Statement, ¶ 9.) As part of the sale transaction, NIU, New Cingular, and nonparty Citibank N.A. ("Citibank" or "Escrow Agent") executed the Escrow Agreement dated January 26, 2015. [7] (7056-1(b) Statement, ¶ 2.) The sale closed on April 30, 2015 with a final purchase price of $1.875 billion, minus certain adjustments. (7056-1(b) Statement, ¶ 11.)

## C. NIU Agreed to Indemnify New Cingular for Certain Potential Taxes and Damages; NII Agreed to Guarantee NIU's Obligations.

In the Purchase Agreement, NIU agreed that it would be "responsible for, and will indemnify and hold harmless Purchaser . . . for all Taxes and Damages relating to . . . any taxes imposed on the Entities that are attributable to any Pre-Closing Period . . . ." (7056-1(b) Statement, ¶ 15 (quoting Purchase Agreement § 11.4(a)).) As part of the indemnification process, New Cingular or AT&T are required to give notice of potential indemnification matters once "a written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim (a 'Tax Claim') is delivered or sent to or commenced or initiated" against any indemnified business entity "by any Government Authority with respect to Taxes or Tax Returns . . . ." (7056-1(b) Statement, ¶ 16 (quoting Purchase Agreement § 11.5(a)).)

NII, as a Seller Guarantor, "irrevocably guarantee[d]" to New Cingular "the full, complete and timely payment and performance . . . by [NIU] of each and every payment and

---

proceeding. (7056-1(b) Statement, ¶ 13.) The Court order granting NIU's motion was entered on March 5, 2019. (7056-1(b) Statement, ¶ 13.)

[7] On March 23, 2015, this Court approved the proposed sale—including the Purchase Agreement and Escrow Agreement—in accordance with Bankruptcy Code Sections 105 and 363. (7056-1(b) Statement, ¶ 10.)

performance obligation" in the Purchase Agreement. (7056-1(b) Statement, ¶ 18 (quoting Purchase Agreement § 12.13).) If NIU "defaults . . . on any such payment obligation when and to the extent that any of the same will become due and payable," then NII agreed to "unconditionally pay or cause to be paid such payment obligation . . . immediately upon notice from [New Cingular] specifying the default so that the same benefits will be conferred upon [New Cingular] as would have been received if such payment or performance obligations had been duly performed and satisfied" by NIU. (7056-1(b) Statement, ¶ 19 (quoting Purchase Agreement § 12.13).)

**D.     Ten Percent of the $1.875 Billion Sale Price Was Placed in Escrow to Be Distributed in Accordance with the Parties' Written Escrow Agreement.**

The Purchase Agreement provided that ten percent of the sale consideration would be deposited in an Escrow Account and distributed in accordance with a written Escrow Agreement. (7056-1(b) Statement, ¶ 20.) Accordingly, $187.5 million was deposited into the Escrow Account after the sale transaction closed on April 30, 2015. (7056-1(b) Statement, ¶ 21.)

The Escrow Agreement sets forth the conditions under which funds in the Escrow Account are to be distributed. (7056-1(b) Statement, ¶ 22.) If NIU (as Seller) and AT&T (as Purchaser New Cingular's assignee) agree on amounts to be disbursed from the account, they can jointly execute and deliver to the Escrow Agent a Joint Release Notice with instructions on how, when, and to whom funds should be sent. (7056-1(b) Statement, ¶ 23 (citing Escrow Agreement § 3(e)(iii)(2)).) The procedure is different, however, when the parties disagree.

To the extent that AT&T intends to assert a claim against the Escrow Account, Section 3(e)(i)(2) of the Escrow Agreement provides:

> If the Purchaser intends to assert a claim against the Escrow Account for Damages pursuant to Article 9 or Article 11 of the Purchase and Sale Agreement (each a "Claim"), then Purchaser shall deliver a written notice to Escrow Agent (with a copy to

Seller) (each a "<u>Claim Notice</u>") describing such claim in reasonable detail and stating the estimate of the amount of the Escrow Account to be reserved with respect to such Claim prepared in good faith based on information then available (the amount set forth in the applicable Claim Notice, the "<u>Claimed Amount</u>").

(7056-1(b) Statement, ¶ 24 (quoting Escrow Agreement § 3(e)(i)(2)).) Upon AT&T's delivery of a Claim Notice describing any claim in "reasonable detail" and providing an "estimate of the amount . . . to be reserved with respect to such Claim," NIU has thirty days to submit to the Escrow Agent an "Objection Notice" setting forth any objection it may have to the Purchaser's Claim Notice. (7056-1(b) Statement, ¶ 25 (quoting Escrow Agreement § 3(e)(i)(3)).)

If NIU delivers an Objection Notice to the Escrow Agent, then Section 3(e)(ii) applies. (7056-1(b) Statement, ¶ 26.) Section 3(e)(ii) provides that the Escrow Agent will distribute only those amounts that are undisputed between the parties and will "continue to hold in the Escrow Account the amount in dispute (each such amount, a '<u>Disputed Claim Amount</u>') . . . ." (7056-1(b) Statement, ¶ 27 (quoting Escrow Agreement § 3(e)(ii)).) The Escrow Agent is required to hold any Disputed Claim Amount in the Escrow Account until it either (1) receives from the parties a Joint Release Notice directing the disposition of "all or part of" the Disputed Claim Amount, or (2) receives from either of the parties (with notice to the other) a written notice of a legally binding settlement agreement or a final order or judgment. (7056-1(b) Statement, ¶ 28 (citing Escrow Agreement § 3(e)(ii)).)

**E.      April 30, 2017 Was the Agreed "Final Release Date" Under the Escrow Agreement. By That Date, AT&T Needed to Assert All Claims Against the Escrow Account. After the Final Release Date, NIU Was Entitled to Receive All Excess Funds.**

Under the Escrow Agreement, funds in the Escrow Account are available only for Claims New Cingular (or AT&T, as its assignee) asserted on or before the Final Release Date. The Final Release Date was two years after the closing of the transaction: April 30, 2017.

(7056-1(b) Statement, ¶ 30.) After the Final Release Date, all funds remaining in the Escrow Account were to be returned to NIU, unless (1) the funds were Disputed Claim Amounts or (2) Seller's time to submit an Objection Notice had not yet expired (7056-1(b) Statement, ¶ 29 (citing Escrow Agreement § 3(e)(iii)).).

The Escrow Agreement specifically provides that:

> ***upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount***, Seller and Purchaser ***shall*** deliver a Joint Release Notice to the Escrow Agent to release from the Escrow Account, (x) to Purchaser, the applicable amount, if any, with respect to such Disputed Claim Amount . . . and (y) ***to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed pursuant to Claim Notices executed and delivered by Purchaser and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New York, on the Final Release Date***, in each case, if any. . . .

(7056-1(b) Statement, ¶ 31 (quoting Escrow Agreement § 3(e)(iii)(2)) (emphasis added).)

Therefore, as any dispute that gave rise to a Disputed Claim Amounts is resolved after the Final Release Date, the Escrow Agreement obligates the parties to submit a Joint Release Notice to the Escrow Agent releasing the applicable amounts relating to the resolved Claim to the Purchaser or to the Seller.

