JONES DAY
Jane Rue Wittstein
Thomas E. Lynch
Andrew Butler
250 Vesey Street
New York, NY 10281
Tel:  (212) 326-3939
Fax:  (212) 755-7306
Email: jruewittstein@jonesday.com
Email: telynch@jonesday.com
Email: abutler@jonesday.com

*Attorneys for Reorganized Debtors*
  *NIU Holdings LLC and NII Holdings, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------------ x | : | |
| In the matter of: | : | |
| | : | **Chapter 11** |
| NIU Holdings LLC, | : | |
| | : | **Case No. 15-10155 (SCC)** |
|       Reorganized Debtor. | : | |
| ------------------------------------------------------------------ x | : | |
| NIU Holdings LLC, | : | |
| | : | |
|       Plaintiff / | : | |
|       Counterclaim Defendant, | : | |
|    v. | : | |
| | : | |
| AT&T Mobility Holdings, B.V.; New Cingular (Uruguay) | : | |
| Wireless Services, Inc.; Nextel International LLC; and | : | **Adv. Proc. No. 19-01099** |
| Comunicaciones Nextel de México S.A. de C.V., | : | |
| | : | |
|       Defendants / Counterclaim | : | |
|       Plaintiffs / Third-Party Plaintiffs, | : | |
| | : | |
|    v. | : | |
| | : | |
| NII Holdings, Inc., | : | |
| | : | |
|       Third-Party Defendant. | : | |
| ------------------------------------------------------------------ x | | |

**NIU HOLDINGS LLC'S AND NII HOLDINGS, INC.'S REPLY MEMORANDUM OF
LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

REPLY ARGUMENT ................................................................................................................. 1

    A.    There Are No Disputed Material Facts ................................................................. 1

    B.    AT&T's Refusal to Execute a Joint Release Notice Upon Resolution of the 2010 and 2011 Com Nextel Tax Audits Is a Breach of Escrow Agreement Section 3(e)(iii)(2).  NIU Is Entitled to $65.8 Million Plus Interest ................................................................................................................. 3

        1.    AT&T's April 2017 Demand for $117.9 Million in the Escrow Account Reserved $75.7 Million for the 2010 and 2011 Com Nextel Tax Audits.  AT&T Corrected That Amount to $72.3 Million in May 2017 ................................................................................................ 4

        2.    NIU Timely Objected to AT&T's Claim Notice, Including Its Specific Reservations of Funds for the 2010 and 2011 Com Nextel Tax Audits ............................................................................................... 5

        3.    Resolution of the 2010 and 2011 Com Nextel Tax Audits Requires AT&T to Deliver a Joint Release Notice to the Escrow Agent Disbursing Excess Funds to NIU.  AT&T's Refusal to Execute and Deliver a Joint Release Notice Is a Breach of the Escrow Agreement ......... 6

        4.    *Katzman* and *American Securities LLC* Do Not Support AT&T's Refusal to Deliver a Joint Release Notice Under Section 3(e)(iii)(2) .......... 7

        5.    Defendants' Contention That AT&T Has No Obligation To Execute a Joint Release Notice Upon Resolution of Any Dispute Ignores Section 3(e)(iii)(2) of the Escrow Agreement ............................................. 10

        6.    The Relevant Disputes—the 2010 and 2011 Com Nextel Tax Audits—Have Been Resolved ..................................................................... 11

        7.    The Escrow Agreement Provisions Requiring AT&T to Provide a "Reasonable Estimate of the Amount of the Escrow Fund to Be Reserved . . . Based on Information Then Available" Do Not Give AT&T a Right to Increase Its Claims After the Final Release Date .......... 12

        8.    AT&T's Admissions Confirm the Plain Meaning of the Escrow Agreement ................................................................................................ 14

        9.    NIU Is Entitled to $65,800,288 from the Escrow Account ........................ 15

        10.    NIU Is Entitled to 9% Statutory Prejudgment Interest ............................... 16

    C.    Defendants' Claims for Declaratory and Injunctive Relief Should Be Dismissed ........................................................................................................... 18

        1.    Defendants Have Still Not Identified Any "Actual Controversy" That Could Justify Their Request for a Declaratory Judgment ................. 18

        2.    Defendants Have No Legal or Factual Basis for Their Requested Equitable Relief ...................................................................................... 20

CONCLUSION ....................................................................................................................... 23

Page

Cases

*American Securities LLC* v. *E.I. DuPont de Nemours & Co.*,
2013 WL 5718477 (S.D.N.Y. Oct. 15, 2013) ...........................................................3, 7, 8, 9, 10

*Brown v. Sandimo Materials*,
250 F.3d 120 (2d Cir. 2001) ................................................................................................21

*Callen v. Fourteenth Church of Christ, Scientist New York City*,
112 F. App'x 79 (2d Cir. 2004) ...........................................................................................16

*Coventry Enterprises LLC v. Sanomedics Int'l Holdings, Inc.*,
191 F. Supp. 3d 312 (S.D.N.Y. 2016).................................................................................10

*Doc Watson Enters., LLC v. LexisNexis Claims Sols, Inc.*,
2018 WL 6242176 (N.D. Ga. Mar. 22, 2018).................................................................10, 11

*Golden v. Zwickler*,
394 U.S. 103, 89 S. Ct. 956 (1969).....................................................................................19

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308, 119 S. Ct. 1961 (1999)............................................................................22, 23

*In re AMR Corp.*,
485 B.R. 279 (Bankr. S.D.N.Y.), *aff'd*, 730 F.3d 88 (2d Cir. 2013) .....................................11

*In re Las Uvas Valley Dairies*,
2019 WL 2528831 (Bankr. D.N.M. June 19, 2019) ..............................................................23

*In re Trs. of Conneaut Lake Park, Inc.*,
554 B.R. 100 (Bankr. W.D. Pa. 2016) .................................................................................23

*Katzman v. Helen of Troy Texas Corp.*,
2012 WL 3831745 (S.D.N.Y. Aug. 28, 2012)...................................................................7, 20

*Katzman v. Helen of Troy Texas Corp.*,
2013 WL 325562 (S.D.N.Y. Jan. 28, 2013) ......................................................3, 7, 8, 9, 20

*Katzman v. Helen of Troy Texas Corp.*,
2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013)..............................................................7, 17, 18

*Kumiva Grp., LLC v. Garda USA Inc.*,
    146 A.D.3d 504, 45 N.Y.S.3d 410 (N.Y. App. Div. 2017) ....................................16

*Landmark Ins. Co. v. Hensam Enters., Inc.*,
    2011 WL 3366483 (S.D.N.Y. July 29, 2011) ........................................................13

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374, 112 S. Ct. 2031 (1992)..............................................................21, 22

*New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
    352 F.3d 599 (2d Cir. 2003)................................................................................16

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992)................................................................................14

*Spirit Realty, L.P. v. GH & H Mableton, LLC*,
    959 F.2d 425 (2d Cir. 1992)................................................................................19

*U.S. Underwriters Ins. Co. v. Orion Plumbing & Heating Corp.*,
    321 F. Supp. 3d 313 (E.D.N.Y. 2018) ................................................................20

*Wilder v. World of Boxing LLC*,
    310 F. Supp. 3d 426 (S.D.N.Y. 2018), *aff'd,* 2019 WL 2454288 (2d Cir. June
    12, 2019) ............................................................................................................17

**STATUTES**

Del. Code Ann. tit. 8, §§ 271-285.............................................................................22

