James L. Bromley
William B. Monahan
Virginia R. Hildreth
David Salter
Ashley C. Lhérisson
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the matter of:<br><br>NIU Holdings LLC,<br><br>Reorganized Debtor. | **Chapter 11**<br><br>**Case No. 15-10155 (SCC)** |
| NIU Holdings LLC,<br><br>Plaintiff / Counterclaim Defendant,<br><br>v.<br><br>AT&T Mobility Holdings, B.V.; New Cingular Wireless Services, Inc.; Nextel International (Uruguay) LLC; and Comunicaciones Nextel de México S.A. de C.V.,<br><br>Defendants / Counterclaim Plaintiffs / Third-Party Plaintiffs,<br><br>v.<br><br>NII Holdings, Inc.,<br><br>Third-Party Defendant. | **Adv. Proc. No. 19-01099** |

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF AT&T'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

I. NIU IS NOT ENTITLED TO DISBURSEMENT OF THE DISPUTED CLAIMED AMOUNT. ....................................................................................... 1

A. NIU Cannot Distinguish *Katzman* and *American Securities*. ................................. 1

B. NIU's Brief Confirms that AT&T is Under No Obligation to Agree to Release Escrowed Funds. ....................................................................................... 4

C. AT&T's Prior Agreement Does Not Modify Its Rights Under the Parties' Agreements. ....................................................................................... 7

D. There Is No Dispute over the Reasonableness or Good Faith of AT&T's Estimates. ....................................................................................... 10

II. NIU'S ATTEMPTS TO DEFLECT FROM THE IMPENDING DISSOLUTION IGNORE THE EQUITIES INVOLVED. ....................................................................... 11

CONCLUSION ....................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Sec. LLC* v. *E.I. DuPont De Nemours & Co.*,
2013 WL 5718477 (S.D.N.Y. Oct. 15, 2013) ............ 2, 3, 11

*Anheuser-Busch, Inc.* v. *Elsmere Music, Inc.*,
633 F. Supp. 487 (S.D.N.Y. 1986) ............ 8

*In re ASARCO LLC*,
420 B.R. 314 (S.D. Tex. 2009) ............ 6

*C & L Elec., Inc*. v. *City Univ. of New York*,
169 A.D.3d 755 (N.Y. App. Div. 2019) ............ 9

*Cantalupo Const. Corp.* v. *2319 Richmond Terrace Corp.*,
141 A.D.3d 623 (N.Y. App. Div. 2016) ............ 9

*Doc Watson Enters., LLC* v. *LexisNexis Claims Sols, Inc.*,
2018 WL 6242176 (N.D. Ga. Mar. 22, 2018) ............ 7

*Evans* v. *Famous Music Corp.*,
807 N.E.2d 869 (N.Y. 2004) ............ 8

*Jim Ball Pontiac-Buick-GMC, Inc*. v. *DHL Exp. (USA), Inc.*,
2015 WL 1401778 (W.D.N.Y. Mar. 26, 2015) ............ 8

*Jobim* v. *Songs of Universal, Inc.*,
732 F. Supp. 2d 407 (S.D.N.Y. 2010) ............ 8

*Katzman* v. *Helen of Troy Texas Corp.*,
2013 WL 325562 (S.D.N.Y. Jan. 28, 2013) ............ 1, 2, 3

*Lanzafame* v. *Dana Restoration, Inc.*,
2011 WL 1100111 (E.D.N.Y. Mar. 22, 2011) ............ 8

*Steelmasters, Inc.* v. *Local Union 580 of Int'l Ass'n of Bridge, Structural Ornamental & Reinforcing Iron Workers, AFL-CIO*,
2008 WL 312096 (E.D.N.Y. Feb. 1, 2008) ............ 8

*UMB Bank, Nat'l Assoc.* v. *Airplanes Ltd.*,
260 F. Supp. 3d 384 (S.D.N.Y. 2017) ............ 7

*Waverly Corp*. v. *City of New York*,
851 N.Y.S.2d 176 (N.Y. App. Div. 2008) ............ 8-9

