**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
In re                                                        :
                                                             :     **Chapter 11**
NIU Holdings LLC,                                            :
                                                             :     **Case No. 15-10155 (SCC)**
            Reorganized Debtor.                              :
                                                             :
------------------------------------------------------------- :
                                                             :
                                                             x
NIU Holdings LLC,                                            :
                                                             :
            Plaintiff / Counterclaim Defendant,             :
                                                             :     **Adv. Pro. No. 19-01099**
      v.                                                     :
                                                             :
AT&T Mobility Holdings, B.V.; New Cingular                   :
Wireless Services, Inc.; Nextel International               :
(Uruguay) LLC; and Comunicaciones Nextel                    :
de México S.A. de C.V.,                                     :
            Defendants / Counterclaim Plaintiffs             :
            / Third-Party Plaintiffs,                        :
                                                             :
      v.                                                     :
                                                             :
NII Holdings, Inc.,                                          :
                                                             :
            Third-Party Defendant.                           :
------------------------------------------------------------- x

**MEMORANDUM DECISION GRANTING MOTION OF NIU HOLDINGS LLC**
**AND NII HOLDINGS, INC. FOR SUMMARY JUDGMENT**

A P P E A R A N C E S:

JONES DAY
250 Vesey St.
New York, New York 10281
By: Jane Rue Wittstein, Esq.
    Thomas E. Lynch, Esq.
    Andrew Butler, Esq.


*Attorneys for Reorganized Debtors NIU Holdings LLC and NII Holdings, Inc.*

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
By: James L. Bromley, Esq.
    William B. Monahan, Esq.
    Virginia R. Hildreth, Esq.
    David Salter, Esq.
    Ashley C. Lhérisson, Esq.


*Attorneys for AT&T Mobility Holdings B.V., New Cingular Wireless Services, Inc., Nextel International (Uruguay), LLC, and Comunicaciones Nextel de México, S.A. de C.V.*

## TABLE OF CONTENTS

**Page**

BACKGROUND ..................................................................................................... 2

    A.    The Chapter 11 Cases and the Sale of the Telecommunications Business in Mexico to New Cingular .......................................................................... 2

    B.    Indemnification Obligations ........................................................................ 2

    C.    The Escrow Account .................................................................................... 3

    D.    The Claim Notice ......................................................................................... 5

    E.    The Joint Release Notices ............................................................................ 7

    F.    The Objection Notice ................................................................................... 8

    G.    The Com Nextel 2010 and 2011 Tax Audits .............................................. 9

    H.    The Adversary Complaint and the Counterclaims ...................................... 9

    I.    The Parties' Arguments ............................................................................. 11

DISCUSSION ...................................................................................................... 13

    A.    Applicable Law .......................................................................................... 13

    B.    No Material Undisputed Facts Exist Which Preclude the Court from Granting Summary Judgment ................................................................... 14

        1.    In April 2017, AT&T Reserved $75.7 Million in Funds in the Escrow Account for the 2010 and 2011 Com Nextel Tax Audits in Accordance with the Escrow Agreement, and Such Audits Have Been Finally Resolved ........................................................................ 15

        2.    The Escrow Agreement Provides for the Release of Funds Over the Aggregate Disputed Claim Amounts Still Pending and Disputed .......... 16

    C.    Defendants' Contentions Ignore the Plain, Unambiguous Language of the Escrow Agreement ..................................................................................... 17

    D.    AT&T's Refusal to Execute Joint Release Notices Upon Resolution of the 2010 and 2011 Com Nextel Tax Audits is a Breach of Section 3(e)(iii)(2) of the Escrow Agreement ................................................................................ 23

    E.    NIU Is Entitled to Nine Percent Interest from the Date of AT&T's Breach ....... 24

    F.    NIU and NII Are Entitled to Summary Judgment on Defendants' Counterclaims ............................................................................................ 26

**TABLE OF CONTENTS**
**(continued)**

1.    Defendants are Not Entitled to a Declaratory Judgment ......................... 28

      a.    AT&T Has No Current Basis to Demand Indemnification
from NIU or to Enforce its Guarantee Against NII .................... 29

2.    Defendants Are Not Entitled to Equitable Relief ................................... 31

CONCLUSION .......................................................................................................... 32

**HONORABLE SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**

This Adversary Proceeding centers on a dispute over the proper disposition of certain funds in an escrow account that was created in 2015, at the time of the $1.875 billion acquisition by New Cingular Wireless Services, Inc. ("New Cingular") of the Mexican telecommunications operations of NIU Holdings LLC ("NIU") and NII Holdings, Inc. ("NII").  By the terms of the purchase agreement documenting such acquisition, the parties agreed that (i) ten percent of the $1.875 billion purchase price, *i.e.,* $187.5 million, would be held in an escrow account in order to cover the possibility of pre-closing liabilities asserted post-closing; and (ii) the funds from such escrow account would only be distributed in accordance with the terms of an escrow agreement executed by the parties.  NIU and NII now claim that New Cingular and the other Defendants[1] are wrongly refusing to release $65,800,288 in escrow account funds which were reserved on account of claims relating to tax audits which have now been resolved; they argue that Defendants' refusal to consent to the release of such funds is a breach of the parties' escrow agreement.  NIU and NII have moved for summary judgment on the breach of contract claims and seek a declaration that NIU is entitled to $65,800,288 currently being held in escrow. Separately, Defendants have filed counterclaims against NIU and NII seeking (i) to obtain a declaratory judgment that, *inter alia*, NIU is obligated to indemnify AT&T (as New Cingular's assignee) for the full amount of the alleged "Tax Claims" under the parties' purchase agreement and (ii) to enjoin NIU from dissolving its business without reserving for such claims in full.  By their motion for summary judgment, NIU and NII seek dismissal of Defendants' counterclaims.

For the reasons that follow, the motion for summary judgment filed by NIU and NII is granted.

---

[1]     The four Defendants are: New Cingular, AT&T Mobility Holdings B.V. ("AT&T"), Nextel International (Uruguay) LLC ("Nextel Uruguay"), and Comunicaciones Nextel de México S.A. de C.V. ("Com Nextel").

**Background**

### A.    The Chapter 11 Cases and the Sale of the Telecommunications Business in Mexico to New Cingular

On September 15, 2014, NII and several of its affiliates filed for chapter 11 bankruptcy

protection.  On January 25, 2015, NIU filed its chapter 11 case.[2]  During the pendency of their

chapter 11 cases, NIU and NII sold their Mexican telecommunications operations to New

Cingular pursuant to the Purchase and Sale Agreement, dated January 26, 2015 (the "Purchase

Agreement").  On March 23, 2015, this Court approved the proposed sale—including entry into

the Purchase Agreement and its accompanying Escrow Agreement (the "Escrow Agreement"

and, together with the Purchase Agreement, the "Agreements")[3]—in accordance with sections

105 and 363 of the Bankruptcy Code.  As part of the sale transaction, NIU, New Cingular, and

nonparty Citibank N.A. ("Citibank" or "Escrow Agent") executed the Escrow Agreement.

The sale closed on April 30, 2015 with a final purchase price of $1.875 billion, minus certain

adjustments.

### B.    Indemnification Obligations

By the Purchase Agreement, NIU agreed that it would be "responsible for, and will

indemnify and hold harmless [New Cingular] . . . for all Taxes and Damages relating to . . . any

taxes imposed on the Entities that are attributable to any Pre-Closing Period . . . ."  (Purchase

Agreement § 11.4(a).)  As part of the indemnification process, New Cingular or AT&T

(as purchaser New Cingular's assignee) is required to give NIU notice of potential

indemnification matters once "a written notice of deficiency, proposed adjustment, adjustment,

---

[2]    NIU's bankruptcy proceedings were jointly administered with the NII chapter 11 cases. On October 18, 2016, the Court entered the Final Decree Pursuant to Section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022 Closing the Debtors' Jointly Administered Chapter 11 Cases.  On February 11, 2019, NIU filed a motion to reopen its bankruptcy case in order to commence this adversary proceeding (the "Adversary Proceeding"), which motion was granted by order dated March 5, 2019.