**F.      On April 27, 2017, AT&T Submitted an Escrow Claim Notice to Assert Claims for Specific Amounts in the Escrow Account.**

On April 27, 2017, three days before the Final Release Date, AT&T delivered to NIU a "Tax Claim Notice" stating that certain of AT&T's affiliates were the subject of "Tax Claims concerning Taxes attributable to Pre-Closing Periods." (7056-1(b) Statement, ¶ 32 (quoting AT&T's April 27, 2017 Tax Claim Notice).) AT&T presented these Claims as an aggregate amount of $80,600,000 in "Estimated Taxes and Damages" for Com Nextel and an aggregate

amount of $37,300,000 for affiliated Other Entities.[8] (7056-1(b) Statement, ¶¶ 33-34 (citing AT&T's April 27, 2017 Tax Claim Notice).) In its Tax Claim Notice, AT&T set forth its "Tax Claims" as follows:

**Tax Claims**

| Tax Claim | Entities | Estimated Taxes and Damages |
|---|---|---|
| Mexican impuesto especial sobre producción y servicios ("IEPS") audits (fiscal years 2011-2014) and related administrative appeals (fiscal years 2011-2012) and Mexican income tax/VAT audits (fiscal years 2011-2014) | Inversiones Nextel de Mexico, S. de R.L. de C.V.  NII Telecom S. de R.L. de C.V.  NII Digital S. de R.L. de C.V. | USD $37,300,000 |
| Mexican income tax, VAT, flat tax and IEPS audits (fiscal years 2010-2013) | Comunicaciones Nextel de Mexico S.A. de C.V. | USD $80,600,000 |

**Table 1**

(7056-1(b) Statement, ¶ 33 (citing AT&T's April 27, 2017 Tax Claim Notice, Annex A).)

Also on April 27, 2017, AT&T sent to the Escrow Agent an "Escrow Claim Notice" that it described as a "Claim Notice in respect of the Tax Claims detailed in the Tax Claim Notice and a Claim against the Escrow Account for Damages in accordance with Section 3(e)(i)(2) of the Escrow Agreement." (7056-1(b) Statement, ¶ 35 (quoting AT&T's April 27, 2017 Escrow Claim Notice, at 1).) AT&T incorporated its April 27, 2017 Tax Claim Notice into its Escrow Claim Notice and requested "that the Escrow Agent reserve the Claimed Amount equal to the Tax Claim Amount" (*i.e.*, $117.9 million) in the Escrow Account.[9] (7056-1(b) Statement, ¶ 36 (quoting AT&T's April 27, 2017 Escrow Claim Notice, at 1).)

---

[8]    The affiliated "Other Entities" are Inversiones Nextel de Mexico, S. de R.L. de C.V. ("Inv. Mexico"), NII Telecom S. de R.L. de C.V. ("NII Telecom") and NII Digital, S. de R.L. de C.V. ("NII Digital"). (7056-1(b) Statement, ¶ 34.)

[9]    The $117.9 million that AT&T reserved in the Escrow Account by delivering its April 27, 2017 Escrow Claim Notice represented more than seventy percent of the $163.46 million remaining in the Escrow Account as of the April 30, 2017 Final Release Date. (7056-1(b) Statement, ¶ 37.)

After receiving AT&T's notices on April 27, 2017 indicating aggregate Claims totaling $80,600,000 related to Com Nextel and $37,300,000 related to the affiliated Other Entities, NIU asked AT&T to provide more specificity, consistent with AT&T's obligation under Section 3(e)(2) of the Escrow Agreement to describe its Claims "in reasonable detail." (7056-1(b) Statement, ¶ 38; 24-25.) On April 28, 2017—still before the Final Release Date—AT&T provided the following "Breakdown of Estimated Taxes and Damages in Dispute" by tax year and entity:

**AT&T Mexico / NII**
**Breakdown of Estimated Taxes and Damages in Dispute under the Audit Proceedings**
**Referenced in Tax Claim Notice Dated April 27, 2017[1]**

| Audit | Entity | Estimated Taxes and Damages (USD) |
|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $38,600,000 |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $37,100,000 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("**IEPS**") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | $9,900,000 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | $3,000,000 |
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $3,800,000 |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $1,100,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $12,900,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | $7,700,000 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $3,800,000 |

[1] **Note:** The above represents AT&T's current estimate of the breakdown of the Tax Claim Amount set forth in the above-referenced notice of Tax Claim and is subject to AT&T's ongoing review and revision based on developments in the various audit proceedings. Nothing herein is intended to or shall be deemed to limit or modify any statement or claim in the above-referenced notice of Tax Claim referenced above, and AT&T expressly reserves all of its rights, claims and arguments with respect to the Tax Claim Notice and the Taxes and Damages referenced therein.

**Table 2**

(7056-1(b) Statement, ¶ 39.)

As of the April 30, 2017 Final Release Date, the Claims AT&T identified in its April 27, 2017 Escrow Claim Notice and detailed in its April 28, 2017 "Breakdown" were the only Claims against the Escrow Account that AT&T noticed pursuant to Section 3(e)(iii) of the Escrow Agreement. (7056-1(b) Statement, ¶ 41.)

## G.    AT&T Immediately Agreed to Release to NIU All Funds That Exceeded the Amount of All Claims Identified in Its April 2017 Claim Notice.

Consistent with Section 3(e)(iii)(1) of the Escrow Agreement, NIU and AT&T executed and delivered to Citibank (as Escrow Agent) a Joint Release Notice, dated May 4, 2017, instructing Citibank to release $45,562,279.58 from the Escrow Account to NIU. (7056-1(b) Statement, ¶ 42 (citing the parties' May 4, 2017 Joint Release Notice).) NIU and AT&T agreed that the $45.6 million was the difference between the total balance of the funds in the Escrow Account and the total of the Claimed Amounts that AT&T identified in the notices it delivered before the Final Release Date. (7056-1(b) Statement, ¶ 43.) Thus, AT&T agreed that NIU was entitled to receive the excess funds in the Escrow Account after the Final Release Date.

## H.    On May 18, 2017, AT&T Reduced Its Claim Against the Escrow Account and Promptly Agreed to Release to NIU Escrow Funds Exceeding the Corrected Total of Its Claims.

Following discussions between NIU and AT&T regarding the facts underlying AT&T's Claims against the Escrow Account, AT&T recalculated its estimate of the total amount of Taxes and Damages indemnifiable in respect of the Tax Claims referenced in its April 27, 2017 Tax Claim Notice and reduced its aggregate Claims from $117.9 million to $113.8 million. (7056-1(b) Statement, ¶¶ 47-50; 52-53 (citing Letter from A. Keisel to M.E. Connolly, dated May 18, 2019).) Based on AT&T's corrections, NIU and AT&T delivered to Citibank a Joint Release Notice, dated May 18, 2017, directing it to disburse another $4.1 million in the

Escrow Account to NIU. (7056-1(b) Statement, ¶ 52 (citing May 18, 2017 Joint Release Notice).)

## I.     NIU Timely Objected to AT&T's April 27, 2017 Escrow Claim Notice.

NIU timely objected to AT&T's April 2017 Escrow Claim Notice on May 25, 2017. (7056-1(b) Statement, ¶ 56 (citing NIU's May 25, 2017 Objection to Escrow Claim Notice).) As a result, AT&T's $113.8 million in Claims against the Escrow Account for Estimated Taxes and Damages, identified on April 27, 2017 (as set forth above in Table 1) and detailed on April 28, 2017 (as set forth above in Table 2), constituted Disputed Claim Amounts under Section 3(e)(ii)) of the Escrow Agreement. This meant that Citibank, as the Escrow Agent, would "continue to hold in the Escrow Account the amount in dispute" until the parties delivered: (1) a joint notice directing the disposition of "all or part of" the Disputed Claim Amount or (2) a binding settlement agreement or a final and nonappealable order or judgment. (7056-1(b) Statement, ¶ 28 (citing Escrow Agreement § 3(e)(ii)).)