N.Y. C.P.L.R. 5001(a) ...............................................................................................16

## REPLY ARGUMENT

NIU and NII submit this reply memorandum in further support of their motion for summary judgment and in response to Defendants' opposition (Docket Nos. 30-32).[1]

## A.     There Are No Disputed Material Facts.

In response to NIU's and NII's motion for summary judgment, Defendants challenge none of the facts upon which this motion relies.  (*See* NIU's and NII's 7056-1 Reply, at 2-4 and Nos. 1-84.)  While Defendants pretend to dispute some of the facts in NIU's and NII's 7056-1 Statement, their negative responses are almost exclusively objections purporting to question the extent to which NIU and NII have "accurately and completely" characterized evidence. (*See* NIU's and NII's 7056-1 Reply, Nos. 1-84 (including the text of Defendants' Rule 7056-1(c) responses).)  In every one of those instances, Defendants do not identify anything about NIU's and NII's statements that is inaccurate, incomplete, or otherwise unsupported by the underlying evidence.  (*See* NIU's and NII's 7056-1 Reply, Nos. 1-84.)  Defendants' superficial attempts to create impressions of disputed material facts cannot change the unambiguous Escrow Agreement and Purchase Agreement, the parties' contemporaneous conduct, and the rest of the indisputable facts dictating that NIU and NII are entitled to the requested summary judgment.

---

[1]   NIU and NII submit with this memorandum: (1) a Reply 7056-1 Statement of Facts and (2) the Second Declaration of Thomas E. Lynch with attached exhibits.

NIU and NII refer herein to: (1) NIU's and NII's memorandum of law in support of their motion for summary judgment (Docket No. 24, filed July 22, 2019) as "NIU's and NII's MSJ Mem." and (2) Defendants' memorandum of law in opposition to NIU's and NII's motion for summary judgment (Docket No. 30, filed Aug. 14, 2019) as "Defs.' MSJ Opp. Mem." Because issues raised in NIU's and NII's motion for summary judgment overlap with issues raised in Defendants' motion for judgment on the pleadings, NIU and NII also refer herein to: (1) Defendants' memorandum of law in support of their motion for judgment on the pleadings (Docket No. 25-1, filed July 22, 2019) as "Defs.' MJP Mem." and (2) NIU's memorandum of law in opposition to Defendants' motion for judgment on the pleadings (Docket No. 29, filed Aug. 14, 2019) as "NIU's MJP Opp. Mem."

Key facts Defendants cannot dispute are:

● AT&T delivered an Escrow Claim Notice on April 27, 2017 demanding that the Escrow Agent reserve an aggregate total of $117.9 million in the Escrow Account. (*See* NIU's and NII's 7056-1 Reply, Nos. 32-37.) From the outset, AT&T described its Claim as being comprised of estimated aggregate amounts for the various open tax years for each tax entity in Mexico, initially providing one aggregate subtotal for Defendant Com Nextel and a separate aggregate subtotal for its affiliated Other Entities. (*See* NIU's and NII's 7056-1 Reply, Nos. 32-37.)

● On April 28, 2017, AT&T provided more detail to NIU about its Claim by specifying the component amounts of the Claim corresponding to the specific tax years and corporate entities. (NIU's and NII's 7056-1 Reply, Nos. 38-41 (citing Email from D. Welsch to S. Smith, dated Apr. 28, 2017, 5:03 PM (attaching AT&T's "Breakdown of Estimated Taxes and Damages in Dispute" chart)).) Within that detail, $75.7 million of its $117.9 million Claim was based on AT&T's estimates of NIU's potential indemnification obligations for Com Nextel's 2010 tax audit ($38.6 million) and Com Nextel's 2011 tax audit ($37.1 million). (NIU's and NII's 7056-1 Reply, No. 39.)

● In May and July 2017, AT&T fixed errors in its Claim calculations and twice reduced its total aggregate Claim, first to $113.8 million (in May 2017) and later to $109.9 million (in July 2017). (NIU's and NII's 7056-1 Reply, Nos. 48, 53 and 58-61.) Within both of those corrections, $72.3 million was AT&T's total corrected estimate for Com Nextel's 2010 tax audit (recalculated as $35.46 million) and Com Nextel's 2011 tax audit (recalculated as $36.86 million). (NIU's and NII's 7056-1 Reply, Nos. 44-51, 55, 58-64.) In opposition to NIU's motion for summary judgment, Defendants submit a Declaration from Diana Sánchez Yáñez precisely confirming the components of AT&T's April 2017 Claim against the Escrow Account, including the 2010 and 2011 Com Nextel tax audit components. (*See* Decl. of Diana Sánchez Yáñez (Docket No. 31-1), ¶¶ 8, 17.)

● NIU timely objected to AT&T's Claim Notice, including objections to AT&T's reservations of funds in the Escrow Account for the 2010 and 2011 Com Nextel tax audits. (NIU's and NII's 7056-1 Reply, Nos. 56-57.)

● The 2010 and 2011 Com Nextel tax audits have been concluded, with $3.99 million needed to resolve the matters for which AT&T had reserved $72.3 million in the Escrow Account. (NIU's and NII's 7056-1 Reply, Nos. 32-41, 44-51, 55, 62-74.)

● AT&T has refused to execute and deliver a Joint Release Notice to disburse to NIU the excess funds in the Escrow Account—$65.8 million—upon resolution of the 2010 and 2011 Com Nextel tax audits. (NIU's and NII's 7056-1 Reply, Nos. 60, 75-80.)

● NIU and NII have performed all of their obligations under the Purchase Agreement and Escrow Agreement. (NIU's and NII's 7056-1 Reply, Nos. 81-84.)

**B.     AT&T's Refusal to Execute a Joint Release Notice Upon Resolution of the 2010 and 2011 Com Nextel Tax Audits Is a Breach of Escrow Agreement Section 3(e)(iii)(2). NIU Is Entitled to $65.8 Million Plus Interest.**

The crux of this lawsuit is: (1) NIU's assertion of its right, under Escrow Agreement Section 3(e), to $65,800,288 as the excess in the Escrow Account above the amount that should remain based on the still-pending components of the Claim AT&T made before the April 30, 2017 Final Release Date and (2) Defendants' contrary position that Escrow Agreement Section 3(e) permits AT&T to unilaterally change its Claim after the Final Release Date by increasing its estimated reserves for tax audits it identified before the Final Release Date.

As NIU and NII set forth in their opening brief, (NIU's and NII's MSJ Mem. at 6-8, 18-21), and in NIU's opposition to Defendants' motion for judgment on the pleadings, (NIU's MJP Opp. Mem., at 7-15), Escrow Agreement Section 3(e) establishes the procedures under which AT&T had a right to demand funds in the Escrow Account before the Final Release Date, NIU had a right to object to AT&T's demands, and funds would be distributed after the Final Release Date upon resolution of the disputes arising from AT&T's demands and NIU's objections. (*See* Escrow Agreement § 3(e).)

In their opposition, Defendants avoid any serious explication of the relevant Escrow Agreement provisions. (*See* Defs.' MSJ Opp. Mem., at 1 and 8-18.) Instead, Defendants focus on escrow agreements from other cases that were addressed in circumstances that are different than those in this case. (Defs.' MSJ Opp. Mem., at 1 and 8-15 (relying upon *Katzman v. Helen of Troy Texas Corp.* and *American Securities LLC* v. *E.I. DuPont de Nemours & Co.*).) The terms of the Escrow Agreement and the circumstances of the parties' dispute in this case are the relevant facts, and those facts dictate summary judgment in NIU's and NII's favor.