## PRELIMINARY STATEMENT

In its opposition, NIU fails to do the one thing required of it to defeat AT&T's Motion for Judgment on the Pleadings ("Mot."): establish a breach of the Escrow Agreement. NIU cannot escape the simple fact that AT&T submitted a single Claim Notice, creating a single Claimed Amount, which NIU's objection transformed into a single Disputed Claim Amount.[1] Although NIU accuses AT&T of contorting the plain language of the Purchase Agreement and Escrow Agreement (together, the "Agreements") to serve its purposes, there is zero support for NIU's position that it is entitled to the release of any funds in the Escrow Account and zero support for the release of such funds *now*. Without such an obligation, there is no breach, and NIU's claims fail as a matter of law. This is true even without taking into account the announced intention of NIU and NII to dissolve and distribute their assets without reserving funds to protect their admitted obligation to indemnify AT&T for all pre-closing Taxes and Damages—an obligation as to which hundreds of millions of dollars of claims have been asserted by the Mexican Tax Authorities and remain subject to final determination.

## I. NIU IS NOT ENTITLED TO DISBURSEMENT OF THE DISPUTED CLAIMED AMOUNT.

### A. NIU Cannot Distinguish *Katzman* and *American Securities*.

The controlling case law is clear and unambiguous. As this District explained in *Katzman* v. *Helen of Troy Texas Corp.*, an escrow agreement requiring a claim notice to be made based on information "then available" before a final release date—like the agreement before this Court—"implies that *additional information may become available later*, *i.e.*, after [the final release date]," confirming that the same "fluid and evolving" tax claims at the heart of this case must be permitted to "run their course." 2013 WL 325562, at *13 (S.D.N.Y. Jan. 28, 2013)

---

1 All defined terms have the meaning attributed to them in AT&T's Motion for Judgment on the Pleadings.

(emphasis added); *accord American Secs. LLC* v. *E.I. DuPont De Nemours & Co.*, 2013 WL 5718477 (S.D.N.Y. Oct. 15, 2013). Here, as AT&T has emphasized repeatedly, the parties' Agreements contemplated that the value of any noticed tax claims, which by their nature are "fluid," would "evolv[e]." *Katzman*, 2013 WL 325562, at *13.

NIU's attempt to distinguish *Katzman* and *American Securities* is tepid and unavailing. *First*, NIU's protests to the contrary, New York courts regularly look to precedent interpreting analogous agreements in contract interpretation cases. (*See* Opp. at 17 ("The fact that a different contract in an unrelated case led the court in that other case to reach a different conclusion has no pertinence to NIU's ability to state a breach of contract claim against AT&T in this case.")). NIU cannot avoid well-reasoned and persuasive decisions, which not only interpret escrow agreements crafted under New York law with nearly identical language, but expressly do so in the context of "common understandings of the function of an escrow fund," because they do not like the holdings of these decisions. *Katzman*, 2013 WL 325562, at *7. In asserting otherwise, NIU effectively asks this Court to ignore the entirety of the common law as it relates to contracts.

*Second*, NIU's attempts to find factual differences between *Katzman*, *American Securities*, and this case at best raise a minor distinction without a difference. (*See* Opp. at 28-31.) The defendants in those cases, like AT&T, sought to retain funds for "unresolved" tax claims, the quantum of which were unknown, *after* the deadline to assert claims against the relevant escrow funds had passed. *American Secs.*, 2013 WL 5718477, at *3; *Katzman*, 2013 WL 325562, at *6. This NIU admits. (*See* Opp. at 29 ("The *Katzman* court held that the language of the parties' agreements provided that funds would remain in escrow beyond the final release date for the purpose of permitting the claims for which the defendant had timely reserved funds 'to run their course.'") (quoting *Katzman*, 2013 WL 325562, at *12).)