[3]    Adversary Proceeding ECF Nos. 1-2, 1-3.

assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim (a 'Tax Claim') is delivered or sent to or commenced or initiated" against any indemnified business entity "by any Governmental Authority with respect to Taxes or Tax Returns of any of the Entities for which [New Cingular or its affiliates] may reasonably be entitled to indemnification pursuant to Section 11.4 . . . ." (Purchase Agreement § 11.5(a).)

NII, as a "Seller Guarantor" under the Purchase Agreement, "irrevocably guarantee[d]" to New Cingular "the full, complete and timely payment and performance . . . by [NIU] of each and every payment and performance obligation" in the Purchase Agreement. (Purchase Agreement § 12.13(a).) If NIU "defaults . . . on any such payment obligation when and to the extent that any of the same will become due and payable," then NII agreed to "unconditionally pay or cause to be paid such payment obligation . . . immediately upon notice from [New Cingular] specifying the default so that the same benefits will be conferred upon [New Cingular] as would have been received if such payment or performance obligations had been duly performed and satisfied" by NIU. (*Id.*)

## C.    The Escrow Account

The Purchase Agreement established the Escrow Account (governed by the Escrow Agreement) to satisfy indemnification claims made within specified time windows for pre-closing liabilities, including current and estimated future tax liabilities. (Purchase Agreement §§ 11.4(a), 11.5(a), 11.7; Escrow Agreement § 3.) The Purchase Agreement provides that ten percent of the sale consideration would be deposited in the Escrow Account and distributed in accordance with the Escrow Agreement. Accordingly, after the sale transaction closed on April 30, 2015, $187.5 million was deposited into the Escrow Account.

The Escrow Agreement sets forth the conditions under which funds in the Escrow Account are to be distributed. If NIU (as seller) and AT&T (as purchaser New Cingular's

assignee) agree on amounts to be disbursed from the account, they can jointly execute and

deliver to the Escrow Agent a joint release notice ("Joint Release Notice") with instructions

on how, when, and to whom funds should be sent.  (Escrow Agreement § 3(e)(i)(1).)  The

procedure is different, however, when the parties disagree.

      To the extent that AT&T intends to assert a claim against the Escrow Account,

Section 3(e)(i)(2) of the Escrow Agreement provides:

> If the Purchaser intends to assert a claim against the Escrow
> Account for Damages pursuant to Article 9 or Article 11 of the
> Purchase and Sale Agreement (each, a "Claim"), then Purchaser
> shall deliver a written notice to Escrow Agent (with a copy to
> Seller) (each, a "Claim Notice") describing such claim in
> reasonable detail and stating the estimate of the amount of the
> Escrow Account to be reserved with respect to such Claim
> prepared in good faith based on information then available (the
> amount set forth in the applicable Claim Notice, the "Claimed
> Amount").

(Escrow Agreement § 3(e)(i)(2).)  Upon AT&T's delivery of a Claim Notice describing any

claim in "reasonable detail" and providing an "estimate of the amount . . . to be reserved with

respect to such Claim," NIU has thirty days to submit to the Escrow Agent an "Objection

Notice" setting forth any objection it may have to the Claim Notice.  (Escrow Agreement §

3(e)(i)(3).)

      If NIU delivers a timely Objection Notice to the Escrow Agent, then Section 3(e)(ii) of

the Escrow Agreement applies.  Section 3(e)(ii) provides that the Escrow Agent will distribute

only those amounts that are undisputed between the parties and will "continue to hold in the

Escrow Account the amount in dispute (each such amount, a 'Disputed Claim Amount') . . . ."

(Escrow Agreement § 3(e)(ii).)  The Escrow Agent is required to hold any Disputed Claim

Amount in the Escrow Account until it (i) receives from the parties a Joint Release Notice

directing the disposition of "all or part of" the Disputed Claim Amount, or (ii) receives from

either of the parties (with notice to the other party) a written notice of a legally binding

settlement agreement or a final order or judgment.  (Escrow Agreement § 3(e)(ii).)

      Under the Escrow Agreement, funds in the Escrow Account are available only for Claims

New Cingular (or AT&T, as its assignee) asserted on or before the "Final Release Date," which

date was April 30, 2017, two years after the closing of the sale transaction.  After the Final

Release Date, all funds remaining in the Escrow Account were to be returned to NIU, unless (i)

the funds were Disputed Claim Amounts "still pending or disputed" or (ii) NIU's time to submit

an Objection Notice had not yet expired.  (Escrow Agreement § 3(e)(iii)(1).).

      The Escrow Agreement further provides that:

> . . . [U]pon resolution of any dispute that was the subject of an
> Objection Notice giving rise to a Disputed Claim Amount,
> [NIU] and [New Cingular] shall deliver a Joint Release Notice
> to the Escrow Agent to release from the Escrow Account,
> (x) to [New Cingular], the applicable amount, if any, with respect
> to such Disputed Claim Amount . . . and (y) to [NIU], an amount
> equal to the excess of the entire balance then available in the
> Escrow Account (if any) over the aggregate Disputed Claim
> Amounts still pending or disputed pursuant to Claim Notices
> executed and delivered by [New Cingular] and received by the
> Escrow Agent prior to 6:00 p.m. local time in New York, New
> York, on the Final Release Date, in each case, if any. . . .

(Escrow Agreement § 3(e)(iii)(2).)

**D.**    **The Claim Notice**

      On April 27, 2017, three days before the Final Release Date, AT&T delivered to NIU

a "Tax Claim Notice" stating that certain of AT&T's affiliates were the subject of "Tax Claims

concerning Taxes attributable to Pre-Closing Periods."  (AT&T's April 27, 2017 Tax Claim

Notice, ECF No. 1-4.)  In its Tax Claim Notice, AT&T set forth its "Tax Claims" in chart form,

as follows:

**Tax Claims**

| Tax Claim | Entities | Estimated Taxes and Damages |
|---|---|---|
| Mexican impuesto especial sobre producción y servicios ("IEPS") audits (fiscal years 2011-2014) and related administrative appeals (fiscal years 2011-2012) and Mexican income tax/VAT audits (fiscal years 2011-2014) | Inversiones Nextel de Mexico, S. de R.L. de C.V.<br><br>NII Telecom S. de R.L. de C.V.<br><br>NII Digital S. de R.L. de C.V. | USD $37,300,000 |
| Mexican income tax, VAT, flat tax and IEPS audits (fiscal years 2010-2013) | Comunicaciones Nextel de Mexico S.A. de C.V. | USD $80,600,000 |

**Table 1**

(AT&T's April 27, 2017 Tax Claim Notice, Annex A, ECF No. 1-4.)  AT&T presented its

claims as (i) an aggregate amount of $37,300,000 in "Estimated Taxes and Damages" for

affiliated "Other Entities"[4] and (ii) an aggregate amount of $80,600,000 in "Estimated Taxes and

Damages" for Com Nextel.  (*Id*.)

 Also on April 27, 2017, AT&T sent to the Escrow Agent an "Escrow Claim Notice"

that it described as a "Claim Notice in respect of the Tax Claims detailed in the Tax Claim

Notice and a Claim against the Escrow Account for Damages in accordance with Section

3(e)(i)(2) of the Escrow Agreement."  (AT&T's April 27, 2017 Escrow Claim Notice, ECF No.

1-4, at 1.)  AT&T incorporated its April 27, 2017 Tax Claim Notice into its Escrow Claim Notice

and requested "that the Escrow Agent reserve the Claimed Amount equal to the Tax Claim

Amount" (*i.e.*, $117.9 million) in the Escrow Account.  (AT&T's April 27, 2017 Escrow Claim

Notice, ECF No. 1-4, at 1.)  AT&T specifically stated that the figures provided therein were

estimates "subject to amendment in the event additional information becomes available."  (*Id*.)

 After receiving AT&T's notices on April 27, 2017 reflecting aggregate Claims totaling

---

[4] The affiliated "Other Entities" are Inversiones Nextel de Mexico, S. de R.L. de C.V. ("Inv. Mexico"),
NII Telecom S. de R.L. de C.V. ("NII Telecom"), and NII Digital, S. de R.L. de C.V. ("NII Digital").