## J.     The Parties Reached an Agreement Regarding a Portion of the Disputed Claim Amounts on July 18, 2017, and AT&T Agreed to Release $3.8 Million More from the Escrow Account to NIU.

It its May 25, 2017 Objection to Escrow Claim Notice, NIU noted that $3,816,390 within AT&T's total Claims against the Escrow Account was not backed-up by the kind of notice Section 11.5(a) of the Purchase Agreement required to support a valid Tax Claim. (7056-1(b) Statement, ¶ 58 (citing Letter from S. Smith to J. O'Connor and D. Welsch, dated May 25, 2017).) On July 18, 2017, AT&T and NIU agreed to submit a Joint Release Notice to the Escrow Agent directing the release of these funds from the Escrow Account to NIU.[10]

---

[10]   In the parties' July 18, 2017 Joint Release, AT&T agreed to immediately release $3,816,390 from the Escrow Account and NIU agreed that AT&T could later "adjust the Claimed Amount set forth in the Tax Claim Notice to include any Taxes and Damages attributable or otherwise related to the 2012 fiscal year" in an amount not to exceed $3,816,390 (*i.e.,* the amount asserted by AT&T for this entity and tax year prior to the Final Release Date). (7056-1(b) Statement, ¶ 60 (citing July 18, 2017 Joint Release Notice).) The Com Nextel tax audit for the 2012 fiscal

(7056-1(b) Statement, ¶ 59 (citing July 18, 2017 Joint Release Notice).) AT&T also reduced its aggregate Claim Amount by $3,816,390, thereby lowering its total Claims from $113.8 million to $109.9 million as of July 2017. (7056-1(b) Statement, ¶¶ 59, 61.)

**K.** **Of the $109,941,971 in Disputed Claim Amounts Held in the Escrow Account as of July 2017, $72,320,671 Related to the 2010 and 2011 Com Nextel Audits.**

AT&T's basis for its Claims, including adjustments to those Claims made between April and July 2017, are set forth in the following table with references to the relevant tax years and entities:

| Audit | Entity | Estimated Taxes and Damages (USD) | | Adjustments | Updated Amount |
|---|---|---|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 38,600,000 | | (3,137,035) | 35,462,965 |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 37,100,000 | | (242,294) | 36,857,706 |
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 3,800,000 | | (3,800,000) | - |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 1,100,000 | | (46,807) | 1,053,193 |
| | Total Comunicaciones Nextel | 80,600,000 | | (7,226,136) | 73,373,864 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("IEPS") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | 9,900,000 | | (739,929) | 9,160,071 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | 3,000,000 | | 5,111 | 3,005,111 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | 12,900,000 | | (40,164) | 12,859,836 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | 7,700,000 | | 6,870 | 7,706,870 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | 3,800,000 | | 36,219 | 3,836,219 |
| | Total Other Entities | 37,300,000 | | (731,893) | 36,568,107 |
| | Total Claims | 117,900,000 | | | 109,941,971 |

**Table 3**

(7056-1(b) Statement, ¶ 62.) Of the $109,941,971 aggregate total of AT&T's Claims to funds in the Escrow Account as of July 2017, $73,373,864 related to Com Nextel and $36,568,107 related to the affiliated Other Entities. (7056-1(b) Statement, ¶ 63.) Of the $73,373,864 related

---

year has recently been resolved, and by agreement of the parties, the $2,693,806 amount due was paid out of the Escrow Account pursuant to a Joint Release Notice executed in June 2019. (7056-1(b) Statement, ¶ 60 (citing the parties' June 24, 2019 Joint Release Notice).)

to Com Nextel, $35,462,965 was for the 2010 tax audit and $36,857,706 was for the 2011 tax audit. (7056-1(b) Statement, ¶ 64.)

**L.  Com Nextel's 2010 and 2011 Tax Audits Have Been Finally Resolved with Payments Totaling $3,994,720 ($68.3 Million Less Than the $72.3 Million AT&T Reserved for Those Two Audits as Claims Against the Escrow Account).**

The Com Nextel 2010 and 2011 tax audits that provided the basis for $75.7 million of the $117.9 million AT&T originally claimed in April 2017 (and $73.4 million of the Disputed Claims Amounts, as adjusted through July 2017) have now been finally resolved. (7056-1(b) Statement, ¶¶ 63, 65, 66, 69.) Amended tax returns for Com Nextel have been filed for those tax years, all amounts determined to be due have been satisfied, and the relevant governmental authorities have confirmed that the audits are closed. (7056-1(b) Statement, ¶¶ 66, 68, 69-71, 73.)

AT&T satisfied the 2010 Com Nextel tax audit without any outlay of cash; hence, no funds from the Escrow Account were disbursed in connection with that resolution. (7056-1(b) Statement, ¶ 66.) For the 2011 Com Nextel tax audit, NIU and AT&T agreed on July 9, 2018 to a Joint Release Notice that disbursed $3,994,720 from the Escrow Account to fund resolution of that audit. (7056-1(b) Statement, ¶ 71 (citing July 18, 2017 Joint Release Notice).)

Subtracting the $3,994,720 disbursed to pay the 2011 Com Nextel tax audit from the Escrow Account pursuant to the July 9, 2018 Joint Release Notice from the previous $109,941,971 aggregate total of AT&T's Claims reduced the aggregate total of Claims to $105,947,251. (7056-1(b) Statement, ¶ 72.) Out of that amount, $68,325,951 is the amount that AT&T claimed for the 2010 and 2011 Com Nextel tax audits but that was not needed when those audits were resolved. (7056-1(b) Statement, ¶ 73.) The remaining $37,621,300 is the aggregate

total of Disputed Claim Amounts that AT&T reserved before the Final Release Date for audits related to tax entities and tax years other than Com Nextel's 2010 and 2011 audits. (*Id.*) [11]

**M.    Despite Final Resolutions of the 2010 and 2011 Com Nextel Tax Audits, AT&T Refuses to Execute a Joint Release Notice for the Excess Funds Held in the Escrow Account.**

Although Defendants admit that the Com Nextel 2010 and 2011 tax audits are final, AT&T refuses to jointly release to NIU the excess funds in the Escrow Account. (7056-1(b) Statement, ¶¶ 66, 69, 74, 75-77.) Pursuant to the Escrow Agreement, "***upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount***, Seller and Purchaser ***shall*** deliver a Joint Release Notice to the Escrow Agent to release from the Escrow Account . . . (y) ***to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed pursuant to Claim Notices executed and delivered by Purchaser and received by the Escrow Agent***" prior to the Final Release Date. (7056-1(b) Statement, ¶ 31 (quoting Escrow Agreement § 3(e)(iii)(2)) (emphasis added).)