**1.    AT&T's April 2017 Demand for $117.9 Million in the Escrow Account
Reserved $75.7 Million for the 2010 and 2011 Com Nextel Tax Audits.
AT&T Corrected That Amount to $72.3 Million in May 2017.**

If AT&T wanted to "assert a claim against the Escrow Fund for Damages pursuant to Article 9 or Article 11 of the Purchase and Sale Agreement (each, a 'Claim')," the Escrow Agreement required AT&T to "deliver a written notice to Escrow Agent (with a copy to Seller) (each, a 'Claim Notice') *describing such Claim in reasonable detail and stating a reasonable estimate of the amount of the Escrow Fund to be reserved with respect to such Claim prepared in good faith based on information then available (the amount set forth in the applicable Claim Notice, the 'Claimed Amount')*." (Escrow Agreement § 3(e)(i)(2) (emphasis added).)

AT&T delivered its Escrow Claim Notice to the Escrow Agent on April 27, 2017, demanding that Citibank reserve an aggregate total of $117.9 million. (NIU's and NII's 7056-1 Reply, Nos. 32-37.) AT&T initially described its Claim in two parts, one part for tax audits related to Defendant Com Nextel and the other part for tax audits related to its affiliated Other Entities. (NIU's and NII's 7056-1 Reply, Nos. 32-37.) On April 28, 2017, AT&T provided NIU with more detail about its Claim by specifying its component estimated amounts by individual tax years and corporate entities. (NIU's and NII's 7056-1 Reply, Nos. 38-41 (citing Email from D. Welsch to S. Smith, dated Apr. 28, 2017, 5:03 PM (attaching AT&T's "Breakdown of Estimated Taxes and Damages in Dispute" chart)).) Within the detail that AT&T provided on April 28, 2017, it specified that $75.7 million of the $117.9 million aggregate total was based on estimates of NIU's potential indemnification obligations for Com Nextel's 2010 tax audit ($38.6 million) and 2011 tax audit ($37.1 million). (NIU's and NII's 7056-1 Reply, No. 39.)

In the months following its April 2017 Claim, AT&T fixed errors in its calculations and twice reduced its total aggregate Claim, first to $113.8 million (in May 2017) and later to $109.9 million (in July 2017). (NIU's and NII's 7056-1 Reply, Nos. 48, 53 and 58-61.) Within both of

those corrected amounts, $72.3 million was reserved based on AT&T's corrected estimates for Com Nextel's 2010 tax audit (recalculated as $35.46 million) and Com Nextel's 2011 tax audit (recalculated as $36.86 million). (NIU's and NII's 7056-1 Reply, Nos. 44-51, 55, 58-64.)

The Declaration of Diana Sánchez Yáñez that Defendants submit in opposition to NIU's motion for summary judgment affirms these components of AT&T's corrected Claim. In her declaration, Ms. Sánchez describes how AT&T's April 27, 2017 Claim included estimates of: $35,462,965 for Com Nextel's 2010 audit; $36,857,706 for Com Nextel's 2011 audit; $1,053,193 for Com Nextel's 2013 audit; $3,005,111 for the NII Telecom 2012 audit; $9,160,071 for the Inv. Mexico 2011 audit; $12,859,836 for the Inv. Mexico 2013 audit; $3,836,219 for the Inv. Mexico 2014 audit; and $7,706,870 for the NII Digital 2013 audit. (*See* Decl. of Diana Sánchez Yáñez (Docket No. 31-1), ¶¶ 8, 17, 25, 34, 44, 56, 66, 76.)[2] Those component amounts match, ***dollar for dollar***, the components of its Claim as AT&T explained to NIU in May 2017. (*Compare* NIU's and NII's 7056-1 Reply, No. 55 *with* Decl. of Diana Sánchez Yáñez (Docket No. 31-1), ¶¶ 8, 17, 25, 34, 44, 56, 66, 76.)

### 2. NIU Timely Objected to AT&T's Claim Notice, Including Its Specific Reservations of Funds for the 2010 and 2011 Com Nextel Tax Audits.

If NIU did not object to AT&T's April 2017 Escrow Claim Notice within thirty days, NIU would have been "deemed to have agreed to such Claimed Amount without dispute," and the Escrow Agent would have been required to release to AT&T the amount it had demanded. (Escrow Agreement § 3(e)(i)(3).) There is no dispute that NIU delivered an "Objection Notice"

---

[2] The $109,941,971 total of these eight components is equal to the aggregate total of AT&T's Claim as of July 2017. (*See* NIU's and NII's 7056-1 Reply, Nos. 61-64.) As of May 2017, AT&T's Claim included an additional $3,816,390 related to Com Nextel's 2012 tax audit, which the parties agreed in July 2017 to release from the Escrow Account with a corresponding reduction in AT&T's Claimed Amount. (*See* NIU's and NII's 7056-1 Reply, Nos. 58-62.)

to the Escrow Agent on May 25, 2017 disputing on a year-by-year basis AT&T's right to the

indemnification demanded in the Claim Notice, and NIU's Objection Notice prevented the

Escrow Agent from releasing the funds to AT&T.  (NIU's and NII's 7056-1 Reply, Nos. 56-57;

Escrow Agreement §§ 3(e)(i)(3), 3(e)(ii).)

3. **Resolution of the 2010 and 2011 Com Nextel Tax Audits Requires AT&T to Deliver a Joint Release Notice to the Escrow Agent Disbursing Excess Funds to NIU.  AT&T's Refusal to Execute and Deliver a Joint Release Notice Is a Breach of the Escrow Agreement.**

In unambiguous language, the Escrow Agreement requires the following:

> After the Final Release Date and ***upon resolution of any dispute that was the subject of an Objection Notice*** giving rise to a Disputed Claim Amount, ***Seller and Purchaser shall deliver a Joint Release Notice*** to the Escrow Agent to release from the Escrow Account . . . to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed pursuant to Claim Notices executed and delivered by Purchaser and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New York, on the Final Release Date . . . .

(Escrow Agreement, § 3(e)(iii)(2) (emphasis added).)

There is no dispute that AT&T's Claim reserved $35,462,965 and $36,857,706,

respectively, for the 2010 and 2011 Com Nextel tax audits in the Escrow Account beyond the

Final Release Date.  (NIU's and NII's 7056-1 Reply, Nos. 32-41, 44-51, 55, 62-64.)  There is

also no dispute that NIU timely objected to AT&T's claimed right, making those funds part of

the Disputed Claim Amount under Escrow Agreement Section 3(e)(ii).  (NIU's and NII's 7056-1

Reply, Nos. 56-57; Escrow Agreement § 3(e)(ii).)  The 2010 and 2011 Com Nextel tax audits are

indisputably closed, with no money needed to resolve the 2010 Com Nextel audit and $3.99

million paid out of the Escrow Account for Com Nextel's 2011 audit, (NIU's and NII's 7056-1

Reply, Nos. 65-74).  In accordance with Escrow Agreement Section 3(e)(iii)(2), resolution of the

2010 and 2011 Com Nextel tax audits renders $65,800,288[3] in the Escrow Account (out of a current $103.4 million balance) excess available funds "over the aggregate Disputed Claim Amounts still pending or disputed pursuant to Claim Notices" (currently an aggregate total of $37.6 million) that AT&T executed and delivered before the Final Release Date. (*See infra* Reply Argument Section B.9.)

AT&T's refusal to execute a Joint Release Notice directing the Escrow Agent to release to NIU the difference between the current total Escrow Account balance and the aggregate Disputed Claim Amounts that are still pending based upon AT&T's April 2017 Claim constitutes a breach of Escrow Agreement Section 3(e)(iii)(2).