NIU skims past this admission and attempts to create a diversion by arguing that the fact that NIU did not "tak[e] [the] position" *on the Final Release Date* that certain funds should be released from the Escrow Account makes *American Securities* and *Katzman* irrelevant. (Opp. at 29.) This argument is completely beside the point and fails because both cases establish—in substantially similar circumstances—that the Agreements do not allow for the disbursement NIU is *currently* seeking. Here, as in *Katzman*, the Agreements plainly "contemplate that funds would remain in escrow after [a date certain – April 30, 2017], for the purpose of permitting those third-party claims of which [the obligee – AT&T] gave [the obligor – NIU] and the escrow agent timely notice to run their course." *Katzman*, 2013 WL 325562, at *12. *Katzman* also held that the requirement that a notice of claim include information "then available," before the final release date, "implies that *additional information*," which necessarily could change the quantum of the claim, "*may become available later*, *i.e.*, after [the final release date] with regard to" the same claim. *Id.* at *13 (emphasis added). The fact that the *Katzman* dispute arose at the time of the final release date of the escrow agreement at issue in that litigation (which is not the case here) does not change this analysis; in fact, the *Katzman* court directly addressed the fact that the information available to the parties *would* change *after* the final release date.

Similarly, NIU admits that *American Securities* dealt with the reservation of funds in an escrow account "specifically for the purpose of resolving unresolved claims such as those at issue in this case." (Opp. at 30 (citing *American Secs.*, 2013 WL 5718477, at *10).) The focus of the *American Securities* defendant—consistent with AT&T's focus here—was not to "seek[] disbursement of [the] [e]scrow [a]ccount funds," but rather to ensure that the escrow agent "ha[d] a hold on the funds until certain potential tax liabilities are resolved." *American Secs.*, 2013 WL 5718477, at *1. Again, this analysis regarding when funds amounting to the

"reasonable estimates of the dollar amounts *potentially owed* to the [relevant] taxing authorities" may be released, *id.* at *11 (emphasis added), is no less relevant after the Final Release Date set out in the Escrow Agreement. NIU's arguments to the contrary are nothing but smoke and mirrors.

### B. NIU's Brief Confirms that AT&T is Under No Obligation to Agree to Release Escrowed Funds.

NIU's assertion that the Escrow Agreement obliges AT&T to consent to *now* release funds from the Escrow Account is self-defeating. NIU's argument relies primarily on Section 3(e)(iii)(2) of the Escrow Agreement, which provides that:

> upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount, Seller and Purchaser shall deliver a Joint Release Notice to the Escrow Agent to release from the Escrow Account . . . (y) to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed pursuant to [timely delivered] Claim Notices.

(Escrow Agreement, ECF No. 1-3; *see* Opp. at 7-11, 13-18, 20, 26-29.) NIU's assertion that this section obligates AT&T to agree to an escrow disbursement when *any* portion of a Disputed Claim Amount is resolved is premised on two incorrect assumptions, neither of which are supported by the plain language of the Escrow Agreement.

*First*, NIU's argument assumes that AT&T submitted multiple Claims, each representing a separate Claimed Amount, resulting in multiple Disputed Claim Amounts. As AT&T has argued extensively already (*see* Mot. at 3, 18-19), there is no textual basis whatsoever to divide a Disputed Claim Amount into NIU's self-servingly determined constituent Claims. According to NIU, the Escrow Agreement creates a legal regime where a single Claim Notice for a single Claimed Amount can be picked apart and divided for release, even where the overall potential liability for the Disputed Claim Amount, the defense of which is entirely in NIU's

exclusive control, *exceeds* the actual funds in escrow. NIU does not and cannot articulate how far this principle extends; is each type of tax claim a different Disputed Claim Amount? Is it simply per year, or per entity? NIU's failure lies in the clear language of the contract: a "Claim"—the subject of a Claim Notice, which, on NIU's objection, became a Disputed Claim Amount—is defined as "a claim against the Escrow Fund for Damages," and "Damages" are defined as inclusive of multiple potential indemnification claims, including "any and all demands, *claims*, actions or causes of action, assessments, losses, damages . . . liabilities, costs and expenses." (Escrow Agreement, ECF No. 1-3, § 3(e)(i)(2); Purchase Agreement, ECF No. 1-2, § 9.2 (emphasis added)).