$80,600,000 related to Com Nextel and $37,300,000 related to the affiliated Other Entities, NIU

asked AT&T to provide more specificity, consistent with AT&T's obligation under Section

3(e)(i)(2) of the Escrow Agreement to describe its claims "in reasonable detail."  On April 28,

2017, prior to the Final Release Date, AT&T provided to NIU the following "Breakdown of

Estimated Taxes and Damages in Dispute" by tax year and entity:

**AT&T Mexico / NII**
**Breakdown of Estimated Taxes and Damages in Dispute under the Audit Proceedings**
**Referenced in Tax Claim Notice Dated April 27, 2017[1]**

| Audit | Entity | Estimated Taxes and Damages (USD) |
|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $38,600,000 |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $37,100,000 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("**IEPS**") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | $9,900,000 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | $3,000,000 |
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $3,800,000 |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $1,100,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $12,900,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | $7,700,000 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $3,800,000 |

[1] **Note:**  The above represents AT&T's current estimate of the breakdown of the Tax Claim Amount set forth in the above-referenced notice of Tax Claim and is subject to AT&T's ongoing review and revision based on developments in the various audit proceedings. Nothing herein is intended to or shall be deemed to limit or modify any statement or claim in the above-referenced notice of Tax Claim referenced above, and AT&T expressly reserves all of its rights, claims and arguments with respect to the Tax Claim Notice and the Taxes and Damages referenced therein.

**Table 2[5]**

E.    **The Joint Release Notices**

Shortly after the Final Release Date, and consistent with Section 3(e)(iii)(1) of the

Escrow Agreement, NIU and AT&T promptly executed and delivered to Citibank (as Escrow

---

[5]    ECF No. 1-5.

Agent) a Joint Release Notice, dated May 4, 2017, instructing Citibank to release $45,562,279.58 from the Escrow Account to NIU.  NIU and AT&T agreed that such amount was the difference between the total balance of the funds in the Escrow Account and the total of the Claimed Amounts that AT&T identified in the notices it delivered prior to the Final Release Date.

Following discussions between NIU and AT&T regarding the facts underlying AT&T's claims against the Escrow Account, AT&T recalculated its estimate of the total amount of taxes and damages indemnifiable in respect of the Tax Claims referenced in its April 27, 2017 Tax Claim Notice and reduced its aggregate claims from $117.9 million to $113.8 million. Based on the foregoing, NIU and AT&T delivered to Citibank another Joint Release Notice, dated May 18, 2017, directing Citibank to disburse $4.1 million from the Escrow Account to NIU.

Additionally, on July 18, 2017, the parties agreed to a joint release of $3,816,390 from the Escrow Account to NIU, bringing the balance of the Escrow Account to $109,941,971.  In July 2018, the parties agreed to the release of an additional $3,994,720.20 to AT&T to fund the resolution of the 2011 Com Nextel tax audit, bringing the balance of the Escrow Account to $105,947,250.80.  Finally, in June 2019, after the commencement of this Adversary Proceeding, the parties agreed to the release of $2,693,806 to AT&T to fund the resolution of the 2012 Com Nextel tax audit, bringing the current balance of the Escrow Account to $103,425,987.81.[6]

F.    **The Objection Notice**

On May 25, 2017, NIU timely objected to the Escrow Claim Notice.  (NIU's May 25, 2017 Objection to Escrow Claim Notice, ECF No. 1-7.)  As a result, AT&T's $113.8 million in

---

[6]    NIU has clarified that, while the complaint filed in the Adversary Proceeding in March 2019 (the "Complaint") demanded the release of $68.3 million from the Escrow Account, as a result of the $2,693,806 disbursed from the Escrow Account in June 2019, the amount of funds in the Escrow Account exceeding the pending Disputed Claim Amounts has been reduced from $68.3 million to approximately $65.8 million.  By the Summary Judgment Motion (as defined below), NIU and NII seek, among other things, a declaration that NIU is entitled to $65,800,288.  (*See* Summary Judgment Motion at 3 n. 5.)

claims against the Escrow Account, identified on April 27, 2017 (as set forth *supra* in Table 1) and broken down into detail on April 28, 2017 (as set forth *supra* in Table 2), became "Disputed Claim Amounts" under Section 3(e)(ii) of the Escrow Agreement.

**G.     The Com Nextel 2010 and 2011 Tax Audits**

As set forth on the April 28, 2017 "Breakdown of Estimated Taxes and Damages in Dispute" provided by AT&T to NIU (Table 2, *supra*), $75.7 million of the $117.9 million originally claimed by AT&T in the Tax Claim Notice sent on April 27, 2017 was based on unresolved 2010 and 2011 tax audits for Com Nextel.  Since the delivery of the April 27, 2017 Tax Claim Notice, the 2010 and 2011 Com Nextel tax audits have been finally resolved, and the relevant governmental authorities have confirmed that the audits are closed.

AT&T satisfied the 2010 Com Nextel tax audit without any outlay of cash; no funds from the Escrow Account were disbursed in connection with that resolution.  For the 2011 Com Nextel tax audit, as discussed *supra*, on July 9, 2018, NIU and AT&T agreed to a Joint Release Notice that disbursed $3,994,720 from the Escrow Account to AT&T to fund resolution of such audit.

**H.     The Adversary Complaint and the Counterclaims**

On March 25, 2019, NIU filed the Adversary Proceeding seeking, among other relief, a declaration that (i) there is no longer any dispute with respect to the 2010 and 2011 Com Nextel tax audits, such that the funds in the Escrow Account associated with those now-resolved Claims should be released to NIU and (ii) AT&T is in breach of the Escrow Agreement on account of its failure to execute and deliver a Joint Release to the Escrow Agent on account of such funds, which funds currently total approximately $65.8 million.

Defendants amended their answer on June 10, 2019 and asserted counterclaims against NIU and NII (the "Counterclaims").[7]    By the Counterclaims, Defendants request that the Court enter an order: (i) declaring that (a) NIU is obligated to indemnify AT&T for the full amount of the "Tax Claims" under the Purchase Agreement, and (b) any dissolution of NII that does not account for the maximum potential amount of AT&T's Tax Claims is improper; (ii) enjoining NII from dissolving without reserving the full estimated amount of AT&T's asserted Tax Claims; (iii) enjoining NII from releasing funds from the Escrow Account absent further order of the Court; (iv) enjoining NIU and NII from releasing funds from any distribution absent further order of this Court; and (v) awarding costs, expenses, and attorneys' fees to AT&T.[8]

On July 22, 2019, NIU and NII moved for summary judgment,[9] requesting that the Court enter judgment in NIU's favor and dismiss AT&T's counterclaims against NIU and NII (the "Summary Judgment Motion"); that same day, the Defendants moved for judgment on the pleadings in AT&T's favor and against NIU for failure to state a cause of action.[10]   The Defendants filed an objection to the Summary Judgment Motion (the "Objection"),[11] together with (i) the Declaration of James L. Bromley, to which was attached the Declaration of Diana Sánchez Yáñez, and (ii) the Counter Statement under Bankruptcy Rule 7056-1 of Material Facts and Replies to NII and NIU's Statements of Undisputed Material Facts.[12]   NIU and NII filed a

---

[7]    *See* Defendants' Amended Answer, Affirmative Defenses, and Counterclaims to the Complaint for Declaratory Judgment and Breach of Contract Filed by NIU Holdings LLC (ECF No. 14).

[8]    *Id.* at 30-31.

[9]    *See* Motion of NIU Holdings LLC and NII Holdings, Inc. for Summary Judgment and Memorandum of Law in Support of Motion of NIU Holdings LLC and NII Holdings, Inc. for Summary Judgment (ECF Nos. 21 and 24, together, the "Summary Judgment Motion").   In support of the Summary Judgment Motion, NIU and NII also filed the Declaration of Thomas E. Lynch (ECF No. 22) and their Statement of Undisputed Facts (ECF No. 23).

[10]    *See* Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings (ECF No. 25-1, the "Motion for Judgment on the Pleadings").   NIU and NII filed opposition to the Motion for Judgment on the Pleadings (ECF No. 29), to which the Defendants filed a reply (ECF No. 38).

[11]    ECF No. 30.

[12]    ECF Nos. 31 and 32.

reply to the Objection, together with (a) the Reply Statement of Undisputed Material Facts in

Support of Their Motion For Summary Judgment and (b) the Second Declaration of Thomas E.