As of June 28, 2019, the balance of funds in the Escrow Account is $103,421,588. (7056-1(b) Statement, ¶ 80.) In accordance with Section 3(e)(iii)(2) of the Escrow Agreement, now that the 2010 and 2011 Com Nextel tax audits are resolved—facts that AT&T cannot and does not dispute—NIU is entitled to the difference between $103,421,588 and the $37,621,300 aggregate amount of the remaining Disputed Claims Amounts asserted in the Claim Notice that

---

[11]    As is reflected above in Table 3, the audits other than Com Nextel's 2010 and 2011 tax audits for which AT&T asserted Claims are: the Com Nextel 2013 audit ($1,053,193); the Inv. Mexico 2011 audit ($9,160,071); the NII Telecom 2012 audit ($3,005,111); the Inv. Mexico 2013 audit ($12,859,836); the NII Digital 2013 audit ($7,706,870); and the Inv. Mexico 2014 audit ($3,836,219). AT&T's Claims related to those other audits total $37,621,300. (*See supra* Table 3.)

AT&T delivered before the Final Release Date. (*See* Escrow Agreement § 3(e)(iii)(2).) Thus, NIU is currently entitled to $65,800,288 from the Escrow Account.

## N.    NIU's Adversary Complaint

NIU filed this adversary proceeding on March 25, 2019 seeking, among other relief: a declaration that (1) AT&T is in breach of the Escrow Agreement and (2) there is no longer any dispute with respect to Defendant Com Nextel's 2010 and 2011 audits, such that the excess of funds in the Escrow Account associated with those now-resolved Claims should be released to NIU. (*See* NIU's Adversary Complaint for Declaratory Judgment and Breach of Contract, filed Mar. 25, 2019 (ECF No. 1).)

## O.    Defendants' Counterclaims

Defendants amended their answer on June 10, 2019 and asserted "counterclaims" against NIU and NII. (*See* Defendants' Amended Answer, Affirmative Defenses, and Counterclaims to the Complaint for Declaratory Judgment and Breach of Contract Filed by NIU Holdings LLC, dated June 10, 2019 (ECF No. 14).) Within those counterclaims, Defendants request that the Court enter an order: (1)(a) declaring that NIU is obligated to indemnify AT&T for the full amount of the alleged "Tax Claims" under the Purchase Agreement and (1)(b) declaring that any dissolution of NII that does not account for the maximum potential amount of AT&T's alleged Tax Claims would be improper; (2) enjoining NII from dissolving without reserving the full amount of the current purported estimate for the total amount of AT&T's alleged Tax Claims; (3) enjoining NII from releasing funds from the Escrow Account absent further order of the Court; and (4) enjoining NIU and NII from releasing funds from any distribution absent further order of this Court. (*See id.*)

**P.     Jurisdiction and Venue**

NIU and NII submit that the Court has jurisdiction over the matter and this motion pursuant to 28 U.S.C. §§ 157, 1334, that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that venue is proper pursuant to 28 U.S.C. §§ 1408, 1409. Defendants have not contested jurisdiction or venue, and they have expressly consented to the entry of final orders or judgment by the Bankruptcy Court. (*See* Defendants' Amended Answer, Affirmative Defenses, and Counterclaims to the Complaint for Declaratory Judgment and Breach of Contract Filed by NIU Holdings LLC, dated June 10, 2019 (ECF No. 14), at 2.)

## LEGAL ARGUMENT

**A.     NIU Is Entitled to Summary Judgment on Its Breach of Contract and Declaratory Judgment Claims Because There Are No Material Disputed Facts.**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509-11 (1986).

To establish AT&T's breach of contract as a matter of New York law,[12] NIU must show: (1) the existence of the relevant agreements; (2) adequate performance by NIU; (3) breach by AT&T; and (4) damages. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *see also Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012)).

Because the applicable contracts are unambiguous and there are no material disputes about the facts demonstrating NIU's right to relief, summary judgment is appropriate.[13]

---

[12]   New York law governs both the Purchase Agreement and the Escrow Agreement. (7056-1(b) Statement, ¶ 3.)

[13]   "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002). Under well-established New York principles of contract interpretation, the Purchase Agreement and the Escrow Agreement should be "interpreted so as to give effect to the intention of the parties as expressed in the unequivocal

**B.     NIU Is Entitled to the $65,800,288 From the Escrow Account Because
the 2010 and 2011 Tax Audits for Com Nextel Are Now Resolved.**

**1.     In April 2017, AT&T Reserved Funds in the Escrow Account for the 2010
and 2011 Com Nextel Tax Audits in Accordance with the Escrow Agreement.**

The Escrow Agreement provides that, to the extent AT&T sought to "assert a claim

against the Escrow Account for Damages pursuant to . . . Article 11" of the Purchase Agreement,

AT&T was required to deliver "a written notice to Escrow Agent . . . describing such Claim

in reasonable detail and stating a reasonable estimate of the amount of the Escrow Account to be

reserved with respect to such Claim prepared in good faith based on information then available

(the amount set forth in the applicable Claim Notice, the 'Claimed Amount')." (*See* Escrow

Agreement § 3(e)(i)(2)).) Upon receipt of a Claim Notice, NIU had the right to deliver an

"Objection Notice" within thirty (30) days "disputing in reasonable detail Purchaser's right to

indemnification . . . ." (*See* Escrow Agreement § 3(e)(i)(3)).) Upon receipt of a Claim Notice

from AT&T followed by a corresponding Objection Notice from NIU—as indisputably occurred

in this case—Citibank (as Escrow Agent) was required to maintain the Disputed Claim Amounts

in the Escrow Account until they could be distributed by agreement of the parties or in

accordance with a court order. (*See* Escrow Agreement §§ 3(e)(i)(3) and 3(e)(ii)).)

AT&T delivered an Escrow Claim Notice to Citibank on April 27, 2017, describing it as

a "Claim Notice in respect of the Tax Claims detailed in the Tax Claim Notice and a Claim

against the Escrow Account for Damages in accordance with Section 3(e)(i)(2) of the Escrow

Agreement." (7056-1(b) Statement, ¶ 35 (citing April 2017 Escrow Claim Notice, at 1).)

AT&T demanded "that the Escrow Agent reserve the Claimed Amount equal to the Tax Claim

Amount," $117.9 million in total as set forth in the Tax Claim Notice sent to NIU. (7056-1(b)

---

language employed." *Morlee Sales Corp. v. Manufacturers Trust Co.*, 9 N.Y.2d 16, 19, 210
N.Y.S.2d 516, 172 N.E.2d 280 (1961).

Statement, ¶ 36 (citing April 2017 Escrow Claim Notice, at 1).) In the Tax Claim Notice attached to its April 2017 Escrow Claim Notice, AT&T set forth its "Tax Claims" in the following chart (identified above as Table 1):

**Tax Claims**

| Tax Claim | Entities | Estimated Taxes and Damages |
|---|---|---|
| Mexican impuesto especial sobre producción y servicios ("IEPS") audits (fiscal years 2011-2014) and related administrative appeals (fiscal years 2011-2012) and Mexican income tax/VAT audits (fiscal years 2011-2014) | Inversiones Nextel de Mexico, S. de R.L. de C.V. NII Telecom S. de R.L. de C.V. NII Digital S. de R.L. de C.V. | USD $37,300,000 |
| Mexican income tax, VAT, flat tax and IEPS audits (fiscal years 2010-2013) | Comunicaciones Nextel de Mexico S.A. de C.V. | USD $80,600,000 |

(7056-1(b) Statement, ¶¶ 33-35 (citing April 2017 Tax Claim Notice, Annex A).)