4. ***Katzman* and *American Securities LLC* Do Not Support AT&T's Refusal to Deliver a Joint Release Notice Under Section 3(e)(iii)(2).**

As they did in support of their motion for judgment on the pleadings, Defendants tout *Katzman v. Helen of Troy Texas Corp.*[4] and *American Securities LLC* v. *E.I. DuPont de Nemours & Co.* as supposed justifications for AT&T's refusal to issue a Joint Release Notice now that the 2010 and 2011 Com Nextel tax audits are resolved. (*See* Defs.' MSJ Opp. Mem., at 1, 8-15; Defs.' MJP Mem., at 9-15; *see also* Defs.' MJP Mem., at 10-16, 18.) The plaintiffs' arguments

---

[3]   For reasons NIU and NII set forth in their opening brief and in opposition to Defendants' motion for judgment on the pleadings, the updated $65.8 million amount differs from the $68.3 million that NIU demanded in its Complaint primarily due to a June 24, 2019 release of funds from the Escrow Account. (*See* NIU's and NII's MSJ Mem., at 3 n.5 and 20 n.14.)

[4]   Defendants cite in their opposition memorandum two decisions from the *Katzman v. Helen of Troy Texas Corp.* litigation. (*See* Defs.' MSJ Opp. Mem., at 1, 8-15, 18 n.5.) In this brief, NIU and NII cite to a third decision from that case. For clarity, the three *Katzman* decisions are: *Katzman v. Helen of Troy Texas Corp.*, 2012 WL 3831745 (S.D.N.Y. Aug. 28, 2012) ("*Katzman I*"); *Katzman v. Helen of Troy Texas Corp.*, 2013 WL 325562 (S.D.N.Y. Jan. 28, 2013) ("*Katzman II*"); *Katzman v. Helen of Troy Texas Corp.*, 2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013) ("*Katzman III*").

in *Katzman* and *American Securities* are so different from NIU's arguments in this case that Defendants' reliance on those cases widely misses the mark.

Defendants argue that "*Katzman* is directly on point" and that the court's decision in that case somehow can be read to justify AT&T's refusal to execute a Joint Release Notice here.[5] (Defs.' MSJ Opp. Mem., at 11.) In *Katzman*, however, the plaintiff was taking a position that it was entitled at the final release date to all funds in the escrow account since no indemnification amount was immediately payable. *See Katzman II*, 2013 WL 325562, at *4. In response to that argument, the *Katzman* court held that the language of the parties' agreements provided that funds would remain in escrow beyond the final release date for the purpose of permitting the claims for which the defendant had timely reserved corresponding funds "to run their course." *Katzman II*, 2013 WL 325562, at *12. Unlike the plaintiff in *Katzman*, NIU waited until after the 2010 and 2011 Com Nextel audits were resolved before demanding the excess funds to which it is entitled under the Escrow Agreement. Unlike in *Katzman*, where the plaintiff demanded funds immediately upon the passing of the final release date, the issue in this case is AT&T's refusal to execute a Joint Release Notice disbursing excess funds from the Escrow Account after an audit is resolved for which corresponding funds were held beyond the Final Release Date. Language from *Katzman II* that Defendants quote throughout their opposition brief—including language about the relevance of adjustments that were "not yet final" and were

---

[5]    Defendants also rely on *Katzman* to misstate the pertinent issue as "What standard must be met to justify the retention of escrow funds after [April 30, 2017]?'" (Defs.' MSJ Opp. Mem., at 8 (quoting *Katzman II*, 2013 WL 325562, *9 (alterations in original)); *see also* Defs.' MJP Mem., at 9.) On this motion, the issue is not whether it was appropriate for the funds that AT&T estimated in April 2017 for potential indemnification claims related to the Com Nextel 2010 and 2011 audits to be kept in the Escrow Account after the Final Release Date, but whether AT&T has a right now that those audits have been resolved to refuse to deliver a Joint Release Notice under Escrow Agreement Section 3(e)(iii)(2) releasing the excess funds. Based on the plain text of the Escrow Agreement, AT&T has no such right.

"fluid and evolving"—were relevant to the particular issue in *Katzman* (where the plaintiff laid

claim to all funds under the escrow agreement as soon as the final release date passed) and are

not at all relevant to the very different issue in this case (*i.e.*, AT&T's obligation to deliver

a Joint Release Notice after a dispute that was the subject of an Objection Notice answering

a Claim made before the Final Release Date is resolved).[6]

Defendants' reliance on *American Securities LLC* v. *E.I. DuPont de Nemours & Co.*

is similarly misplaced. (Defs.' MSJ Opp. Mem., at 12-14.) As in *Katzman,* the *American*

*Securities* plaintiff demanded immediate disbursement of escrow funds relating to timely noticed

tax claims that remained unresolved as of a final release date. *See American Securities LLC v.*

*E.I. DuPont de Nemours & Co.,* 2013 WL 5718477, at *1 (S.D.N.Y. Oct. 15, 2013).

As in *Katzman*, the plaintiff in *American Securities* argued that it was entitled to disbursement

of funds upon the final release date because no actual tax liability had been imposed upon the

indemnitee, and therefore the indemnitee was not yet entitled to indemnification. *See American*

*Securities*, 2013 WL 5718477, at *1-3. As in *Katzman*, the *American Securities* court held that

the parties' agreements "clearly contemplated that at least some portion of the funds being held

in the Escrow Account would be retained after the [ ] cutoff date, specifically for the purpose of

resolving unresolved claims such as those at issue in this case," and so the plaintiff was not

entitled to an immediate disbursement at the final release date. *American Securities*, 2013 WL

---

[6]    Notably, the court in *Katzman* only permitted funds identified for each properly asserted corresponding claim to be retained in the escrow account beyond the final release date, and it directed that funds corresponding to claims that were not properly asserted as of the final release date (even if they might later become proper claims) be returned to the plaintiff under the terms of the parties' agreement in that case. *See Katzman II*, 2013 WL 325562, at *15-16. Nothing in *Katzman* supports any type of rule that a purchaser can increase the estimated amount of its claims after the final release date. And as the court's analysis in *Katzman* illustrates, every contract needs to be analyzed and applied in accordance with its terms.

5718477, at *10.  The *American Securities* court said nowhere that the defendant was entitled

after the final release date passed to block the release of funds timely reserved for resolved

claims by later increasing its estimates for other claims, as Defendants attempt to do here.

5.    **Defendants' Contention That AT&T Has No Obligation To Execute
a Joint Release Notice Upon Resolution of Any Dispute Ignores
Section 3(e)(iii)(2) of the Escrow Agreement.**

In their opposition, Defendants contend that "AT&T Has Not Violated Any Obligation

Regarding the Disputed Claim Amount."  (Defs.' MSJ Opp. Mem., at 15-18.)  To make that

argument, Defendants disregard Escrow Agreement Section 3(e)(iii)(2) and its unambiguous

requirement that the parties, "***upon resolution of any dispute that was the subject of an***

***Objection Notice giving rise to a Disputed Claim Amount***" "***shall deliver a Joint Release***

***Notice*** to the Escrow Agent" disbursing funds exceeding remaining Disputed Claim Amounts.

(Escrow Agreement, § 3(e)(iii)(2) (emphasis added).)  The word "shall" in Escrow Agreement

Section 3(e)(iii)(2) means that the promised action is required.[7]  Once the 2010 and 2011

Com Nextel audits underlying $72.3 million of AT&T's Claim were resolved, AT&T did not

have an option to refuse a Joint Release Notice directing the Escrow Agent to transfer excess

funds from the Escrow Account to NIU.  AT&T's refusal is a breach of the Escrow Agreement.