Moreover, even if a "Claim" was restricted to a *single* claim, which it is not, the Purchase Agreement's own rules of construction expressly dictate that the singular includes the plural and vice versa. (Purchase Agreement, ECF No. 1-2, § 1.2(e) (applying the "rule[] of construction and interpretation" that "words imparting the singular number only will include the plural and vice versa").) Either way, the Agreements unambiguously contemplate that a single Claim Notice would encompass multiple claims in the aggregate, based on a "reasonable estimate of the amount of the Escrow Fund" to be reserved to cover such claims that may necessarily, and indeed are expected to, evolve over time. (Escrow Agreement, ECF No. 1-3, § 3(e)(i)(2).) As articulated in AT&T's Motion for Judgment on the Pleadings, the language of the Escrow Agreement supports a *singular* Disputed Claim Amount. (*See* Mot. at 18-19; *see also* Escrow Agreement, ECF No. 1-3, § 3(e)(ii) (instructing the Escrow Agent to "continue to hold [the Disputed Claim Amount] in the Escrow Account" as "an *undivided portion of the Escrow Fund*" (emphasis added)).)[2]

[2] Here, NIU attempts to make much of the fact that Section 3(e)(ii) of the Escrow Agreement *permits* the Escrow Agent to disburse funds from the Escrow Account upon receipt of a Joint Release Notice "directing the disposition of all or part of such Disputed

Further, NIU points to no requirement that AT&T submit one claim per audit by the Mexican Tax Authorities, nor any obligation to subdivide the Disputed Claim Amount—something as to which the parties could very well have agreed. *See, e.g.*, *In re ASARCO LLC*, 420 B.R. 314, 391 (S.D. Tex. 2009) (Order of Confirmation providing that "[i]f a Claim or any portion of a Claim is disputed, no payment or distribution will be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless such Disputed Claim becomes an Allowed Claim.").

*Second*, NIU argues that the "'aggregate'" Disputed Claim Amount "'still pending or disputed'" is frozen at the date the corresponding Notice of Claim is filed and cannot evolve over time. (Opp. at 12-14, 27 (quoting Escrow Agreement, ECF No. 1-3, § 3(e)(iii)(2).) But in doing so, NIU reads only half of Section 3(e)(iii)(2) of the Escrow Agreement. Assuming, *arguendo*, that NIU is correct that a Disputed Claim Amount can be divided into constituent Claims, the resolution of any particular Claim under Section 3(e)(iii)(2) would obligate the parties to deliver a Joint Release Notice *only when* the Escrow Account holds "an amount" in "excess of" the "aggregate Disputed Claim Amounts still pending." (Escrow Agreement, ECF No. 1-3.) As discussed *supra*, NIU has no credible legal basis to assert that an estimated Claim should not be permitted to evolve over time. In fact, the contractual right of NIU to assume the defense of any tax claim, a right that it has insisted on and exercised at every opportunity, anticipates that the quantum of an estimated Claim is uncertain and may increase after the Final Release Date. (*See* Purchase Agreement, ECF No. 1-2, § 11.5.) NIU further does not dispute that the current exposure of the Claims subject to the April 2017 Claim Notice

---

Claim Amount." (Opp. at 20.) AT&T does not dispute that it *could* agree to the release of a portion of a Disputed Claim Amount. It disputes that it is *obligated* to do so, and NIU has made no credible argument otherwise.

*themselves exceed* the total current escrowed funds (and cannot, since NIU and NII have assumed the defense of such claims under Section 11 of the Purchase Agreement).