Lynch in Support of Motion For Summary Judgment.[13]  On September 5, 2019, the Court held a

hearing on the Summary Judgment Motion and the Motion for Judgment on the Pleadings (the

"Hearing").

## I.      The Parties' Arguments

NIU and NII argue that, because the 2010 and 2011 Com Nextel tax audits are now

resolved—facts that AT&T cannot and does not dispute—NIU is entitled to the $65,800,288 in

the Escrow Account that was reserved for claims on account of those two audits.  Stated

differently, according to NIU, the approximately $65.8 million it seeks is the difference between

(i) $103,421,588, the entire balance currently remaining in the Escrow Account and (ii)

$37,621,300, the aggregate amount of the remaining Disputed Claim Amounts asserted in the

Claim Notice that AT&T delivered before the Final Release Date.

In support of its assertion that AT&T is required to execute a Joint Release Notice for the

$65.8 million, NIU points to the language in the Escrow Agreement, which provides that "***upon***

***resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed***

***Claim Amount***, Seller and Purchaser ***shall*** deliver a Joint Release Notice to the Escrow Agent to

release from the Escrow Account . . . (y) ***to Seller, an amount equal to the excess of the entire***

***balance then available in the Escrow Account (if any) over the aggregate Disputed Claim***

***Amounts still pending or disputed pursuant to Claim Notices executed and delivered by***

***Purchaser and received by the Escrow Agent***"[14] prior to the Final Release Date.  Such

unambiguous language, asserts NIU, mandates that AT&T execute a Joint Release Notice to

---

[13]     ECF Nos. 35, 36, and 37.

[14]     Summary Judgment Motion at 8 (quoting Escrow Agreement § 3(e)(iii)(2) (emphasis added)).

cause the Escrow Agent to disburse to NIU those funds which are no longer the subject of

Claims that AT&T asserted before the Final Release Date—funds totaling $65.8 million.

NIU contends that AT&T's refusal to execute a Joint Release Notice stems from its

present attempt to revamp the Claims it submitted in its Escrow Claim Notice in order to

reallocate to different claims those Escrow Account funds admittedly no longer needed for the

now-resolved 2010 and 2011 Com Nextel tax audits, notwithstanding the absence of any such

right in the Agreements. NIU further argues that AT&T's unjustifiable refusal to sign the

required Joint Release Notice is a breach of the Escrow Agreement for which there is no legal

justification. Because the applicable contracts are unambiguous and there are no material

disputes with respect to those facts demonstrating NIU's right to relief, NIU submits that

summary judgment is appropriate.

By their objection to the Summary Judgment Motion, Defendants argue that the motion

fails on both counts, as (i) NIU's summary judgment arguments rely on extrinsic evidence,

rendering summary judgment inappropriate and (ii) NIU is not entitled to a declaratory judgment

because AT&T is under no obligation to agree to the release of funds comprising a Disputed

Claim Amount. Specifically, Defendants assert that the escrow release mechanism established

by the Agreements contemplated that a single Claim Notice could encompass multiple claims in

the aggregate, based on a "reasonable estimate" of the amount of the Escrow Fund to be reserved

to cover such claims that may necessarily evolve over time. (Objection at 10 (citing Escrow

Agreement § 3(e)(i)(2)).) They argue that the April 2017 Escrow Claim Notice that AT&T

delivered contained a *single* Claim—now, a *single* Disputed Claim Amount—that cannot be

broken apart. As a result, Defendants maintain that a resolution of a subset of the proceedings

underlying AT&T's good faith estimate of the Claimed Amount does not require that any of such

funds be released from the Escrow Account.

Moreover, because AT&T contends that it met its obligation to deliver a timely Claim Notice (i) identifying a Claimed Amount, (ii) describing the claim in "reasonable detail," and (iii) "stating a reasonable estimate of the amount . . . to be reserved" in good faith "based on information then available," and, based on the plain language of the Escrow Agreement, its Claims were not finalized upon delivery of its Claim Notice.  (Objection at 8-9 (citing Escrow Agreement § 3(e)(i)(2).)  Citing to decisions from this District which it maintains are controlling here, AT&T argues that the Agreements contemplated that the Mexican tax claims may be "fluid and evolving" and "may change" as new relevant information may become available with respect to inchoate or unresolved claims.  (Objection at 15 (citing *Katzman* v. *Helen of Troy Texas Corp.*, 2013 WL 325562, *13 (S.D.N.Y. Jan. 28, 2013) (quotation marks omitted)).)  As such, because all of the claims encompassed by AT&T's April 2017 Escrow Claim Notice were timely noticed by AT&T in good faith, may change over time, and have not yet "run their course," AT&T contends that the full Claimed Amount should remain available in the Escrow Account for future disbursement until the entirety of the Claimed Amount is resolved.  (Objection at 10-12.)

**<u>Discussion</u>**

**A.     Applicable Law**

Under Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, a party may move for summary judgment on any claim or any portion of a claim.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Neshewat v. Salem*, 365 F. Supp. 2d. 508, 517 (S.D.N.Y. 2005); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-50 (1986).  A fact is material "if it 'might affect the outcome of the suit under the governing law.'"  *Royal Crown Day Care LLC v.*

- 13 -

*Dep't of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In deciding if such an

issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences in

the light most favorable to the party opposing the motion.  *Cifarelli* v. *Vill. of Babylon*, 93 F.3d

47, 51 (2d Cir. 1996).  To defeat a motion for summary judgment, the non-movant must set forth

specific evidence demonstrating the existence of a factual issue that is both material and

genuine.  *Liberty Lobby*, 477 U.S. at 248.  Where there are no disputes of material fact, "[t]he

proper interpretation of an unambiguous contract is a question of law for the court, and a dispute

on such an issue may properly be resolved by summary judgment."  *Omni Quartz, Ltd. v. CVS

Corp.*, 287 F.3d 61, 64 (2d Cir. 2002); *Am. Express Travel Related Servs. Co. v. Accu-Weather,

Inc.*, 849 F. Supp. 233, 239 (S.D.N.Y. 1994).

    To establish a breach of contract as a matter of New York law,[15] a party must show: (i)

the existence of the relevant agreements; (ii) adequate performance by one party; (iii) breach by

the other party; and (iv) damages.  *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d

162, 168 (2d Cir. 1998); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996); *see also Swan

Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012)).

**B.    No Material Undisputed Facts Exist Which Preclude the Court from Granting
       Summary Judgment**

    The Defendants have failed to set forth specific evidence demonstrating the existence of a

factual issue that is material and genuine and which would render the instant dispute not ripe for

summary judgment.  The Court has recited, *supra*, the material background facts and the

information on Table 1 and Table 2, none of which is in dispute.  Specifically, with respect to

Tables 1 and 2, at the Hearing, counsel for the Defendants conceded that the Defendants do not

---

[15]    New York law governs both the Purchase Agreement and the Escrow Agreement.

dispute "that the number on those pages are on those pages."[16]   The Court finds that it need not

look to extrinsic evidence as to the parties' intent in drafting the Agreements.   Rather, the

pleadings submitted by all parties and the statements by counsel at the Hearing make clear that

NIU and the Defendants disagree not on genuine issues of fact, but instead on the interpretation

and application of the relevant provisions of the Escrow Agreement.[17]   The Court finds no

ambiguity in the language of such provisions.   Accordingly, there is no need to resort to parole

evidence as to intent or as to any other issue pertaining to the interpretation of the Escrow

Agreement.

> **1.**     **In April 2017, AT&T Reserved $75.7 Million in Funds in the Escrow
>             Account for the 2010 and 2011 Com Nextel Tax Audits in Accordance with
>             the Escrow Agreement, and Such Audits Have Been Finally Resolved**

In accordance with Section 3(e)(i)(2) of the Escrow Agreement, AT&T delivered an

Escrow Claim Notice to Citibank on April 27, 2017, demanding that the Escrow Agent reserve

$117.9 million in total as set forth in the Tax Claim Notice sent to NIU.   As set forth in Table 1,

*supra*, the Tax Claim Notice contained a chart separating AT&T's Claims into two buckets of

tax claims: (i) an aggregate amount of $37,300,000 in "Estimated Taxes and Damages" for

affiliated "Other Entities" and (ii) an aggregate amount of $80,600,000 in "Estimated Taxes and

Damages" for Com Nextel.   (AT&T's April 27, 2017 Tax Claim Notice, ECF No. 1-4.)