AT&T specified on April 28, 2017 that $75.7 million of the $80.6 million in aggregate Claims that it demanded as part of its Claims constituted its estimated amounts for Com Nextel's tax audits for fiscal years 2010 ($38.6 million) and 2011 ($37.1 million). (7056 1(b) Statement, ¶ 39; *see also supra* Table 2.) Between April 2017 and July 2017, AT&T corrected errors in its original calculations and reduced its potential indemnification amounts to be reserved for Com Nextel's 2010 and 2011 fiscal years to $35,462,965 and $36,857,706, respectively, for total asserted Claims of $72,320,671 for Com Nextel covering those two years. (7056-1(b) Statement, ¶ 62; *see also supra* Table 3.)

2. **The 2010 and 2011 Com Nextel Tax Audits For Which AT&T Reserved Escrow Account Funds Have Been Finally Resolved. NIU Is Entitled to Receive the Funds in the Escrow Account That Exceed Still Pending Disputed Claim Amounts for Which AT&T Delivered a Claim Notice Before the Final Release Date.**

The 2010 and 2011 Com Nextel tax audits have been finally resolved. (7056-1(b) Statement, ¶¶ 66, 69.) Amended tax returns have been filed, all amounts determined to be due have been satisfied, and the relevant governmental authorities have confirmed that those audits are closed. (7056-1(b) Statement, ¶¶ 66, 68, 69, 70, 74.) NIU has performed all of its contractual obligations under the Escrow Agreement related to those audits, including its execution on July 9, 2018 of the Joint Release Notice necessary to release $3.99 million that was required to resolve the 2011 Com Nextel audit. (7056-1(b) Statement, ¶ 71 (citing July 9, 2018 Joint Release Notice).) No money was needed to resolve the 2010 Com Nextel audit. (7056-1(b) Statement, ¶ 66.) Thus, AT&T asserted Claims that reserved $68.3 million more in the Escrow Account than was ultimately needed for the 2010 and 2011 Com Nextel tax audits. (7056-1(b) Statement, ¶ 73.)

3. **AT&T's Refusal to Execute a Joint Release Notice to Disburse to NIU the Excess $65,800,288 in the Escrow Account That Exceeds Still Pending Disputed Claim Amounts Is a Breach of the Escrow Agreement.**

AT&T is in breach of the Escrow Agreement by refusing to execute a Joint Release Notice that directs the Escrow Agent to release to NIU the $65,800,288 difference between the current total Escrow Account balance [14] and the aggregate Disputed Claim Amounts that are still pending based upon AT&T's April 27, 2017 Escrow Claim Notice.

---

[14] As noted, this $65.8 million to which NIU is entitled under the Escrow Agreement differs from the $68.3 million that NIU demanded in the Adversary Complaint, primarily due to the June 24, 2019 release of funds from the Escrow Account that the parties agreed could be used to pay an amount due for Com Nextel's tax audit for the 2012 fiscal year. (7056-1(b) Statement, ¶ 79.) That disbursement reduced the total funds in the Escrow Account that exceed the remaining Disputed Claims under the parties' agreements. (*Supra* footnote 5.)

In the Escrow Agreement, the parties agreed that:

> [a]fter the Final Release Date and ***upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount, Seller and Purchaser shall deliver a Joint Release Notice to the Escrow Agent to release from the Escrow Account . . . to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed pursuant to Claim Notices executed and delivered by Purchaser and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New York, on the Final Release Date*** . . . ."

(Escrow Agreement, § 3(e)(iii)(2) (emphasis added).) Final resolution of the 2010 and 2011 Com Nextel tax audits renders $65,800,288 in the Escrow Account excess available funds "over the aggregate Disputed Claim Amounts still pending and disputed pursuant to Claim Notices" that AT&T executed and delivered before the Final Release Date. In accordance with the Escrow Agreement, therefore, NIU is entitled to $65.8 million and AT&T is required by the mandatory "shall" language in Section 3(e)(iii)(2) to join NIU in delivering a Joint Release Notice to the Escrow Agent directing it to transfer the funds to NIU.

These undisputed facts demonstrate NIU's entitlement to summary judgment, which is appropriate "where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." *TAP Manutencao e Engenharia Brasil S.A. v. Int'l Aerospace Grp., Corp.*, 127 F. Supp. 3d 202, 206 (S.D.N.Y. 2015). AT&T's refusal to execute the required Joint Release Notice transferring the funds previously reserved for the Com Nextel 2010 and 2011 audits entitles NIU to a judgment declaring that: (1) AT&T is in breach of the Purchase Agreement and the Escrow Agreement; (2) there is no longer any dispute with respect to Defendant Com Nextel's 2010 and 2011 audits and NIU is entitled to $68,325,951 from the Escrow Account.

**C.       AT&T's Refusals to Execute a Joint Release Notice Are Unjustified.**

AT&T has refused NIU's repeated requests that it execute a Joint Release Notice

directing that the Escrow Agent disburse to NIU funds previously reserved for the Com Nextel

2010 and 2011 tax audits as those audits were resolved.  (7056-1(b) Statement, ¶¶ 75-77.)  As its

purported justification, AT&T contended in August 2018 that its April 2017 Escrow Claim

Notice (as subsequently clarified and adjusted) set forth a single "Claim" giving rise to a single

"Disputed Claim Amount" and that all components of its Escrow Claim Notice need to be finally

resolved before any one is considered final.  (7056-1(b) Statement, ¶ 78.)  Under AT&T's

theory, it can add new facts and change its estimates to justify one large, amorphous, adjustable

"Claim," even after the April 30, 2017 Final Release Date, effectively rendering the Final

Release Date meaningless.

AT&T's arguments are inconsistent with the plain terms of the parties' agreements, with

prior admissions made by AT&T's representatives, and with AT&T's prior agreements to release

funds from the Escrow Account.

**1.       AT&T's Argument That Its Tax Claim Notice Identified a Single, Aggregate Claim and All Disputes Must Be Resolved Before Any Disbursement Is Made to NIU Contradicts the Parties' Agreements.**

Section 3(e)(i)(2) of the Escrow Agreement provides that:

> If Purchaser intends to assert a claim against the Escrow Account
> for Damages pursuant to Article 9 or Article 11 of the Purchase
> and Sale Agreement (each, a "Claim"), then Purchaser shall deliver
> a written notice to Escrow Agent (with a copy to Seller) (each, a
> "Claim Notice") describing such Claim in reasonable detail and
> stating a reasonable estimate of the amount of the Escrow Account
> to be reserved with respect to such Claim prepared in good faith
> based on information then available (the amount set forth in the
> applicable Claim Notice, the "Claimed Amount").

(Escrow Agreement, § 3(e)(i)(2).)  The Escrow Agreement identifies each claim in the singular

(*i.e.*, "each, a 'Claim'"), specifying that individual claims are distinct from one another.

Interpreting each basis for a Claim under Section 3(e)(i)(2) as singular Claims is consistent with Section 11.5(a) of the Purchase Agreement, which allows AT&T (or an affiliate Purchaser) to request indemnification from NIU based on any "written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim (a 'Tax Claim')" from or by a "Governmental Authority with respect to Taxes or Tax Returns of any of the Entities for which Purchaser or its Affiliates may reasonably be entitled to indemnification." (Purchase Agreement § 11.5(a).) Notably, the events giving rise to Purchaser's eventual indemnification rights under the Purchase Agreement each represent an individualized "Tax Claim." And that interpretation is consistent with AT&T's own justification for its April 27, 2017 Escrow Claim, which it described in its April 28, 2017 "Breakdown of Estimated Taxes and Damages in Dispute" with reference to the tax audits for individual entities and tax years. (7056-1(b) Statement, ¶ 39.)