As in their motion for judgment on the pleadings, (Defs.' MJP Mem., at 17-18),

Defendants rely again on *Doc Watson Enters., LLC v. LexisNexis Claims Sols., Inc.* and argue

that the *Doc Watson* court's recognition that the parties' contract in that case imposed no

affirmative duty on the defendant to consent to joint disbursement instructions somehow applies

---

[7]    *See Coventry Enters. LLC v. Sanomedics Int'l Holdings, Inc.*, 191 F. Supp. 3d 312, 318
(S.D.N.Y. 2016) (referring to "shall" as "mandatory language" in the context of a contract);
*see also Doc Watson Enters., LLC v. LexisNexis Claims Solutions, Inc.*, 2018 WL 6242176, at *9
(N.D. Ga. Mar. 22, 2018) (applying Georgia law) (the language "'shall disburse' . . . plainly
impose[s] an affirmative obligation").

here.  (*See* Defs.' MSJ Opp. Mem., at 17-18 (citing *Doc Watson Enters., LLC v. LexisNexis Claims Sols., Inc.*, 2018 WL 6242176, at *10 (N.D. Ga. Mar. 22, 2018)).)  The result in *Doc Watson* is irrelevant because the escrow agreement in that case imposed no "affirmative obligation on the parties" to issue joint instructions.  *Doc Watson Enters., LLC*, 2018 WL 6242176, at *9.  The Escrow Agreement between NIU and AT&T expressly states that ***AT&T "shall deliver a Joint Release Notice"*** to the Escrow Agent "upon resolution of any dispute that was the subject of an Objection Notice . . . ."  (Escrow Agreement, § 3(e)(iii)(2) (emphasis added).)  The fact that a different contract in a different case led the court in that other case to reach a different conclusion cannot save Defendants from AT&T's breach of the Escrow Agreement.  *Accord In re AMR Corp.*, 485 B.R. 279, 309 (Bankr. S.D.N.Y.), *aff'd,* 730 F.3d 88 (2d Cir. 2013) ("Each contract is different, of course, and parties are free to draft their contracts as they wish.").

6.    **The Relevant Disputes—the 2010 and 2011 Com Nextel Tax Audits— Have Been Resolved.**

Defendants also argue that "the funds at issue remain disputed," (Defs.' MSJ Opp. Mem., at 17),[8] suggesting either that AT&T's refusal to execute a Joint Release Agreement perpetuates a dispute or that, because some of the matters underlying other components of AT&T's April 2017 Claim Notice remain open, none can be considered resolved.  Both arguments are inconsistent with Section 3(e)(ii) of the Escrow Agreement, in which the parties agreed that the Escrow Agent, after receipt of a timely Objection Notice, is required to:

> continue to hold in the Escrow Account the amount in dispute (each such amount, a "<u>Disputed Claim Amount</u>") . . . as an undivided portion of the Escrow Fund, until . . . the Escrow Agent's receipt of (1) a Joint Release Notice executed and

---

[8]    *See also* Defs.' MSJ Opp. Mem., at 14 n.3 (arguing that, "[h]ere, as the entire amount remaining in the Escrow Account is subject to dispute, no instruction could be given").

> delivered by [AT&T] and [NIU] directing the disposition **of all
> or part of such Disputed Claim Amount** in respect of which
> **a dispute** between [AT&T] and [NIU] has been resolved . . . .

(Escrow Agreement § 3(e)(ii) (emphasis added).)  The words "directing the disposition **of all

or part of such Disputed Claim Amount** in respect of which **a dispute** between [AT&T]

and [NIU] has been resolved" provide an unambiguous acknowledgment that resolution of

"**a dispute**" (not all disputes) may resolve either "**all or a part of**" a Disputed Claim Amount.

(Escrow Agreement § 3(e)(ii) (emphasis added).)  The text of Escrow Agreement Section 3(e)(ii)

recognizing that a Disputed Claim Amount can be resolved, in whole or in part, whenever "a

dispute" has been resolved is also consistent with Section 3(e)(iii)(2) and its requirement that the

parties execute a Joint Release Notice after the Final Release Date upon resolution of "**any

dispute** that was the subject of an Objection Notice giving rise to a Disputed Claim Amount"

(not all disputes).  (Escrow Agreement § 3(e)(iii)(2).)

> **7.     The Escrow Agreement Provisions Requiring AT&T to Provide a
> "Reasonable Estimate of the Amount of the Escrow Fund to Be Reserved . . .
> Based on Information Then Available" Do Not Give AT&T a Right to
> Increase Its Claims After the Final Release Date.**

Defendants point to the language in Escrow Agreement Section 3(e)(i)(2) requiring

AT&T to describe any "Claim in reasonable detail and stating a reasonable estimate of the

amount of the Escrow Fund to be reserved with respect to such Claim prepared in good faith

based on information then available (the amount set forth in the applicable Claim Notice, the

'Claimed Amount')," (Escrow Agreement § 3(e)(i)(2)), as somehow permitting AT&T to

increase its Claims after the Final Release Date if it receives new information after that deadline.

(*See* Defs.' MSJ Opp. Mem., at 1, 9-11, 14-15.)  The Escrow Agreement requirements that any

Claim be described "in reasonable detail" and as "a reasonable estimate . . . prepared in

good faith based on information then available" are indisputably requirements for a timely

asserted Claim, but nothing in the language of that provision or elsewhere in the Escrow Agreement suggests that AT&T can amend the Claim later pursuant to Section 3(e)(i)(2).

Defendants' attempt to re-cast its obligation to provide "reasonable detail" and a "reasonable estimate" identifying its Claim under Section 3(e)(i)(2) as permission to revise the estimate after the Final Release Date is a non sequitur. Nothing about an obligation to provide information "in good faith based on information then available" suggests that the Claim can be amended later, even if additional information is learned later. The straightforward application of Section 3(e)(i)(2) is that it establishes the requirements for AT&T to identify a Claim demanding funds from the Escrow Account.[9]

Defendants' argument that Escrow Agreement Section 3(e)(i)(2) grants AT&T a right to increase Claims after the Final Release Date is also inconsistent with the express language in Sections 3(e)(iii)(1) and 3(e)(iii)(2) that any funds retained in the Escrow Account after the April 30, 2017 Final Release Date were to be released, in all cases, "pursuant to Claim Notices executed and delivered by [AT&T] and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New York, on the Final Release Date." (Escrow Agreement, § 3(e)(iii)(1) and 3(e)(iii)(2).) Moreover, Sections 3(e)(iii)(1) and 3(e)(iii)(2) both calculate the "excess of the entire balance" remaining in the Escrow Account to be disbursed to NIU with reference to

---

[9]    Defendants also suggest that reservation of rights language that AT&T added to its notices and included in correspondence supports their argument that AT&T could amend its Claim if new information became available later. (Defs.' MSJ Opp. Mem., at 5; *see also id.,* at 20, 23 and 23 n.8.) Nothing in Section 3(e)(i)(2) or elsewhere in the Escrow Agreement says anything about AT&T having a right to amend its Claim later, (Escrow Agreement § 3(e)(i)(2)), and any reservation of rights extended only to "rights that exist under the terms" of the parties' contracts, *Landmark Ins. Co. v. Hensam Enters., Inc.,* 2011 WL 3366483, at *7 n.7 (S.D.N.Y. July 29, 2011). Since AT&T had no right to make new Claims against the Escrow Account or revise upwards its estimates of claimed amounts after the Final Release Date, it "could not have reserved its rights to enforce nonexistent terms," *Landmark Ins. Co.,* 2011 WL 3366483, at *7 n.7.