In other words, NIU's argument, when taken to its logical conclusion, would insist that the parties deliver a Joint Release Notice directing the Escrow Agent to release zero dollars to NIU, the amount that is "equal to the excess of the entire balance . . . available in the Escrow Account . . . over the aggregate Disputed Claim Amounts still pending or disputed," Section 3(e)(iii)(2), an "absurd" and "commercially unreasonable" result that should be rejected by this Court. *UMB Bank, Nat'l Assoc.* v. *Airplanes Ltd.*, 260 F. Supp. 3d 384, 393-94 (S.D.N.Y. 2017) ("Courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical.") (gathering New York cases).[3]

**C. AT&T's Prior Agreement Does Not Modify Its Rights Under the Parties' Agreements.**

Similarly, NIU's argument that AT&T's "prior conduct" in providing additional information for the April 27, 2017 Escrow Claim Notice (Opp. at 23) is unavailing and irrelevant under New York law. NIU provides no explanation as to why AT&T's provision of information regarding various tax matters making up a single Claimed Amount somehow requires AT&T to

---

3 NIU's attempt to distinguish *Doc Watson Enters., LLC* v. *LexisNexis Claims Sols, Inc.*, 2018 WL 6242176 (N.D. Ga. Mar. 22, 2018) because the provision addressing joint release instructions in the escrow agreement at issue in that case did not use the word "shall" misses the forest for the trees. (*See* Opp. at 16-17; Mot. at 17-18.) *Doc Watson* held that the escrow agreement at issue did not "obligate Defendant to authorize disbursement of funds *subject to disputed indemnification claims that remain unresolved*," as AT&T argues here. 2018 WL 6242176, at *10 (emphasis added). Whereas the *Doc Watson* plaintiff asserted that the defendant's claim notice, which expressly reserved funds for amounts "still unknown at this time," was "improper," the Court noted that the parties' escrow agreement required indemnification claims to be described "in reasonable detail" based on "estimated amount[s]." *Id.* at **1-2. Among other reasons, *Doc Watson* therefore rejected the plaintiff's attempt, like NIU, to "impose a duty to enter into joint written instructions for disbursement from [the parties'] escrow fund," when the plaintiff could find no such duty in the plain language of the agreement. *Id*. at *10.

treat any particular component part as a separate claim; AT&T has never disputed the fact that the Disputed Claim Amount is an aggregate of multiple claims and assessments from the Mexican Tax Authorities. Indeed, the definition of a "Claim" assumes that may be the case. (*See* Escrow Agreement, ECF No. 1-3, § 3(e)(i)(2); Purchase Agreement, ECF No. 1-2, § 9.2 (defining a "Claim" constituting a Claim Notice as "Damages," defined as "demands, claims, actions . . . [or] liabilities")). The dispute is over whether NIU can force the *disaggregation* of the single Disputed Claim Amount because it wants a substantial distribution of funds now, even when the Disputed Claimed Amount far exceeds available escrowed funds and the avowed used for such funds is the distribution to NIU's (and NII's) equity holders as part of the dissolution of NII under Delaware law.

Even if prior conduct had any bearing on this issue, and it does not, NIU still fails to establish a course of performance relevant to interpretation of the parties' Agreements. The *single* instance in which AT&T provided information regarding its Claim Notice does not in any way reduce AT&T's contractual rights.[4] And even if NIU could establish a legally sufficient

---

[4] New York courts require conduct "over an *extensive* period of time" in order to establish a course of performance relevant to the interpretation of an ambiguous contract, *Jobim* v. *Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 417 (S.D.N.Y. 2010) (emphasis added); *Evans* v. *Famous Music Corp.*, 807 N.E.2d 869, 873 (N.Y. 2004) (same), and *reject* course of performance evidence relying on only a "few" relevant actions, or actions over a period of mere weeks. *Anheuser-Busch, Inc.* v. *Elsmere Music, Inc.*, 633 F. Supp. 487, 493 (S.D.N.Y. 1986) ("[F]ewer than 8" payments were "insufficient evidence of a course of performance"); *Lanzafame* v. *Dana Restoration, Inc.*, 2011 WL 1100111, at *3 (E.D.N.Y. Mar. 22, 2011) (course of conduct over period of only "two months" was insufficient to "manifest a clear intent"); *Steelmasters, Inc.* v. *Local Union 580 of Int'l Ass'n of Bridge, Structural Ornamental & Reinforcing Iron Workers, AFL-CIO*, 2008 WL 312096, *7 (E.D.N.Y. Feb. 1, 2008) ("course of conduct" over "16 weeks" was insufficient period of time to bind party to an agreement); *compare Jim Ball Pontiac-Buick-GMC, Inc*. v. *DHL Exp. (USA), Inc.*, 2015 WL 1401778, at *27 (W.D.N.Y. Mar. 26, 2015) ("nearly 11 year course of performance between the parties" established relevant course of performance); *Waverly Corp*. v. *City of New York*, 851 N.Y.S.2d 176, 179 (N.Y. App. Div. 2008) (12 year course of conduct established relevant course of