By its April 28, 2017 "Breakdown of Estimated Taxes and Damages in Dispute" by tax

year and entity, AT&T clarified that $75.7 million of the aggregate $80.6 million that it had

reserved for Com Nextel's estimated taxes and damages constituted estimated amounts for

Com Nextel's tax audits for fiscal years 2010 ($38.6 million) and 2011 ($37.1 million).   (*See*

---

[16]   *See* Sept. 5, 2019 Hr'g Tr. (ECF No. 40) at 31:21-31:23.

[17]   *See id.* at 31:25-32:6 (Mr. Bromley: "The question, though, is the import of what those numbers are on those
pages, and not just the numbers, but the categories, the different entities that are subject to tax claims, right, and for
what types of taxes.   Now, and that goes into whether we complied with the provisions of the escrow agreement and
what did those provisions of the escrow agreement actually mean?").

Table 2, *supra*, ECF No. 1-5.)  Between April 2017 and July 2017, AT&T corrected errors in its original calculations and reduced the potential indemnification amounts to be reserved for Com Nextel's 2010 and 2011 fiscal years to $35,462,965 and $36,857,706, respectively, for total asserted Claims of $72,320,671 for Com Nextel covering those two tax years.  Accordingly, as of May 2017, the amount in the Escrow Account reserved for the 2010 and 2011 Com Nextel tax audits was approximately $72.3 million, a number which has been confirmed by Defendants. (*See* Declaration of Diana Sánchez Yáñez, ECF No. 31-1.)[18]

NIU timely delivered an Objection Notice to AT&T's Escrow Claim Notice, rendering all components of AT&T's Escrow Claim Notice "Disputed Claim Amounts" under the Escrow Agreement.  Because the 2010 and 2011 Com Nextel tax audits have been fully and finally resolved, a fact which is not in dispute, pursuant to the terms of the Escrow Agreement, NIU is entitled to receive the funds reserved for the 2010 and 2011 Com Nextel tax audits that were not ultimately needed to resolve such audits.

### 2.    The Escrow Agreement Provides for the Release of Funds Over the Aggregate Disputed Claim Amounts Still Pending and Disputed

Section 3(e) of the Escrow Agreement establishes the procedures under which (i) AT&T may assert a claim to funds in the Escrow Account before the Final Release Date; (ii) NIU may object to such claim; and (iii) and the Escrow Agent will distribute funds upon resolution of disputed claimed amounts.  Specifically, subsection (i) of Section 3(e) governs undisputed distributions as well as the process for delivering a Claim Notice and a corresponding Objection Notice, if applicable; subsection (ii) governs disputed distributions and what funds should be released and/or maintained by the Escrow Agent upon receipt of an Objection Notice; and

---

[18]    For the 2011 Com Nextel tax audit, as discussed *supra*, NIU and AT&T agreed on July 9, 2018 to a Joint Release Notice that disbursed $3,994,720 to AT&T from the Escrow Account to fund resolution of such audit. Accordingly, as of the filing of this Adversary Proceeding, the funds in the Escrow Account reserved for the 2010 and 2011 Com Nextel tax audits totaled approximately $68.3 million, the amount demanded by NIU at the time it filed its Complaint.

subsection (iii) governs how funds are to be distributed from the Escrow Account after the Final

Release Date, with subsection (iii)(2) specifically addressing the procedure for the Escrow Agent

to follow upon resolution of any dispute that was the subject of an Objection Notice.

Specifically, Section 3(e)(iii)(2) of the Escrow Agreement provides as follows:

> After the Final Release Date and upon resolution of any dispute
> that was the subject of an Objection Notice giving rise to a
> Disputed Claim Amount, Seller and Purchaser **shall** deliver a Joint
> Release Notice to the Escrow Agent to release from the Escrow
> Account, (x) to Purchaser, **the applicable amount, if any, with
> respect to such Disputed Claim Amount** that is payable pursuant
> to Section 3(e)(ii) and (y) to Seller, an amount equal to the excess
> of the entire balance then available in the Escrow Account (if any)
> over the aggregate Disputed Claim Amounts still pending or
> disputed pursuant to Claim Notices executed and delivered by
> Purchaser and received by the Escrow Agent prior to 6:00 p.m.
> local time in New York, New York, on the Final Release Date, in
> each case, if any. . . .

(Escrow Agreement § 3(e)(iii)(2) (emphasis added).)

Therefore, as any dispute that gave rise to a portion of a Disputed Claim Amount is

resolved after the Final Release Date, the Escrow Agreement obligates the parties to deliver a

Joint Release Notice to the Escrow Agent releasing to the Purchaser or to the Seller, as

applicable, the "applicable amount" of the Disputed Claim Amount that has been resolved.  Final

resolution of the 2010 and 2011 Com Nextel tax audits renders $65,800,288 in the Escrow

Account excess available funds "over the aggregate Disputed Claim Amounts still pending and

disputed pursuant to Claim Notices" that AT&T executed and delivered before the Final Release

Date.

**C.    Defendants' Contentions Ignore the Plain, Unambiguous Language of the Escrow
Agreement**

AT&T argues that its April 2017 Escrow Claim Notice (as subsequently clarified and

adjusted) set forth a single "Claim" giving rise to a single "Disputed Claim Amount" and that all

components of its Escrow Claim Notice need to be finally resolved before any one component is considered final.  AT&T relies on the "reasonable detail" and "based on information then available" requirements of Section 3(e)(i)(2) of the Escrow Agreement to argue that, as long as it complied with these requirements in its Claim Notice, the aggregate amount contained therein would remain available for future disbursement "'for the purpose of permitting those third-party claims . . . to run their course.'" (Objection at 10-11 (citing *Katzman*, 2013 WL 325562, at *12).) AT&T contends that the Agreements contemplate that its "good faith claims before the Final Release Date may necessarily change over time" (Objection at 12), and that the Escrow Agreement permits it to have one large, adjustable "Claim" that must be held in escrow and can be amended until all "buckets" of its Claimed Amount are resolved.  As further support for its argument, AT&T maintains that it reserved its rights to amend its Claim by specifically stating in the April 27, 2017 Escrow Claim Notice that the figures provided were estimates "subject to amendment in the event additional information becomes available."  (Objection at 5 (citing April 27, 2017 Escrow Claim Notice, ECF No. 1-4).)

The Court disagrees.  Nowhere in the plain language of the Escrow Agreement does it state that AT&T's obligations to provide a "reasonable estimate" in "reasonable detail" give AT&T a right to amend its Claims after the Final Release Date.  The Court observes that such a reading of the Escrow Agreement would render the Final Release Date and the provisions of Section 3(e) meaningless.  As NIU correctly asserts, "[n]othing in either the Purchase Agreement or the Escrow Agreement suggests that AT&T or its affiliates have a right to unilaterally combine individual Claims into an amorphous amount that can then be amended after the Final Release Date and applied to different facts after the date the parties agreed was the deadline for asserting any Claim against the Escrow Account." (Summary Judgment Motion at 23.)  In fact, the Escrow Agreement provides that any funds retained in the Escrow Account after the Final

Release Date were to be released, in all cases, "pursuant to Claim Notices executed and delivered

by Purchaser and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New

York, on the Final Release Date, in each case, if any. . . ," after subtracting Disputed Claim

Amounts "still pending or disputed" pursuant to Claim Notices received before the Final Release

Date from the "excess of the entire balance" remaining in the Escrow Account.  (Escrow

Agreement § 3(e)(iii)(2).)  This provision further highlights the absence of language in the

Escrow Agreement providing that Claims could be increased after the Final Release Date.  The

Court observes that, had the parties intended to include such a provision, they could have chosen

to do so.  Finally, AT&T's argument that the reservation of rights language that it included in its

notices supports its right to amend its Claim based on new information learned after the Final

Release Date is also unsupported and does not alter the Court's conclusion in this regard.