Nothing in either the Purchase Agreement or the Escrow Agreement suggests that AT&T or its affiliates have a right to unilaterally combine individual Claims into an amorphous amount that can then be amended after the Final Release Date and applied to different facts after the date the parties agreed was the deadline for asserting any Claim against the Escrow Account. (*See* Escrow Agreement § 3(e)(iii).) Instead, the Escrow Agreement calls for each "***such Claim***" to be described before the Final Release Date "in reasonable detail and stating a reasonable estimate of the amount of the Escrow Account to be reserved with respect to ***such Claim*** prepared in good faith based on information then available." (Escrow Agreement, § 3(e)(i)(2) (emphasis added).) The Escrow Agreement likewise sets forth circumstances under which funds are to be distributed from the Escrow Account "[a]fter the Final Release Date and ***upon resolution of <u>any dispute</u>*** that was the subject of an Objection Notice giving rise to a Disputed Claim Amount."

(*See* Escrow Agreement, § 3(e)(iii)(2)) (emphasis added).) Nothing in the Escrow Agreement gives or even suggests that AT&T has a right to change the basis for or increase the amount of any Claims after the Final Release Date. This is not surprising, since such a loophole would effectively render the Final Release Date meaningless by allowing AT&T to continuously recharacterize claims against the Escrow Account.

### 2. AT&T's Prior Agreements to Disburse Escrow Funds That Exceeded Its Claims Are Inconsistent with Its New, Litigation-Driven Interpretation

AT&T's own conduct in the months immediately following the Final Release Date confirms NIU's plain-language interpretation that the Escrow Agreement requires distribution of funds in the Escrow Account as disputes are resolved after the Final Release Date. For example, AT&T executed with NIU two Joint Release Notices in May 2017 that directed Citibank (as Escrow Agent) to release funds from the Escrow Account—$45.6 million and $4.1 million, respectively—because those amounts were either not or no longer in dispute, despite the persistence of other Claims. (7056-1(b) Statement, ¶ 42 (citing Joint Release Notice, delivered May 4, 2017); 7056-1(b) Statement, ¶ 52 (citing Joint Release Notice, delivered May 18, 2017).) Again in July 2017, AT&T executed with NIU a third Joint Release Notice directing Citibank to release $3.816 million to NIU from the Escrow Account because that amount was no longer disputed, once again despite the fact that other Claims were still pending. (7056-1(b) Statement, ¶ 59 (citing Joint Release Notice, dated July 17, 2017).)

### 3. In May 2017, AT&T Said It Would Disburse $35 Million From the Escrow Account Upon Resolution of the 2010 ComNextel Tax Audit Consistent with the Plain Language of the Escrow Agreement. In 2018, AT&T Reversed Course and Introduced a New, Litigation-Driven Interpretation.

As if there could be any doubt that the Escrow Agreement requires excess funds to be disbursed from the Escrow Account as individual Disputed Claim Amounts are resolved, AT&T's in-house lawyer David Welsch wrote to NIU in May 2017 and expressed AT&T's

readiness to disburse excess funds reserved in the Escrow Account for the 2010 Com Nextel tax audit once the Mexican tax authorities declared that audit complete. (7056-1(b) Statement, ¶ 51.) Mr. Welsch wrote:

> ***Once the 2010 [Com Nextel] audit is finally settled, AT&T is willing to release to NII of the corresponding portion of the claimed amount. Assuming the final settlement is as expected, we would release an additional $35.5M from the escrow.*** AT&T's willingness to do so is without prejudice to its rights, claims and arguments with respect to the claimed amount in the claim notice.

(7056-1(b) Statement, ¶ 51 (quoting Email from D. Welsch to S. Smith, dated May 12, 2017 (emphasis added)).) By the time the 2010 Com Nextel tax audit was finally resolved in 2018, however, AT&T changed its position to the one it took giving rise to this litigation.

AT&T's opportunistic about-face does not change the plain language of the Escrow Agreement requiring Disputed Claim Amounts to be disbursed once the disputes are resolved. AT&T's pre-litigation recognition of the proper interpretation of the Escrow Agreement is, however, "compelling evidence" of the parties' intent and the meaning of the agreement. *See Ocean Transp., Inc. v. Am. Phil. Fiber Indus.*, 743 F.2d 85, 91 (2d Cir. 1984) (*quoting Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967 (1913)). The terms of the Escrow Agreement are both unambiguous and consistent with the parties' pre-dispute actions with respect to the disposition of funds upon the resolution of any one of AT&T's Claims. NIU is thus entitled to summary judgment, including a declaration that there is no longer any dispute with respect to Defendant Com Nextel's 2010 and 2011 audits and the excess $65,800,288 in the Escrow Account should be released to NIU.

**D.    NIU Is Entitled to 9% Interest from the Date of AT&T's Breach.**

Under New York law, prevailing plaintiffs in breach of contract actions are entitled to prejudgment interest, computed from "the earliest ascertainable date the cause of action existed."

N.Y. C.P.L.R. 5001(b); *see also Bison Capital Corp. v. ATP Oil & Gas Corp.*, 884 F. Supp. 2d 57, 59 (S.D.N.Y. 2012); *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 257, 952 N.E.2d 482, 488 (2011) ("[I]nterest on a sum awarded as a result of a breach of contract is computed from the earliest date that the claim accrued"); *McNally Wellman Co., a Div. of Boliden Allis v. New York State Elec. & Gas Corp.*, 63 F.3d 1188, 1200 (2d Cir. 1995) ("The 'earliest possible date' in contract actions arises when the alleged breach occurred, regardless of the parties' states of mind or subsequent discussions.").

In this case, AT&T breached the Escrow Agreement when it refused to jointly release excess funds from the Escrow Account after the disputes for which it had reserved funds were resolved. With respect to the $35,462,965 that AT&T reserved but that was not needed for the Com Nextel 2010 tax audit, AT&T breached at least by October 24, 2018, when the 2010 Com Nextel tax audit was finally resolved and AT&T refused to sign a joint release notice. (7056-1(b) Statement, ¶ 68.) With respect to the $32,862,986 that AT&T reserved but that was not needed for the Com Nextel 2011 tax audit, AT&T breached at least by April 2, 2019 when the 2011 Com Nextel tax audit was finally resolved and AT&T refused to sign a joint release notice. [15] (7056-1(b) Statement, ¶¶ 64, 71, 73-74.)