"Disputed Claim Amounts still pending or disputed" pursuant to Claim Notices received before the Final Release Date, providing more unambiguous textual support for the conclusion that AT&T could neither increase nor reallocate Claims after the April 30, 2017 Final Release Date. (Escrow Agreement, § 3(e)(iii)(1) and 3(e)(iii)(2).)[10]

### 8.     AT&T's Admissions Confirm the Plain Meaning of the Escrow Agreement.

Defendants spend six pages in their opposition brief contending that "NIU's contract interpretation arguments extensively rely on extrinsic evidence" and that such reliance "is a fatal admission that NIU's arguments are inconsistent with the plain language of the Agreements, making its argument inappropriate for summary judgment." (Defs.' MSJ Opp. Mem., at 18, 19; *see also id.* at 18-24.) Without citing a single instance in which NIU claimed that extrinsic evidence is necessary to interpret the Escrow Agreement, Defendants argue that NIU's "Reliance on Extrinsic Evidence Assumes a Contract Is Ambiguous," (Defs.' MSJ Opp. Mem., at 19), and that "[t]his Court's analysis of NIU's motion can begin and end with NIU's *own assertion* that 'there is relevant extrinsic evidence of the parties' actual intent,'"[11] (*Id.*, at 20 (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992))).

---

[10]    As part of their argument, Defendants cite the well-established New York rule of contract construction that agreements should not be read in ways that render provisions meaningless or superfluous. (Defs.' MSJ Opp. Mem., at 15.) While NIU and NII agree with that general principle of New York law, nothing about their interpretation of Section 3(e)(i)(2) (and the remainder of Section 3) renders any provision meaningless or superfluous. Defendants' tortured, unreasonable reading of Section 3(e) would render meaningless the Final Release Date and the procedural mechanisms within Section 3(e)(iii) that refer to the Final Release Date as the date by which Claims are fixed, and would thus run afoul of these same canons of construction.

[11]    Defendants' description of the statement "there is relevant extrinsic evidence of the parties' actual intent" as "NIU's *own assertion,*" (Defs.' MSJ Opp. Mem., at 20 (emphasis in original)), is wrong and misleading. NIU never made that statement and has never argued that extrinsic evidence is needed to interpret the unambiguous Escrow Agreement. The quotation in Defendants' brief is from the *Seiden Associates* decision, not NIU's brief.

NIU never advanced these arguments that Defendants invent and counter. The Escrow Agreement is unambiguous, extrinsic evidence is not needed to interpret the contract's terms, and NIU has never contended otherwise. (*See* NIU's and NII's MSJ Mem. at 17-25.) Undisputed facts regarding AT&T's acknowledgment and performance consistent with the plain terms of the Escrow Agreement do serve to confirm both the Escrow Agreement's unambiguous meaning and the unreasonableness of Defendants' current position. For example, the May 2017 statement from AT&T's in-house counsel, David Welsch, expressing AT&T's supposed willingness "to release to NII [ ] the corresponding portion of the claimed amount," $35.5 million, upon resolution of the 2010 Com Nextel tax audit is consistent with the unambiguous language in the Escrow Agreement and demonstrates that AT&T read the contract the same way before litigation. (NIU's and NII's 7056-1 Reply, No. 51 (quoting Email from D. Welsch to S. Smith, dated May 12, 2017 (NIU Ex. 10).) But AT&T's admission is not needed to interpret the Escrow Agreement's terms. (NIU's and NII's MSJ Mem. at 24-25.)

AT&T's argument that "NIU Fails to Establish a Relevant Course of Performance" necessary to interpret the Escrow Agreement or to find a waiver of Defendants' rights is another argument countering positions NIU never takes. (Defs.' MSJ Opp. Mem., at 20-24) Again, facts showing how AT&T's pre-litigation conduct was consistent with the unambiguous terms of the Escrow Agreement only serve to confirm NIU's plain text reading of the agreement's terms. (*See* NIU's and NII's MSJ Mem. at 24-25; NIU's MJP Opp. Mem., at 25 n.17.)

9. **NIU Is Entitled to $65,800,288 from the Escrow Account.**

There is no dispute that the Escrow Account balance was $103,421,588.85 as of June 28, 2019. (NIU's and NII's 7056-1 Reply, No. 80.) There is also no dispute—based on evidence that includes the declaration from Diana Sánchez Yáñez that Defendants submitted with their summary judgment opposition—that AT&T's pre-Final Release Date estimates for the

six remaining components of its aggregate April 2017 Claim total $37,621,300.  (*See* Decl.

of Diana Sánchez Yáñez (Docket No. 31-1), ¶ 25 (Com Nextel's 2013 audit: $1,053,193), ¶ 34

(NII Telecom 2012 audit: $3,005,111), ¶ 44 (Inv. Mexico 2011 audit: $9,160,071), ¶ 56

(Inv. Mexico 2013 audit: $12,859,836), ¶ 66 (Inv. Mexico 2014 audit: $3,836,219), ¶ 76

(NII Digital 2013 audit: $7,706,870); *see also* NIU's and NII's 7056-1 Reply, No. 55.)

Performing the calculation set forth in Escrow Agreement Section 3(e)(iii)(2), NIU

is entitled to the amount equal to the excess of (1) the entire balance available in the Escrow

Account ($103,421,588) over (2) the aggregate Disputed Claim Amounts still pending or

disputed pursuant to Claim Notices executed before the Final Release Date ($37,621,300).

NIU is therefore entitled to $65,800,288.

### 10.      NIU Is Entitled to 9% Statutory Prejudgment Interest.

New York law provides that "[i]nterest shall be recovered upon a sum awarded because

of a breach of performance of a contract," N.Y. C.P.L.R. 5001(a), and "[w]ith regard to

preverdict interest determinations . . . New York law does not permit the trial court to exercise

any discretion where a party is entitled to such interest as a matter of right," *New England Ins.

Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 603 (2d Cir. 2003).

AT&T's breach of the Escrow Agreement by refusing to deliver the required Joint

Release Notice justifies an award of statutory interest on the funds that AT&T has unjustly

blocked NIU from receiving.  *See Callen v. Fourteenth Church of Christ, Scientist New York

City*, 112 F. App'x 79, 81 (2d Cir. 2004) (holding that plaintiff's "action for breach of contract

explicitly sought damages and the fact that the money was being held in an escrow account does

not prevent the district court's action from being interpreted as an award of a sum."); *Kumiva

Grp., LLC v. Garda USA Inc*., 146 A.D.3d 504, 509, 45 N.Y.S.3d 410, 415 (N.Y. App. Div.

2017) (awarding statutory interest in a breach of escrow agreement case).