course of conduct, which it cannot, NIU has already agreed that AT&T did not waive its rights: the Purchase Agreement specifically provides that "[n]o failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy." (Purchase Agreement, ECF No. 1-2 § 12.5(c); *id.* § 12.5(b) (agreement "may be amended, supplemented or changed, and any provision of this Agreement may be waived, *only by written instrument making specific reference to this Agreement* signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.") (emphasis added); *accord* Escrow Agreement, ECF No. 1-3 § 11(a) ("The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing executed and delivered by the Escrow Agent, Purchaser and Seller . . . The waiver by the Parties . . . of a breach of any of the provisions of this Agreement or failure to exercise any right or privilege hereunder shall not be construed as a waiver of any other breach of a similar nature, or as a waiver of any such provisions, rights or privileges hereunder.").) Standard provisions such as these are commonly accepted by New York courts to protect bargained-for contractual rights.[5] NIU cannot ignore such provisions at its convenience.

---

performance). As a matter of law, NIU's reliance on a single provision of AT&T's "breakdown" of its estimated claim is insufficient to establish a course of performance.

5 *See Cantalupo Const. Corp.* v. *2319 Richmond Terrace Corp.*, 141 A.D.3d 623, 625 (N.Y. App. Div. 2016) (rejecting course of performance claim where the parties' agreement "provided that neither this contract nor any provision thereof may be waived, changed or cancelled except in writing") (internal quotations omitted); *C & L Elec., Inc.* v. *City Univ. of New York*, 169 A.D.3d 755, 757 (N.Y. App. Div. 2019) (rejecting course of performance claim where the "parties' contract provides that a waiver by the defendant of . . . its rights under the contract provision, does not constitute a waiver of any other breach of or entitlement to assert its rights under the same provision.").

### D. There Is No Dispute over the Reasonableness or Good Faith of AT&T's Estimates.

NIU's attempt to now challenge the reasonableness and good faith of AT&T's estimate is at best a misreading of the Escrow Agreement's requirements, and at worst merely an attempt to manufacture a factual dispute where none exists. The Escrow Agreement does not require that AT&T provide a reasonable estimate of the ultimate *value* of the claim or the amount for which AT&T expects the claim may be *resolved*. Instead, a claim notice must only contain "a reasonable estimate of the amount of the Escrow Fund to be *reserved* with respect to such Claim prepared in good faith based on information then available." (Escrow Agreement, ECF No. 1-3, § 3(e)(i)(2) (emphasis added).) AT&T's good faith estimate is based upon the amount claimed by the Mexican Tax Authorities, which is the amount—barring settlement by NIU, the defender of the claims— to which AT&T is currently exposed. That is what is reasonable.