AT&T also argues that the Escrow Agreement permits it to make one large "Claim" and

to reallocate the portions within such Claim after the Final Release Date.  In support of this

argument, AT&T focuses on the term "Claimed Amount," as such term is used in Section

3(e)(i)(2) of the Escrow Agreement, to contend that the "Claimed Amount" becomes "the

amount in dispute," and that such claim "can be comprised of multiple tax claims." (Sept. 5,

2019 Hr'g Tr. At 38:12-40:23.)  Accordingly, such "Claimed Amount," AT&T asserts, should be

rightfully held in escrow until all portions of such Claimed Amount are resolved.

Simply put, this is not what the Escrow Agreement provides.  The Escrow Agreement

identifies each claim in the singular (*i.e.*, "each, a '<u>Claim</u>'"), calling for "such Claim" to be

described before the Final Release Date "in reasonable detail and stating a reasonable estimate of

the amount of the Escrow Account to be reserved with respect to such Claim prepared in good

faith based on information then available."  (Escrow Agreement, § 3(e)(i)(2).)  As NIU

accurately points out, interpreting each basis for a Claim under Section 3(e)(i)(2) as a singular

Claim is also consistent with Section 11.5(a) of the Purchase Agreement, which allows AT&T (or an affiliate Purchaser) to request indemnification from NIU based on any "written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim (a '<u>Tax Claim</u>')" from or by a "Governmental Authority with respect to Taxes or Tax Returns of any of the Entities for which Purchaser or its Affiliates may reasonably be entitled to indemnification." (Purchase Agreement § 11.5(a).) The indemnification rights under the Purchase Agreement each represent an individualized "Tax Claim," which is consistent with AT&T's own April 28, 2017 "Breakdown of Estimated Taxes and Damages in Dispute," which references the tax audits for individual entities and tax years. (ECF No. 1-5.)

Sections 3(e)(ii) and (iii) of the Escrow Agreement also provide that individual Claims are distinct from each other and can be resolved separately, whereupon amounts held in escrow can be released. Section 3(e)(ii) specifically refers to the buckets of Claims which may comprise the Disputed Claim Amount, requiring the Escrow Agent to hold any Disputed Claim Amount until the agent (1) receives from the parties a Joint Release Notice directing the disposition of **"all or part of"** the Disputed Claim Amount, or (2) receives from either of the parties (with notice to the other party) a written notice of a legally binding settlement agreement or a final order or judgment. (Escrow Agreement § 3(e)(ii) (emphasis added).) Section 3(e)(iii) of the Escrow Agreement likewise sets forth circumstances under which funds are to be distributed from the Escrow Account "[a]fter the Final Release Date and ***upon resolution of any dispute*** that was the subject of an Objection Notice giving rise to a Disputed Claim Amount." (*See* Escrow Agreement § 3(e)(iii)(2)) (emphasis added).)

Finally, as counsel for NIU correctly asserted at the Hearing, the words "any dispute" are given meaning under the Escrow Agreement by AT&T's Claim Notice and NIU's Objection

Notice.  If NIU does not object to a Claim Notice within thirty days, NIU is deemed to have

agreed to such Claimed Amount without dispute, and the Escrow Agent is required to release to

AT&T the amount demanded by the Claim Notice.  (*See* Escrow Agreement § 3(e)(i)(3).)  The

Objection Notice informs the Escrow Agent what funds need to be reserved.  Here, the Objection

Notice delivered by NIU on May 25, 2017 disputed on a year-by-year basis the Claims asserted

by AT&T in the Claim Notice and prevented the Escrow Agent from releasing such funds.

Accordingly, were AT&T's theory that it could increase or reallocate its claim a correct one,

there would be no opportunity provided for NIU to deliver an Objection Notice objecting to any

new claim by AT&T.  There would be no Objection Notice from NIU to clearly indicate to the

Escrow Agent what funds to reserve for any Claim increased or modified by AT&T after the

Final Release Date.  This is not surprising, since such a loophole would effectively render the

Final Release Date meaningless by allowing AT&T to continuously recharacterize and/or

increase claims against the Escrow Account.  Nothing in the Escrow Agreement gives AT&T a

right to change the basis for or increase the amount of any Claims after the Final Release Date.

Based on each of these provisions of the Escrow Agreement, the Court concludes that the

Escrow Agreement unambiguously provides that Claims set forth in a Claim Notice timely

submitted before the Final Release Date cannot be increased or recharacterized after such date.

Defendants attempt to rely upon three decisions from this District,[19] two decided in the

*Katzman v. Helen of Troy Texas Corp.* litigation and one decided in *American Securities LLC*, to

argue that the funds sought by NIU should not be released because all of AT&T's Claims have

not yet "run their course."  (*See* Objection at 11 (citing *Katzman* v. *Helen of Troy Texas Corp.*,

2013 WL 325562 at *12).)  Defendants cite to *Katzman* in support of their argument that,

---

[19]        *See* Objection at 1, 8-15, 18 n.5 (citing *Katzman v. Helen of Troy Texas Corp.*, 2013 WL 325562
(S.D.N.Y. Jan. 28, 2013); *Katzman v. Helen of Troy Texas Corp.*, 2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013);
*American Securities LLC v. E.I. DuPont de Nemours & Co.*, 2013 WL 5718477 (S.D.N.Y. Oct. 15, 2013)).

because AT&T's Claim Notice provided a reasonable estimated based upon information then available, "the Agreements must be read to contemplate that good faith claims before the Final Release Date may necessarily change over time." (Objection at 12.)

While *Katzman* does indeed address the release of funds held in escrow, it is factually distinguishable from this case.  In *Katzman*, the plaintiff sought the release of all funds in the escrow account immediately upon the passing of the final release date, asserting the funds should be released because no indemnification amount was immediately payable.  The court held that the language of the escrow agreement required the funds to remain in escrow until the claims for which funds were reserved had "run their course."  *See Katzman* v. *Helen of Troy Texas Corp.*, 2013 WL 325562, at *12.  Similarly, in *American Securities LLC*, the plaintiff also demanded immediate disbursement of escrow funds upon the final release date because, while the timely noticed tax claims also remained unresolved, no actual liability had been imposed at that time. *See American Securities LLC*, 2013 WL 5718477, at *1-3.  The *American Securities* court held that the plaintiff was not entitled to immediate disbursement of the funds at the final release date because the parties' agreements contemplated that at least some portion of the funds would be retained after the final release date "specifically for the purpose of resolving unresolved claims such as those at issue in this case."  *Id.* at *10.  Here, in contrast, NIU waited until the 2010 and 2011 Com Nextel tax audits were resolved before seeking the release of funds reserved for such audits, and there is no dispute that such audits have been fully and finally resolved. Significantly, nothing in the decisions cited by Defendants supports the conclusion that a purchaser can increase the amount of its estimated claims after the final release date or otherwise prevents the release of escrow funds for resolved claims in order to use such funds to pay new claims.

NIU is thus entitled to judgment declaring that there is no longer any dispute with respect to Defendant Com Nextel's 2010 and 2011 audits and the excess $65,800,288 in the Escrow Account should be released to NIU.[20]

**D.     AT&T's Refusal to Execute Joint Release Notices Upon Resolution of the 2010 and 2011 Com Nextel Tax Audits is a Breach of Section 3(e)(iii)(2) of the Escrow Agreement**

NIU also seeks judgment declaring that, because AT&T refused to execute Join Release Notices directing the Escrow Agent to transfer to NIU the funds previously held in escrow for the Com Nextel 2010 and 2011 audits, AT&T is in breach of the Agreements.  Section 3(e)(iii)(2) of the Escrow Agreement provides as follows:

> After the Final Release Date and upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount, Seller and Purchaser **shall** deliver a Joint Release Notice to the Escrow Agent to release from the Escrow Account, (x) to Purchaser, the applicable amount, if any, with respect to such Disputed Claim Amount that is payable pursuant to Section 3(e)(ii) and (y) to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed pursuant to Claim Notices executed and delivered by Purchaser and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New York, on the Final Release Date, in each case, if any. . . .