In breach of contract cases, pre-judgment interest is calculated at "nine per centum per annum." N.Y. C.P.L.R. 5004; *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 258, 952 N.E.2d 482, 488 (2011); *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, 577 F. App'x 58, 61 (2d Cir. 2014) ("New York law expressly provides for the award of prejudgment interest in

---

[15] NIU submits that AT&T's breach could be fixed at earlier dates, based upon the fact that the Com Nextel 2010 and 2011 tax audits were resolved when amended tax returns were filed and, for 2011 Com Nextel tax audit, when the required payment was made. (7056-1(b) Statement, ¶¶ 76-78.) For purposes of summary judgment and to avoid a dispute that could unnecessarily prolong these proceedings, NIU relies upon conservatively fixed dates, by which those audits were indisputably final. (7056-1(b) Statement, ¶¶ 68, 74)

conversion and breach of contract cases as a matter of right. The statutory interest rate for these actions is 9% per annum.") (references omitted); *Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D.3d 504, 509, 45 N.Y.S.3d 410, 415 (N.Y. App. Div. 2017) (awarding statutory prejudgment interest where "[n]either the merger agreement nor the related escrow agreement specified an interest rate to be paid in the event of default"). NIU is therefore entitled to prejudgment interest at the rate of 9% from the dates of AT&T's breach. [16]

## E. Defendants' Counterclaims Are Both Factually and Legally Deficient.

Defendants' counterclaims convey their unhappiness with: (1) NIU's assertion of its rights under the Escrow Agreement, (Counterclaims, ¶¶ 47-49); (2) NII's planned sale of its business operations in Brazil, (Counterclaims, ¶¶ 50-54); and NII's announcement of a potential dissolution and wind-down at an unspecified future date. (Counterclaims, ¶¶ 55-62). As remedies, Defendants demand that NIU and NII effectively cease all ongoing business operations by restricting NIU's and NII's use of their unrestricted funds. (Counterclaims, ¶¶ 63-71.) Notably missing from Defendants' counterclaims, however, are any cognizable legal grounds for the wide-ranging relief they ask this Court to impose upon NIU and NII.

Instead of pointing to the parties' rights and obligations under the Escrow and Purchase Agreements, Defendants' counterclaims ask the Court to rewrite those agreements to provide Defendants with protections they neither bargained for nor obtained when those agreements were signed in 2015. Defendants have neither factual nor legal support for their

---

[16] NIU requested that AT&T release the excess funds that AT&T had reserved but that was not needed for the 2010 and 2011 Com Nextel tax audits, $35,462,965 and $32,862,986, respectively. (*E.g.,* 7056-1(b) Statement, ¶ 76 at Email from S. Smith to D. Welsch, dated July 18, 2018, 3:46 PM (NIU Ex. 21) (attaching presentation and proposed joint release notice).) While those requests understated amounts NIU could have demanded under Escrow Agreement Section 3(e)(iii)(2) (*i.e.,* amounts calculated based upon the then-current balances of the Escrow Account), pre-judgment interest here should be applied (1) to $35,462,965 starting on October 24, 2018 and (2) to $32,862,986 starting on April 2, 2019. (7056-1(b) Statement, ¶¶ 68, 74.)

counterclaims, and both NIU and NII are entitled to a summary judgment on those counterclaims.

## 1. AT&T Has No Current Basis to Demand Indemnification from NIU.

In their Counterclaim, Defendants assert that, "[p]ursuant to [the Purchase Agreement and the Escrow Agreement], the Purchase Agreement requires NIU to indemnify AT&T for the Full Amount of the Tax Claims." (Counterclaim ¶ 65.) AT&T asserts that the "total amount of open, indemnifiable Tax Claims" is $502,922,689. (Counterclaim ¶ 55.) Defendants both misstate NIU's obligations under the Purchase Agreement (by conflating the defined term "Taxes and Damages" in Section 11.4 of the Purchase Agreement with the term "Tax Claims" in Section 11.5) and ignore that NIU has timely honored all of its indemnification and payment obligations. (7056-1(b) Statement, ¶ 81.)

Section 11.4(a) requires that NIU "indemnify and hold harmless [AT&T] for, without duplication, all *Taxes and Damages* relating to (i) any Taxes imposed on the Entities that are attributable to any Pre-Closing Period . . . ." (Purchase Agreement, § 11.4(a) (emphasis added).) Defendants claim that they have identified and purported to quantify certain Tax Claims, but they neither allege nor have a basis to claim that NIU owes them any Taxes and Damages for which Defendants have not already been reimbursed.

The term "Tax Claim" is defined in Section 11.5 of the Purchase Agreement with reference to the process of administering issues for which AT&T and its affiliates *"may reasonably be entitled to indemnification pursuant to Section 11.4 . . . ."*(Purchase Agreement, § 11.5(a) (emphasis added).) "Tax Claims" may someday become "Taxes and Damages" when audits are complete and Taxes imposed are payable, (Purchase Agreement, § 11.4), but Defendants' contention that "the Purchase Agreement requires NIU to indemnify

AT&T for the full amount of the Tax Claims," (Counterclaim ¶ 65), is an inaccurate statement of NIU's obligations that is devoid of support in the text of the Purchase Agreement.

## 2. Because NIU Has Not Defaulted on Any Obligation to AT&T, AT&T Has No Current Basis to Enforce Its Guarantee Against NII.

Related to Defendants' inability to show that NIU owes any indemnification payment under Section 11.4 of the Purchase Agreement, Defendants likewise have no basis to demand that NII perform guarantee obligations under Section 12.13. NII's guarantee in Section 12.13 provides that, if NIU:

> *defaults for any reason* whatsoever on any [ ] payment obligation or *fails to perform* such performance obligation when and to the extent that any of the same will become due and payable, then [NII] will unconditionally pay or cause to be paid such payment obligation or perform or cause to be performed such performance obligation immediately upon notice from Purchaser specifying the default so that the same benefits will be conferred on Purchaser as would have been received if such payment or performance obligations had been duly performed and satisfied . . . .

(Purchase Agreement, § 12.13 (emphasis added).)

Defendants have no guarantee claim against NII because none of the conditions precedent to NII's guarantee obligations have occurred. NIU has not defaulted on any payment obligation or otherwise failed to perform any other obligation. (7056-1(b) Statement, ¶¶ 81-83.) Because there has been no default, no Defendant has made or could make a demand upon NII seeking to enforce any guarantee right. (7056-1(b) Statement, ¶ 84.)

## 3. Defendants Cannot Create Claims by Characterizing Them as Seeking Declaratory Judgment or Equitable Relief.

Seemingly aware of their inability to assert straightforward breach of contract claims, Defendants characterize their causes of action as claims for declaratory judgment and equitable relief. Those monikers cannot disguise the Defendants' lack of a basis for any claims against NIU and NII, let alone a claim that is ripe at this time.

### a. Defendants Are Not Entitled to a Declaratory Judgment.

A claim for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, "must be presented in the context of a specific live grievance." *Golden v. Zwickler*, 394 U.S. 103, 110, 89 S.Ct. 956, 960 (1969). "The determinative issue is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Spirit Realty, L.P. v. GH & H Mableton, LLC*, 227 F. Supp. 3d 291, 297 (S.D.N.Y. 2017) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510 (1941)). "This standard is 'conceptually linked to the doctrine of ripeness, requiring that the claim of threatened injury be of direct and immediate impact and the injury sufficiently likely to occur, so as to render the issue appropriate for judicial review.'" *Id.* (quoting *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 407 (S.D.N.Y. 2002)). [17]

Because Defendants have no basis to assert either an indemnification claim against NIU or a guarantee claim against NII, their requests for a declaratory judgment are not ripe. "Generally, claims involving indemnification obligations are not justiciable until liability has been imposed upon the party to be indemnified" and "federal courts have generally declined to award declaratory relief" where there is no liability yet. *U.S. Underwriters Ins. Co. v. Orion Plumbing & Heating Corp.*, 321 F. Supp. 3d 313, 318-19 (E.D.N.Y. 2018) (citing *Cohen v. Loeb Partners Corp.*, No. 90 CIV. 5175 (KMW), 1992 WL 84535, at *4 (S.D.N.Y. Apr. 13, 1992)).