Defendants state that NIU's "attempt to collect prejudgment interest based on funds held in escrow is barred by case law"—a sweeping proposition they support with a single case, *Wilder* v. *World of Boxing LLC*. (Defs.' MSJ Opp. Mem., at 2 (citing 310 F. Supp. 3d 426, 450 (S.D.N.Y. 2018), *aff'd,* 2019 WL 2454288 (2d Cir. June 12, 2019)). In *Wilder*, however, the court declined to grant prejudgment interest because the defendant did not breach the escrow agreement in that case. *See Wilder*, 310 F. Supp. 3d at 450. In this case, statutory interest is both mandatory and appropriate because AT&T has breached the Escrow Agreement. Even the court in the *Katzman* case, upon which Defendants try to rely so heavily, recognized that "where, as here, damages are awarded from an escrow fund, prejudgment interest is generally awarded" and proceeded to determine that the plaintiff was entitled to statutory interest on the wrongfully blocked escrow funds from the date of the breach. *See Katzman III,* 2013 WL 1496952, at *2-3 and n. 3 ("[B]ecause the Court has found that [defendant] had breached its contract with [plaintiff] by refusing to assent after May 15, 2012, to the release of funds . . . , C.P.L.R. § 5001(a) presumptively requires that prejudgment interest run on the improperly withheld sums from that point forward.").[12] As in *Katzman,* this award of prejudgment interest prevents AT&T from being rewarded for its recalcitrance in refusing to issue the Joint Release Notice since otherwise AT&T "would have no downside risk in doing so, because the money would stay in

---

[12] In a footnote, Defendants argue that, if awarded, "the statutory rate of 9% should be adjusted to reflect the approximately five basis points per year paid to the Deposit Account by Citibank, in order to avoid an inequitable windfall." (Defs.' MSJ Opp. Mem., at 25 n.10.) Defendants notably cite no authority for the proposition that the statutorily-required interest rate can be reduced (and ignore that the court in *Katzman III* calculated interest at the statutory rate even though interest was payable on the escrowed funds). *Katzman III*, 2013 WL 1496952, at *4. Even if the Court determines that the statutory rate of interest should be reduced by the income in the Escrow Account, NIU disagrees that the 0.05% rate the Escrow Account receives would be accurately characterized as a "windfall."

the escrow account until it was ordered to be paid to [NIU]." *Katzman III*, 2013 WL 1496952, at *6.

## C. Defendants' Claims for Declaratory and Injunctive Relief Should Be Dismissed.

### 1. Defendants Have Still Not Identified Any "Actual Controversy" That Could Justify Their Request for a Declaratory Judgment.

In opposition to NIU's and NII's request for summary judgment on Defendants' claim for a declaration that "(i) NIU is obligated to indemnify AT&T for the full amount of the Tax Claims under the Purchase Agreement; and (ii) any dissolution of NII that does not account for full value of these claims is improper," (Defendants' Counterclaims, filed June 10, 2019 (Docket No. 14), ¶ 64), Defendants have no meaningful response to the undisputed facts that they have no current basis to assert either an underlying indemnification claim against NIU or a guarantee claim against NII. (*See* NIU and NII's MSJ Mem., at 30; NIU's and NII's 7056-1 Reply, Nos. 81-84.)

Defendants have neither alleged nor have a basis to allege that NIU owes them any Taxes and Damages under Purchase Agreement § 11.4(a) for which Defendants have not already been reimbursed. Since NIU has not defaulted on any payment obligation or otherwise failed to perform its obligations, Defendants have not made and cannot make a demand upon NII seeking to enforce any guarantee right. Hence, there is no actual controversy sufficient to invoke the Declaratory Judgment Act. (*See generally* NIU and NII's MSJ Mem., at 27-31.)

In their opposition, Defendants do not identify a single disagreement between the parties over the contractual rights and obligations about which Defendants request declaratory relief. Defendants also do not allege that there are "any Taxes imposed on the Entities that are attributable to any Pre-Closing Period . . . .," (Purchase Agreement, § 11.4(a)), such as would give rise to a claim for indemnification that has not already been satisfied. (*See* NIU's and NII's

7056-1 Reply, Nos. 81-84.)  As NIU and NII have stated: if and when audits close for tax years and amounts that are not offset by credits are due under Section 11.4 of the Purchase Agreement, Defendants may be entitled to indemnification from NIU and performance of the guarantee from NII.  (*See* NIU and NII's MSJ Mem., at 28, 31.)  If NIU or NII fail to fulfill those speculative future obligations, Defendants *may* have a "specific live grievance" sufficiently concrete for resolution by this Court.  *See Golden v. Zwickler*, 394 U.S. 103, 110, 89 S. Ct. 956, 960 (1969).  That is just not true today.  Defendants do not and cannot claim otherwise.[13]

The defect in Defendants' declaratory judgment counterclaim is not that the rights about which Defendants seek a declaration are contingent, (*see* Defs.' MSJ Opp. Mem., at 25-27), but rather that there is no controversy sufficient to justify this Court's declaration on contingent rights.[14]  *See Spirit Realty, L.P. v. GH & H Mableton, LLC*, 227 F. Supp. 3d 291, 297 (S.D.N.Y. 2017) ("The determinative issue is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.") (internal

---

[13]  Defendants' opposition states without citation to any evidence that "NII's board of directors and shareholders already have approved its plan to dissolve and distribute all of its assets, without providing any assurance to AT&T that its legitimate indemnification claims will be satisfied" and "NII further seeks the release of the escrow funds to further undercut AT&T's ability to recover—contingent as those claims may be."  (Defs.' MSJ Opp. Mem., at 26.)  These statements are demonstrably false as matters of fact.  NII's publicly announced Plan of Dissolution is contingent upon the closing of the transaction through which it will sell its business operations in Brazil.  (*See* Letter from S. Smith to J. O'Connor and D. Welsch dated June 25, 2019 (NIU Ex. 25), at 2.)  Assuming that NII proceeds with its Plan of Dissolution, "Delaware law will still require NII to address any claims and obligations, including known contingent, conditional, or unmatured contractual claims."  (Letter from S. Smith to J. O'Connor and D. Welsch dated June 25, 2019 (NIU Ex. 25), at 2.)  Such obligations would include NII's guarantee obligations to Defendants, if any.  (Letter from S. Smith to J. O'Connor and D. Welsch dated June 25, 2019 (NIU Ex. 25), at 3.)

[14]  The cases Defendants cite in their opposition memorandum relating to the justiciability of contingent contractual rights therefore fail to address the relevant question.  (Defs.' MSJ Opp. Mem., at 25-27.)

quotation marks omitted). Notably, an earlier opinion in the *Katzman v. Helen of Troy* saga is instructive on exactly this point: "indemnification claims" related to "[w]hether third party tax authorities ***will one day come to claim tax liabilities or payment shortfalls*** by Kaz, Inc., ***and whether on that basis defendants will one day come to have a valid basis to claim to have suffered losses*** by virtue of breaches by Kaz of its representations and warranties in the Merger Agreement ***so as to merit indemnification . . . with respect to such matters is today unknown***" and therefore were "***not yet ripe for resolution."*** *Katzman I*, 2012 WL 3831745, at *3 (emphasis added), *motion for reconsideration denied, Katzman II*, 2013 WL 325562, at *20. The *Katzman* court concluded that such claims were "a matter for conjecture" and that it would be "entirely premature for the Court to adjudicate that issue." *Katzman I*, 2012 WL 3831745, at *3 (S.D.N.Y. Aug. 28, 2012). The same is true here, and nothing in Defendants' opposition should prevent dismissal of their declaratory relief counterclaim.[15]

### 2. Defendants Have No Legal or Factual Basis for Their Requested Equitable Relief.

Defendants also seek equitable relief from this Court in the form of an injunction preventing "NII from dissolving without reserving the full amount of the Tax Claims for AT&T" and preventing NIU and NII "from distributing any funds to creditors or shareholders, absent an order from this Court permitting it," all on the supposed basis that "the ability of NIU to meet its indemnification obligations is in doubt." (Defendants' Counterclaims, filed June 10, 2019 (Docket No. 14), ¶¶ 69-70). Defendants have pointed to no facts that could support their

---

[15] Defendants never address the authority NIU and NII cited in their opening brief dictating that "claims involving indemnification obligations are not justiciable until liability has been imposed upon the party to be indemnified" and "federal courts have generally declined to award declaratory relief" where there is no liability yet. (*See* NIU and NII's MSJ Mem., at 30 (quoting *U.S. Underwriters Ins. Co. v. Orion Plumbing & Heating Corp.*, 321 F. Supp. 3d 313, 318-19 (E.D.N.Y. 2018) (collecting cases).)

contention, which is directly at odds with NIU's and NII's unrebutted evidence. (NIU's and NII's 7056-1 Reply, Nos. 81-84.)