NIU contends that the resolution of certain tax claims for less than the amounts that might ultimately be payable to the Mexican Tax Authorities after negotiation and litigation proves bad faith and requires factual inquiry. (Opp. at 33-34.) NIU therefore asks this Court to reject estimates based on the estimated tax penalties submitted by the Mexican Tax Authorities—estimates that NIU previously argued were *necessary and sufficient to provide reasonable indemnification estimates*, when it demanded detailed information in 2017 regarding the tax claims reflected in AT&T's April 2017 Escrow Claim Notice—as the basis for AT&T's reasonable or good faith estimate. (*See* May 25, 2017 Objection to Escrow Claim Notice, ECF No. 1-6, at 6 (arguing that AT&T's estimate was "not consistent with the good faith requirements of the Escrow Agreement" because "the amounts included in [AT&T's] alleged Tax Claims . . . are not based on information from a Governmental Authority," and "it is not possible to provide a 'reasonable estimate' of the Taxes . . . as required by the Escrow Agreement" without having such a basis). Instead, now that the amount in the Escrow Account

is frozen, NIU wants the focus to be on what it believes will be smaller amounts: settlements agreed on, or that may be agreed on, by the parties on an individual claim by claim basis, all the while ignoring the overall potential exposure of AT&T to the Mexican Tax Authorities.

Of course, NIU's pre-litigation correspondence never raised these concerns. In fact, NIU is now in the unique position of having argued in 2017 that AT&T's claim notice was partially deficient *because* it was not entirely based on written notices provided by the Mexican Tax Authorities, but now asserting that numbers based on written notices from the same authorities *do not* constitute the basis of a reasonable, good-faith estimate. Like NIU's other assertions, the same argument has been made by obligors seeking escrowed funds before the resolution of tax claims—and has been rejected by New York courts. *See American Secs.*, 2013 WL 5718477, at *11 (holding that "reasonable estimates of the dollar amounts potentially owed to the [relevant] taxing authorities" constituted good faith claims). If the absence of such information was previously fatal to the reasonableness of certain of AT&T's estimates, it is absurd for NIU to now argue that its inclusion in other estimates is both unreasonable *and* in bad faith.

## II. NIU'S ATTEMPTS TO DEFLECT FROM THE IMPENDING DISSOLUTION IGNORE THE EQUITIES INVOLVED.

Although NIU has not expressly "disclaimed or disavowed [its] contractual indemnification obligations under the Purchase Agreement" (Opp. at 34)—an agreement this Court approved—NIU steadfastly refuses to reserve the full amount of AT&T's potential exposure. Instead, NIU makes vague reference to Delaware dissolution law without committing to a point of view of what such law actually requires in practice. (*Id.* at 37.) Today, the total estimated exposure for all outstanding Tax Claims, $502,922,689, is *over a quarter* of the purchase price AT&T paid in 2015 and far in excess of the initial amount deposited in the Escrow Account. And while NIU could immediately allay all of AT&T's concerns by promising

to reserve the full amount of AT&T's exposure in any dissolution proceeding, it has remained conspicuously and intentionally silent. AT&T's position is not that NII cannot "conduct its business as it is legally entitled to do" (Opp. at 38), but merely that NIU's dedication to draining the Escrow Account to fund distributions to its shareholders, leaving AT&T potentially high and dry during a Delaware dissolution, is a clear violation of the Purchase Agreement and relevant to this Court (of equity)'s decision-making as to NIU's present demand that the Escrow Agreement be emptied to AT&T's detriment. This Court should not condone such games by NIU.

## CONCLUSION

For the foregoing reasons, AT&T respectfully requests that the Court grant its motion for judgment on the pleadings.

Dated: August 22, 2019
New York, New York

Respectfully submitted,

*/s/ James L. Bromley*
James L. Bromley
William B. Monahan
Virginia R. Hildreth
David Salter
Ashley C. Lhérisson
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
bromleyj@sullcrom.com
monahanw@sullcrom.com
hildrethv@sullcrom.com
salterd@sullcrom.com
lherissona@sullcrom.com

*Attorneys for Defendants AT&T Mobility Holdings B.V., New Cingular Wireless Services, Inc., Nextel International (Uruguay), LLC, and Comunicaciones Nextel de México, S.A. de C.V.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2019, I filed and therefore caused the foregoing document to be served via the CM/ECF system in the United States Bankruptcy Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matter.

*/s/ James L. Bromley*
James L. Bromley