(Escrow Agreement § 3(e)(iii)(2) (emphasis added).)  Final resolution of the 2010 and 2011 Com Nextel tax audits rendered $65,800,288 in the Escrow Account excess available funds "over the aggregate Disputed Claim Amounts still pending and disputed pursuant to Claim Notices" that AT&T executed and delivered before the Final Release Date.  This amount is calculated (pursuant to Section 3(e)(iii)(2)) by taking the balance of the Escrow Account as of

---

[20]     As noted, this amount is lower than the $68.3 million that NIU demanded upon the filing of the Adversary Proceeding primarily due to the June 24, 2019 release of funds from the Escrow Account that the parties agreed could be used to pay an amount due for Com Nextel's tax audit for the 2012 fiscal year, which release occurred subsequent to the commencement of the Adversary Proceeding.

June 28, 2019—$103,421,588.85—and subtracting from it AT&T's pre-Final Release Date

estimates for the remaining unresolved buckets of its April 27, 2017 Claim Notice, which total

$37,621,300 in the aggregate, as set forth in the Declaration of Diana Sánchez Yáñez filed by the

Defendants.  (*See* Declaration of Diana Sánchez Yáñez, ECF No. 31-1.)  This amount is

$65,800,288.  AT&T is required by the mandatory "shall" language in Section 3(e)(iii)(2) to join

NIU in delivering a Joint Release Notice to the Escrow Agent directing it to transfer such funds

to NIU.  The Court finds that, by refusing to do so, AT&T is in breach of this affirmative

obligation imposed by the Escrow Agreement, and NIU is entitled to summary judgment on its

claim for breach of contract.

**E.    NIU Is Entitled to Nine Percent Interest from the Date of AT&T's Breach**

The parties next dispute whether NIU is entitled to prejudgment interest on its breach of

contract claim.  NIU asserts that it is entitled to such interest under New York law, which grants

prejudgment interest to prevailing plaintiffs in breach of contract actions from "the earliest

ascertainable date the cause of action existed . . . ." N.Y. C.P.L.R. § 5001(b).  Absent a contrary

contractual provision, such interest is calculated at the statutory rate of "nine per centum per

annum." Id. § 5004.  NIU argues that its cause of action for breach of the Escrow Agreement

existed at least from the dates on which the 2010 and 2011 Com Nextel tax audits were resolved

and AT&T refused to sign Joint Release Notices.  Therefore, according to NIU, prejudgment

interest should be calculated from (i) October 24, 2018, with respect to the $35,462,965 reserved

for the 2010 Com Nextel tax audit and (ii) April 2, 2019, with respect to the $32,862,986

reserved for the 2011 Com Nextel tax audit, as each of the audits was finally resolved on such

dates.[21]

---

[21]    NIU submits that these dates are "conservative" and that the dates of AT&T's breach could arguably be
fixed at earlier dates, such as when amended tax returns were filed or when the required payment was made.  NIU
states that it has selected these dates (by which the 2010 and 2011 Com Nextel tax audits were indisputably final) in

In response, AT&T urges the Court to deny NIU's requested relief seeking a declaration that AT&T is in breach of Escrow Agreement, even if the Court ultimately finds that the funds at issue should be released. Without a finding of breach of contract, the provision of the New York C.P.L.R providing for statutory prejudgment interest is inapplicable. *See Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 450 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) (denying request for prejudgment interest where there was no finding of breach of contract). Lastly, AT&T requests that even if the Court awards prejudgment interest to NIU, the nine percent statutory rate should be adjusted to reflect the approximately five basis points per year paid to the Escrow Account by the Escrow Agent, "in order to avoid an inequitable windfall" to NIU. (Objection at 25 n.10.)

New York law governs the Escrow Agreement. New York's Civil Practice Law and Rules provide that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property . . . from the earliest ascertainable date the cause of action existed . . . ." N.Y. C.P.L.R. § 5001(a)-(b); *see also NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 258 (2011) (a party that prevails in a breach of contract action is entitled to obtain prejudgment interest from the earliest date on which its claim accrued). This entitlement to prejudgment interest includes instances in which sums are awarded from an escrow fund. *See Callen v. Fourteenth Church of Christ, Scientist N.Y.C.*, 112 F. App'x 79, 81 (2d Cir. 2004) ("[T]he fact that the money was being held in an escrow account does not prevent the district court's action from being interpreted as an award of a sum."); *Katzman v. Helen of*

---

order to avoid a dispute that could unnecessarily prolong these proceedings. (*See* Summary Judgment Motion at 26 n.15.) AT&T has not disputed these dates.

*Troy Texas Corp.*, 2013 WL 1496952, at *2 ("[E]ven where, as here, damages are awarded from an escrow fund, prejudgment interest is generally awarded.").

Here, the Court has found that AT&T breached the Escrow Agreement by refusing to execute Joint Release Notices to release excess Escrow Account funds after the final resolution of the 2010 and 2011 Com Nextel tax audits.  Accordingly, Section 5001 of the New York C.P.LR. requires that prejudgment interest run from the dates on which AT&T was in breach, here, the dates when the tax audits were indisputably finalized.  AT&T has not pointed to any contractual provision specifying an alternative rate of prejudgment interest or any waiver of NIU's right to prejudgment interest.  *See Katzman v. Helen of Troy Texas Corp.*, 2013 WL 1496952, at *6 (stating that a party may waive a right to statutory prejudgment interest but, to be valid, such waiver must be "clear and express").  Further, the Court is not persuaded that the statutory rate should be reduced by the interest earned by the Escrow Account.  In *Katzman*, the District Court similarly confronted whether to grant prejudgment interest on sums held in an interest-bearing escrow account and declined to reduce the mandatory statutory rate of nine percent per annum by the interest earned by the account.  (*See Katzman*, 2013 WL 1496952, at *3-4.).  So too here.  NIU is awarded prejudgment interest at nine percent per annum commencing on (i) October 24, 2018, with respect to the $35,462,965 reserved for the 2010 Com Nextel tax audit and (ii) April 2, 2019, with respect to the $32,862,986 reserved for the 2011 Com Nextel tax audit.

## F.     NIU and NII Are Entitled to Summary Judgment on Defendants' Counterclaims

By the Counterclaims, Defendants request that the Court enter an order: (i) declaring that (a) NIU is obligated to indemnify AT&T for the full amount of the "Tax Claims" under the Purchase Agreement, and (b) any dissolution of NII that does not account for the maximum potential amount of AT&T's Tax Claims is improper; (ii) enjoining NII from dissolving without

reserving the full amount of the current purported estimate for the total amount of AT&T's alleged Tax Claims; (iii) enjoining NII from releasing funds from the Escrow Account absent further order of the Court; (iv) enjoining NIU and NII from releasing funds from any distribution absent further order of this Court; and (v) awarding costs, expenses, and attorneys' fees to AT&T.

NIU and NII seek dismissal of the Counterclaims, arguing that (i) Defendants have not identified any "actual controversy" that could justify their request for a declaratory judgment and (ii) Defendants have no legal or factual basis for their requested equitable relief. With respect to AT&T's request for declaratory relief, NIU and NII argue that it is undisputed that Defendants have no current basis to assert either an underlying indemnification claim against NIU or a guarantee claim against NII under the Purchase Agreement, as NIU has not defaulted on any payment obligation or otherwise failed to perform its obligations under such agreement. (Reply at 18.) Accordingly, they assert that there is no actual controversy sufficient to invoke section 2201(a) of title 28 of the United States Code (the "Declaratory Judgment Act").

AT&T responds that there is a present controversy—the protection of AT&T's contingent contractual rights—which is sufficient to support its claims for relief under the Declaratory Judgment Act. In addition, AT&T urges this Court to issue the injunction sought by the Counterclaims in order to protect what it characterizes as its undisputed indemnification rights under the Agreements, as AT&T's "counterparty blatantly plans to circumvent" AT&T's "substantial contingent contractual rights" by dissolving without adequate reserves for AT&T's indemnification claims. (Objection at 3.) AT&T submits that an injunction is within this Court's equitable powers to protect AT&T's indemnification rights, "rights recognized by this Court as fundamental to the key asset sale in its supervision of NIU's reorganization." (Objection at 28.)