---

[17]  "Even where an actual controversy exists, the Declaratory Judgment Act gives a court discretion to decline jurisdiction." *Spirit Realty, L.P. v. GH & H Mableton, LLC*, 227 F. Supp. 3d 291, 297 (S.D.N.Y. 2017). "[C]ourts in the Second Circuit consider" *inter alia* "'(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; [and] (ii) whether a judgment would finalize the controversy and offer relief from uncertainty.'" *Id.* (quoting *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006)).

Defendants may be entitled to indemnification from NIU at some point in the future, if and when audits close for tax years and amounts that are not offset by credits are due under Section 11.4 of the Purchase Agreement. But there is no current "actual controversy" sufficient to invoke the Declaratory Judgment Act. A judgment from this Court on the Counterclaim would not "clarify[] or settl[e] the legal issues involved" or "finalize the controversy and offer relief from uncertainty," since NIU has no currently enforceable (or even reasonably ascertainable) liability to any Defendant. *See N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006). [18]

### b. Defendants Are Not Entitled to Equitable Relief.

Defendants' request for equitable relief is essentially their claim for a declaratory judgment in a different form, with Defendants asking the Court (1) to enjoin NIU and NII from exercising their corporate prerogatives to spend and distribute funds in legally permissible ways and (2) to enjoin NII from dissolving and distributing its funds without first reserving money that AT&T claims it might someday be owed. (Counterclaim, ¶¶ 69-70.) [19]

---

[18] In what might be an effort to avoid the ripeness deficiency in their claim, Defendants ask the Court to declare that "(i) NIU is obligated to indemnify AT&T for the full amount of the Tax Claims under the Purchase Agreement; and (ii) any dissolution of NII that does not account for full value of these claims is improper." (Counterclaim ¶ 64.) With respect to the first part of that requested declaration, Defendants would have this Court misstate NIU's obligations under the Purchase Agreement. NIU's obligation is to indemnify New Cingular (or its assignee, AT&T) for "Taxes and Damages" under Purchase Agreement Section 11.4, not "Tax Claims" under Section 11.5. (*See supra*, Section E.1.) With respect to the second part of the requested declaration, Defendants' Counterclaim does not even pretend to explain how Defendants could be entitled to a declaration from this Court restricting NII's ability to legally conduct its business.

[19] It is beyond the scope of this motion to litigate the reasonableness or good faith of AT&T's estimates of its Tax Claims, which appear to represent aggregate totals of all items subject to an open audit or inquiry for any and all entities and tax years, plus all possible interest and penalties. NIU considers it sufficient to note that the actual payment required for Com Nextel's 2010 and 2011 tax years ($3.995 million, after credits) was a small fraction of the $75.7 million AT&T initially "estimated" in April 2017. (7056-1(b) Statement, ¶¶ 65, 70.) While NIU is entitled to an immediate judgment and access to the funds AT&T is wrongly blocking in the Escrow Account, NIU and NII reserve all rights as to any breach of contract or other claims that AT&T's conduct has given or may give rise to, including without limitation to the extent AT&T's actions cause any disruption to the planned sale of its Brazil business operations.

Defendants' rights against NIU and NII are set forth in the Purchase Agreement and the Escrow Agreement, and the Court should not countenance Defendants' attempts to expand their rights beyond the bargain the parties negotiated and agreed. "It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S. Ct. 2031, 2035 (1992) (internal citations omitted); *see also Brown v. Sandimo Materials*, 250 F.3d 120, 126 (2d Cir. 2001) ("[A] claim for breach of contract . . . has historically been uniformly treated as a legal claim."); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S. Ct. 948, 954 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.").

As with their requests for declaratory relief, Defendants seek equitable relief based on their speculation that they might someday be harmed if their indemnification rights mature and if NIU and NII fail to comply with their contractual obligations. Defendants point to facts like supposed Tax Claims quantified in the hundreds of millions of dollars that they never claim are actually due, NII's announced sale of its business operations in Brazil in a $905 million transaction, and NII's announcement that its Board of Directors may elect to initiate dissolution proceedings in accordance with Delaware law. (Counterclaims, ¶¶ 50-62.) None of those facts justifies the relief Defendants demand because: any "Taxes and Damages" to be indemnified by NIU that may be determined by Mexican authorities (and which would not be offset by credits under Section 11.4 of the Purchase Agreement) have not yet been calculated, and there is no reason to think that NIU's liability will equal what Defendants calculate as "Tax Claims"; NII's sale of its Brazil business operations benefits NII by securing hundreds of millions of

dollars in cash in exchange for that business; NII's Board of Directors retains the right not to dissolve the company; and if NII's Board of Directors does decide to dissolve the company, any dissolution proceeding will be in accordance with their fiduciary duties and provisions of Delaware law that would ensure due process to creditors and ways to determine appropriate reserves for potential claims when legally required.

Defendants, also without any basis, demand that the Court "enjoin NII from dissolving without reserving the full amount of the Tax Claims for AT&T" and preclude it "from distributing any funds to creditors or shareholders, absent an order from this Court permitting it." (Counterclaim ¶¶ 69-70.) Those requests, for which Defendants point to "section 105(a) of title 11 of the United States Code, Rule 7001(7) of the Federal Rules of Bankruptcy Procedure, and Rule 65 of the Federal Rules of Civil Procedure," (Counterclaim ¶ 69), arguably extend beyond the Court's permissible power and, at a minimum, do not present colorable claims ripe for adjudication.

In effect, Defendants seek an injunction from this Court restraining NIU and NII from using their unrestricted funds pending a speculative, future breach of contract that may give Defendants grounds to seek a judgment for money damages. The Supreme Court, however, has held that courts have "no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333, 119 S. Ct. 1961, 1975 (1999) (ruling on district courts' equitable jurisdiction under Fed. R. Civ. P. 65). "The rule requiring a judgment was a product, not just of the procedural requirement that remedies at law had to be exhausted before equitable remedies could be pursued, but also of the substantive rule that a general creditor (one without a judgment) had no cognizable interest,

either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property." *Id*. at 319–20. In essence, Defendants ask the Court to impose a prejudgment attachment of NIU's and NII's funds, to which Defendants have demonstrated no right at common law or under the agreements approved by this Court as part of NIU's and NII's chapter 11 cases. Moreover, such an injunction would substantially damage NII's ability to operate its business and to deploy its assets in any legally permissible way its Board of Directors and management deem appropriate. Defendants negotiated the Purchase Agreement and the Escrow Agreement, and the Court should enforce those agreements according to their terms. Defendants' apparent unhappiness with the rights they actually obtained is not reason to constrain NIU and NII's corporate prerogatives.

## **CONCLUSION**

For the reasons set forth above, Plaintiff requests that the Court grant NIU and NII's motion for summary judgment: (1) granting NIU's affirmative claims, including its request for a declaration that NIU is entitled to the immediate disbursement of $65,800,288 held in the Escrow Agreement administered by Citibank N.A. and (2) dismissing Defendants' counterclaims against NIU and NII.

Dated: July 22, 2019  
      New York, New York

Respectfully submitted,

 /s/ Thomas E. Lynch

Jane Rue Wittstein  
Thomas E. Lynch  
Andrew Butler  
JONES DAY  
250 Vesey St.  
New York, NY 10281-1047  
Tel:    (212) 326-3939  
Fax:    (212) 755-7306  
Email:  jruewittstein@jonesday.com  
Email:  telynch@jonesday.com  
Email:  abutler@jonesday.com

*Attorneys for Reorganized Debtors*  
    *NIU Holdings LLC and NII Holdings, Inc.*