Defendants' claim for equitable relief is based entirely upon their speculation that NIU and NII may someday breach their indemnification and guarantee obligations under the Purchase Agreement. (*See* NIU and NII's MSJ Mem., at 32-33; Defs.' MSJ Opp. Mem., at 28.) That fact alone dictates dismissal of Defendants' request for equitable relief, as "a claim for breach of contract . . . has historically been uniformly treated as a legal claim," *Brown v. Sandimo Materials*, 250 F.3d 120, 126 (2d Cir. 2001), and "[i]t is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381, 112 S. Ct. 2031, 2035 (1992) (internal citations omitted).

NIU and NII agree that Defendants have rights under the Purchase Agreement to seek indemnification from NIU for certain "Taxes and Damages relating to . . . any Taxes imposed on the Entities that are attributable to any Pre-Closing Period . . . .," (Purchase Agreement, § 11.4(a)), but there are currently no such "Taxes and Damages" due. If and when they become due, and if NIU or NII do not satisfy their contractual indemnification or guarantee obligations, Defendants would have a right to seek legal remedies under the Purchase Agreement. Thus, there is no current basis to justify this Court's exercise of its equitable powers.

Defendants' invocation of NII's possible dissolution is no response to this point. (*See* Defs.' MSJ Opp. Mem., at 28-29.) Even if NII does dissolve—a possibility that is planned but not yet certain—NII is a publicly traded Delaware corporation and any dissolution will be

subject to applicable Delaware law.[16]  (*See* Letter from S. Smith to J. O'Connor and D. Welsch dated June 25, 2019 (NIU Ex. 25), at 3 (citing NII's Definitive Proxy Statement, dated May 24, 2019)).)[17]  As NII has expressed publicly to its stockholders and directly to AT&T, any dissolution proceedings will need to account for NII's "outstanding debts and obligations," including "potential liabilities relating to [its] indemnification obligations."  (*See* Letter from S. Smith to J. O'Connor and D. Welsch dated June 25, 2019 (NIU Ex. 25) at 3 (citing NII's Definitive Proxy Statement, dated May 24, 2019).)  Thus, Defendants would have "an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."  *Morales*, 504 U.S. at 381, 112 S. Ct. at 2035.

Defendants' request for injunctive relief openly seeks to preserve funds to satisfy a potential future contract claim for money damages that may never materialize.  (Defs.' MSJ Opp. Mem., at 28 ("AT&T's requested relief protects its indemnification rights . . . .").).  Even if this claim ripens someday, it will be a purely legal claim and the Supreme Court's holding in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.* provides that federal courts have "no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages."  *Grupo Mexicano de*

---

[16]  *See* Del. Code Ann. tit. 8, §§ 271-285 (Subchapter X: Sale of Assets, Dissolution and Winding up).  Delaware law requires that a dissolved corporation continue its existence "for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct . . . for the purpose of . . . enabling them gradually to discharge their liabilities . . . ."  Del. Code Ann. tit. 8, § 278.  A dissolved corporation must make provision for the payment (or reservation of funds as security for payment) of claims against the corporation.  *See* Del. Code Ann. tit. 8, §§ 280-82.

[17]  The Proxy Statement, dated May 24, 2019 that NII filed with the U.S. Securities and Exchange Commission on May 6, 2019 is Exhibit 2 (Docket No. 14-2) to Defendants' Amended Answer, filed June 10, 2019 (Docket No. 14).)

*Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333, 119 S. Ct. 1961, 1975 (1999).[18]

Since there is no suggestion that the underlying claim Defendants seek to preserve is anything other than a claim for money damages due to contractual breach, *Grupo Mexicano*'s holding that this Court does not have jurisdiction to entertain such a request for injunctive relief is controlling.[19]

## **CONCLUSION**

For the reasons set forth above and in NIU's and NII's moving papers, NIU and NII request that the Court grant NIU's and NII's motion for summary judgment: (1) granting NIU's request for relief on its affirmative claims, including a finding that AT&T has breached the Escrow Agreement and NIU is entitled to $65,800,288 of the amount held in the Escrow

---

[18]   Defendants' sweeping argument that bankruptcy courts are somehow exempt from the holding in *Grupo Mexicano de Desarrollo S.A.* is unsupported in law.  Bankruptcy courts analyzing similar claims in adversary proceedings have held that *Grupo Mexicano* applies to them.  *See, e.g., In re Trs. of Conneaut Lake Park, Inc.*, 554 B.R. 100, 102, 109-10 (Bankr. W.D. Pa. 2016); *In re Las Uvas Valley Dairies*, 2019 WL 2528831, at *3 (Bankr. D.N.M. June 19, 2019).  Unlike Defendants' primary authority, *Adelphia Commc'ns Corp. v. Rigas*, 2003 WL 21297258, at *4 (S.D.N.Y. June 4, 2003), this case does not involve a bankruptcy estate—a fact of jurisdictional significance.  Instead, it involves the contractual rights and obligations of two Reorganized Debtors, NIU and NII.  What is more, Defendants' counterclaim for equitable relief is based on a contractual claim under the Purchase Agreement and not any unique statutory powers of this Court.  *Accord In re Las Uvas Valley Dairies*, 2019 WL 2528831, at *6 ("Bankruptcy Rule 7065 allows bankruptcy courts to enter injunctions, but clearly does not give bankruptcy courts any powers denied to district courts under *Grupo Mexicano*.").  Thus, Defendants' requested relief is unavailable under *Grupo Mexicano*.

[19]   Defendants also argue that *Grupo Mexicano* is "distinguishable because it addressed the issue of preliminary injunctions, which AT&T does not seek."  (Defs' MSJ Opp. Mem., at 27 n.11.) While *Grupo Mexicano* did involve a preliminary injunction, the Court's reasoning is equally applicable to requests for permanent injunctions.  *See Grupo Mexicano de Desarrollo S.A.*, 527 U.S. at 319–20, 119 S. Ct. at 1968 ("The rule requiring a judgment was a product, not just of the procedural requirement that remedies at law had to be exhausted before equitable remedies could be pursued, but also of the substantive rule that a general creditor (one without a judgment) had no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property.").

Account plus interest from AT&T calculated at the statutory rate, and (2) dismissing Defendants'
counterclaims against NIU and NII.

Dated: August 22, 2019                  Respectfully submitted,
       New York, New York

                                     /s/ Thomas E. Lynch
                                    Jane Rue Wittstein
                                    Thomas E. Lynch
                                    Andrew Butler
                                    JONES DAY
                                    250 Vesey St.
                                    New York, NY 10281-1047
                                    Tel:   (212) 326-3939
                                    Fax:   (212) 755-7306
                                    Email: jruewittstein@jonesday.com
                                    Email: telynch@jonesday.com
                                    Email: abutler@jonesday.com

                                    *Attorneys for Reorganized Debtors*
                                        *NIU Holdings LLC and NII Holdings, Inc.*