1.      **Defendants are Not Entitled to a Declaratory Judgment**

The Declaratory Judgment Act provides, in pertinent part, that "[i]n a case of actual

controversy within its jurisdiction . . . any court of the United States, upon the filing of an

appropriate pleading, may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought.  Any such

declaration shall have the force and effect of a final judgment or decree and shall be reviewable

as such."  28 U.S.C. § 2201(a).  Stated differently, declaratory relief is available as a remedy

only if an "actual controversy" exists between the parties and "[t]he determinative issue is

'whether the facts alleged, under all the circumstances, show that there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment.'" *Spirit Realty, L.P. v. GH & H Mableton,

LLC*, 227 F. Supp. 3d 291, 296-97 (S.D.N.Y. 2017) (quoting *Md. Cas. Co. v. Pac. Coal & Oil

Co.*, 312 U.S. 270, 273 (1941)).  "This standard is 'conceptually linked to the doctrine of

ripeness, requiring that the claim of threatened injury be of direct and immediate impact and the

injury sufficiently likely to occur, so as to render the issue appropriate for judicial review.'" *Id.*

at 297 (quoting *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 407 (S.D.N.Y. 2002)).[22]

"Generally, claims involving indemnification obligations are not justiciable until liability

has been imposed upon the party to be indemnified" and "federal courts have generally declined

to award declaratory relief" where there is no liability yet.  *U.S. Underwriters Ins. Co. v. Orion

Plumbing & Heating Corp.*, 321 F. Supp. 3d 313, 318-19 (E.D.N.Y. 2018) (citations omitted).

In order to determine whether Defendants' claims for a declaratory relief are ripe, the Court must

---

[22]    Even where an actual controversy exists, the court still has discretion under the Declaratory Judgment Act to
decline to exercise its jurisdiction.  *See Spirit Realty, L.P. v. GH & H Mableton, LLC*, 227 F. Supp. 3d at 297.  When
making this determination, courts in the Second Circuit consider, *inter alia*, "'(i) whether the judgment will serve a
useful purpose in clarifying or settling the legal issues involved; [and] (ii) whether a judgment would finalize the
controversy and offer relief from uncertainty. . . .'" *Id.* (quoting *N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d
Cir. 2006)).

consider whether Defendants have a current basis to assert either an underlying indemnification claim against NIU or a guarantee claim against NII.

> **a.** **AT&T Has No Current Basis to Demand Indemnification from NIU or to Enforce its Guarantee Against NII**

Defendants' Counterclaim for declaratory relief seeks a declaration that (i) NIU is obligated to indemnify AT&T for the full amount of the "Tax Claims" under the Purchase Agreement, and (ii) any dissolution of NII that does not account for the maximum potential amount of AT&T's Tax Claims is improper. (Counterclaims ¶ 64.). The claim for indemnification from NIU stems from Defendants' assertion that, "[p]ursuant to [the Purchase Agreement and the Escrow Agreement], the Purchase Agreement requires NIU to indemnify AT&T for the Full Amount of the Tax Claims." (Counterclaims ¶ 65.)

Section 11.4(a) of the Purchase Agreement requires that NIU "indemnify and hold harmless [AT&T] for, without duplication, all Taxes and Damages relating to (i) any Taxes imposed on the Entities that are attributable to any Pre-Closing Period . . . ." (Purchase Agreement § 11.4.). The Purchase Agreement obligates NIU to indemnify AT&T (as assignee of New Cingular) for *"Taxes and Damages"* under Purchase Agreement Section 11.4, not *"Tax Claims"* under Section 11.5. The term "Tax Claim," utilized by AT&T in its Counterclaim, is defined in Section 11.5 of the Purchase Agreement with reference to the process of administering issues for which AT&T and its affiliates "may reasonably be entitled to indemnification pursuant to Section 11.4 . . . ." (Purchase Agreement § 11.5(a).) As NIU correctly asserts, "Tax Claims" may at a future date become "Taxes and Damages" when audits are complete and Taxes imposed are payable pursuant to Section 11.4 of the Purchase Agreement, "but Defendants' contention that 'the Purchase Agreement requires NIU to indemnify AT&T for the full amount of the Tax

Claims' . . . is an inaccurate statement of NIU's obligations that is devoid of support in the text

of the Purchase Agreement." (Summary Judgment Motion at 28-29.)

Notwithstanding AT&T's assertion that the "total amount of open, indemnifiable Tax

Claims" is $502,922,689 (Counterclaims ¶ 55), AT&T has failed to specifically identify any

unpaid Taxes and Damages that would give rise to an indemnification claim under the Purchase

Agreement which have not already been reimbursed by NIU. Accordingly, the Court has not

been presented with an actual controversy sufficient to warrant the issuance of a declaratory

judgment with respect to Defendants' claim for indemnification from NIU.

As Defendants have failed to demonstrate that NIU owes and has failed to pay any

indemnifiable obligations under Section 11.4 of the Purchase Agreement, Defendants' request

for a declaratory judgment to enforce guarantee rights against NII similarly fails. Specifically,

Section 12.13 of the Purchase Agreement provides that, if NIU:

> defaults for any reason whatsoever on any [ ] payment obligation
> or fails to perform such performance obligation when and to the
> extent that any of the same will become due and payable, then
> [NII] will unconditionally pay or cause to be paid such payment
> obligation or perform or cause to be performed such performance
> obligation immediately upon notice from Purchaser specifying the
> default so that the same benefits will be conferred on Purchaser as
> would have been received if such payment or performance
> obligations had been duly performed and satisfied . . . .

(Purchase Agreement § 12.13.). Here, none of the conditions precedent to NII's guarantee

obligations has occurred. NIU has not defaulted on any payment obligation or otherwise failed

to perform any other obligation which would trigger an enforceable guarantee right against NII.

As Defendants have not established a basis to assert either an indemnification claim against

NIU or a guarantee claim against NII, their requests for a declaratory judgment are not ripe for

resolution at this time. Simply put, there is no actual controversy sufficient to warrant the

issuance of a declaratory judgment sought by the Counterclaims. The Summary Judgment

Motion is granted with respect to the dismissal of the Counterclaims for declaratory relief against NII and NIU.

### 2.    Defendants Are Not Entitled to Equitable Relief

By the Counterclaims, Defendants also request equitable relief in the form of an order (a) enjoining NII from dissolving without reserving the full amount of the current purported estimate for the total amount of AT&T's alleged Tax Claims; (b) enjoining NII from releasing funds from the Escrow Account absent further order of the Court; and (c) enjoining NIU and NII from releasing funds from any distribution absent further order of this Court. (Counterclaims ¶¶ 69-71.). Defendants assert that, "[i]f NII liquidates without reserving sufficient funds to cover AT&T's tax claims . . . AT&T will be 'left without recourse' because 'the Escrow Account [will be] already empty.'" (Objection at 29 (citing *Am. Sec. LLC*, 2013 WL 5718477, at *11).)

Defendants' speculative concern that a dissolution of NII may impact the payment of a hypothetical future contractual claim assertable by AT&T for money damages is insufficient to support their request for injunctive relief. "It is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (citations omitted); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). Defendants do not allege sufficient facts supporting a claim of irreparable harm warranting the imposition of equitable relief. As stated, *supra*, because no "Taxes and Damages" are currently due from NIU to AT&T, a fact that neither party disputes, it follows that no indemnification claim or guarantee claim is extant and unpaid.

Finally, the Supreme Court has held that federal courts have "no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (ruling on district courts' equitable jurisdiction under Fed. R. Civ. P. 65). Although here the Defendants request the entry of a permanent injunction and not a preliminary injunction, the Supreme Court's reasoning is nonetheless applicable. The Court declines to entertain the Defendants' request for injunctive relief relating to hypothetical claims for potential future liabilities that may arise under the Agreements. The Court grants the Summary Judgment Motion with respect to the dismissal of the Counterclaims for equitable relief against NII and NIU.

## Conclusion

For all of the foregoing reasons, the Summary Judgment Motion is granted. NIU is entitled to the immediate disbursement of $65,800,288 held in the Escrow Agreement administered by Citibank N.A., plus prejudgment interest at nine percent per annum (i) commencing on October 24, 2018 with respect to the Escrow Account funds reserved for the 2010 Com Nextel tax audit and (ii) commencing on April 2, 2019 with respect to the Escrow Account funds reserved for the 2011 Com Nextel tax audit. The Counterclaims are dismissed. The parties are directed to submit an order consistent with this decision.

Dated: October 14, 2020
      New York, New York


                           /S/ Shelley C. Chapman
                           THE HONORABLE SHELLEY C. CHAPMAN